# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | **CV 18-01844 GW(KSx)**<br>CV 18-02693 GW (KSx) | Date | August 2, 2018 |
|---|---|---|---|
| Title | *BlackBerry Limited v. Facebook, Inc. et al*<br>*BlackBerry Limited v. Snap Inc.* | | |

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Katie Thibodeaux | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| James R. Asperger | Heidi L. Keefe - Facebook |
| Edward R. McGah, Jr. | Yar R. Chaikovsky - Snap, Inc. |
| Jordan R. Jaffe | Anthony J. Tartaglio |
| Ray R. Zado | Chad J. Peterman |

**PROCEEDINGS:**       **DEFENDANT'S MOTION TO DISMISS [31];**

**SCHEDULING CONFERENCE**

The Court's Tentative Ruling is circulated and attached hereto. Court hears oral argument. For reasons stated on the record, Defendant's Motion is TAKEN UNDER SUBMISSION, and continued to August 23, 2018 at 9:00 a.m. Court to issue ruling.

The Scheduling Conference is continued to August 23, 2018 at 9:00 a.m.

|  | : | 35 |
|---|---|---|
| Initials of Preparer | JG | |

**_BlackBerry Limited v. Facebook, Inc. et al_**; Case No. 2:18-cv-01844-GW-(KSx)
**_BlackBerry Limited v. Snap Inc._**; Case No. 2:18-cv-02693-GW-(KSx)
Tentative Rulings on: (1) Facebook Defendants' Motion to Dismiss , and (2) Defendant Snap's
Motion to Dismiss

## I. Background

Plaintiff BlackBerry Limited ("BlackBerry") filed suit against Facebook, Inc., WhatsApp, Inc., Instagram, Inc.,[1] and Instagram, LLC (collectively, "Facebook Defendants") on March 6, 2018, alleging infringement of nine patents.  *BlackBerry Limited v. Facebook, Inc. et al*, Case No. 2:18-cv-01844-GW-(KSx) ("*Facebook Case*"), Docket No. 1; *see also* Docket No. 15 (Facebook First Amended Complaint).  Specifically, BlackBerry asserts that the Facebook Defendants infringe U.S. Patent Nos. 8,301,713 ("the '713 Patent"); 8,326,327 ("the '327 Patent"); 8,825,084 ("the '084 Patent"); 8,209,634 ("the '634 Patent"); 8,296,351 ("the '351 Patent"); 8,676,929 ("the '929 Patent"); 9,349,120 ("the '120 Patent"); 8,429,236 ("the '236 Patent") and 8,677,250 ("the '250 Patent").

A month later on April 3, 2018, BlackBerry separately filed suit against Snap Inc., alleging infringement of six of the same patents.[2]  *BlackBerry Limited v. Snap Inc.*, Case No. 2:18-cv-02693-GW-(KSx) ("*Snap Case*"), Docket No. 1.  Snap and Facebook Defendants (collectively, "Defendants") each filed a motion to dismiss in their respective cases on June 7, 2018.  *Snap Case*, Docket No. 24 ("Snap Motion"); *Facebook Case*, Docket No. 31 (public), Docket No. 36 (sealed) ("Facebook Motion").[3]

The Snap Motion moves for dismissal of all six of BlackBerry's causes of action on the basis that each of the patents asserted against it is directed to patent-ineligible subject matter. *See generally*, Snap Motion.  In the alternative, the Snap Motion includes a request for dismissal of 1) the Complaint's claims for willful infringement and/or enhanced damages and; 2) its claims of pre-suit indirect infringement of four of the asserted patents.  *See id.* at 25.  The Facebook

---

[1] In Facebook Defendants' Motion to Dismiss, they state, "Instagram, Inc. is no longer an active corporation, but joins this motion if necessary."  *See Facebook Case,* Docket No. 36 at 1 n.2.

[2] BlackBerry does not assert the '120 Patent, '236 Patent, or '250 Patent against Snap.

[3] In their motion to dismiss filings, in some instances, Defendants dub the asserted patents with different nicknames. *Compare* Snap Motion at 16 (referring to the '634 Patent as the "Sender Count Patent") *with* Consolidated Opposition 10 (referring to the '634 Patent as the "Icon Notification Patent").  For simplicity, the Court refers to the asserted patents simply by their three-digit abbreviations.

Motion moves for dismissal of four out of nine of BlackBerry's causes of action, arguing that the '351 Patent, '929 Patent, '634 Patent, and '120 Patent are directed to patent-ineligible subject matter. *See generally*, Facebook Motion. The Facebook Motion also includes a request that the Court dismiss BlackBerry's willful infringement and pre-suit indirect infringement allegations as to all of the asserted patents. *See id.* at 25.

BlackBerry filed a Consolidated Opposition that responds to both the Facebook and the Snap Motions and specifically addresses the "common patents challenged by both Facebook and Snap: the '634 Patent, the '351 Patent, and the '929 Patent." *Facebook Case*, Docket No. 47; *Snap Case*, Docket No. 38 ("Consolidated Opposition"). The Consolidated Opposition also addresses all Defendants' arguments regarding whether BlackBerry has adequately plead willful and pre-suit indirect infringement. *See* Consolidated Opposition at 20-21. BlackBerry also filed two separate oppositions addressing issues specific to the separate Facebook Motion and Snap Motion. *Facebook Case*, Docket No. 48-1 (public), Docket No. 55 (sealed) ("Opposition to Facebook"); *Snap Case*, Docket No. 39 ("Opposition to Snap"). Defendants have filed replies. *Facebook Case*, Docket No. 57-2 (public), Docket No. 61 (sealed) ("Facebook Reply"); *Snap Case*, Docket No. 41 ("Snap Reply"). Defendants also filed Notices of Supplemental Authority on July 23, 2018 attaching a copy of the Federal Circuit's decision in *Interval Licensing LLC v. AOL, Inc.*, No. 2016-2502, 2018 WL 3485608 (Fed. Cir. July 20, 2018). *Facebook Case*, Docket No. 63; *Snap Case*, Docket No. 42.

For the reasons stated in this Order, the Court would **GRANT** Snap's Motion with prejudice as to Claims 1, 5, and 9 of the '713 Patent. The Court would **GRANT** both Defendants' Motions as to BlackBerry's willful infringement and indirect infringement allegations, with leave for BlackBerry to amend its allegations regarding indirect infringement. The Court would otherwise **DENY** Defendants' Motions without prejudice.

## II. Legal Standard

### A.  Motion to Dismiss (Rule 12(b)(6))

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal

under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.").

In deciding a Rule 12(b)(6) motion, a court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). The court must construe the complaint in the light most favorable to the plaintiff, accept all allegations of material fact as true, and draw all reasonable inferences from well-pleaded factual allegations. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). The court is not required to accept as true legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where a plaintiff facing a Rule 12(b)(6) motion has pleaded "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the motion should be denied. *Id.*; *Sylvia Landfield Trust v. City of Los Angeles*, 729 F.3d 1189, 1191 (9th Cir. 2013). But if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] . . . the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (citations omitted).

B. Patent Eligibility under 35 U.S.C. § 101

An invention or a discovery is patentable if it is a "new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. "In choosing such expansive terms . . . Congress plainly contemplated that the patent laws would be given wide scope." *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980). Still, the Supreme Court has identified exceptions to this wide scope to "distinguish patents that claim the building blocks of human ingenuity, which are ineligible for patent protection, from those that integrate the building blocks into something more." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2350 (2014) (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 89 (2012)) (internal quotations omitted). These exceptions to patent protection are "laws of nature, natural phenomena, and abstract ideas." *Diamond v. Diehr*, 450 U.S. 175, 185 (1981). While the boundaries of the judicial exceptions remain subject to further development, the Supreme Court has clearly delineated the policy underlying those exceptions: avoiding patents that "too broadly preempt the use of a natural law [or abstract idea]." *Mayo*, 132 S. Ct. at

3

1294.  Thus, patent law should "not inhibit further discovery by improperly tying up the future use of laws of nature [or abstract ideas]."  *Id*. at 1301.

In *Mayo*, the Supreme Court "set forth a framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts."  *Alice*, 134 S. Ct. at 2355.  The first step is to ask "whether the claims at issue are directed to one of those patent-ineligible concepts."  *Id.*  If not, the claims fall within the scope of § 101 and are patent-eligible.  If the claims are directed to one of the exceptions, the next step is to search for an "inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law itself."  *Mayo*, 566 U.S. at 72-73.  In doing so, a court must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application."  *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 566 U.S. at 78-79).  If, in considering the claim elements individually and as an ordered combination, they merely recite well-understood, routine, and conventional steps, they will not constitute an inventive concept for patent eligibility purposes.  *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).  "Whether the claim elements or the claimed combination are well-understood, routine, conventional is a question of fact."  *Id.*; *see also Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368-69 (Fed. Cir. 2018) ("Like indefiniteness, enablement, or obviousness, whether a claim recites patent eligible subject matter is a question of law which may contain underlying facts.").

## III.  Discussion

Although the asserted patents are generally directed to the field of distributing content on electronic devices, the specific claims of each patent are different and not all of the asserted patents are related.  Some of the asserted patents will be introduced and analyzed in more detail in the sections that follow and specifically in the context of Defendants' Motions.

### A. The '634 Patent

#### 1. Background of the Patent and the Asserted Claims

Both the Snap and Facebook Defendants argue that the '634 Patent is invalid under 35 U.S.C. § 101.  *See* Facebook Motion at 4-5, 12-14, 17-19, 21-22; Snap Motion at 16-19.  The '634 Patent issued on June 26, 2012, and is titled "Previewing a New Event on a Small Screen Device."

BlackBerry alleges that Snap infringes "at least claims 1, 7, and 13," and the Facebook Defendants infringe "at least claims 1, 5-7, 11-13, 17, and 18" of the '634 Patent. *Facebook Case*, Docket 15 ¶ 144; *Snap Case*, Docket 1 ¶ 160. Defendants refer to Claim 1 of the '634 Patent to support their Motions. *See, e.g.*, Facebook Motion at 4-5, 18; Snap Motion at 16-19. Claim 1 of the '634 Patent recites:

> 1. A method of providing notifications of unread messages on a wireless communication device, comprising:
> > displaying at least one icon relating to electronic messaging on a graphical user interface of the wireless communication device;
> > receiving a plurality of electronic messages on the wireless communication device, the plurality of electronic messages including messages from a plurality of different messaging correspondents; and
> > in response to receiving at least one of the plurality of electronic messages, visually modifying at least one displayed icon relating to electronic messaging to include a numeric character representing a count of the plurality of different messaging correspondents for which one or more of the electronic messages have been received and remain unread.

'634 Patent, Claim 1. Claims 7 and 13 are independent apparatus claims that similarly refer to displaying an icon and modifying the icon to include a numeric character representing the number of messaging correspondents who have sent unread messages. The dependent claims of the '634 Patent claim additional information that can be displayed on the graphical user interface, including, for example, visually modifying the interface to include "an identifier of the correspondent from whom at least one of the plurality of messages was received" ('634 Patent at Claims 5, 17; *see also id.* at Claim 11) and "at least one preview of content associated with at least one of the received electronic messages" ('634 Patent at Claim 6; *see also id.* at Claims 12, 18).

### 2. *Mayo/Alice* Step One

Defendants argue that the claims of the '634 Patent are directed to the abstract concept of collecting and displaying information about unread messages. *See, e.g.*, Facebook Reply at 11. The Facebook Defendants state, "[m]erely displaying a number on an icon does not improve the functioning of a computer. Nothing changes for the user beyond being presented with unread message information on an icon." *Id.* Through their arguments, Defendants seek to downplay that the claims relate not only to compiling and displaying a particular piece of information, but

doing so for a very particular type of data in a very particular way: through the use of visually modifying a graphical icon with a numeric character to identify the number of correspondents for unread messages.  As the Federal Circuit noted in *Core Wireless*, "[a]lthough the generic idea of summarizing information certainly existed prior to the invention, these claims are directed to a particular manner of summarizing and presenting information in electronic devices."  *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1362 (Fed. Cir. 2018).

Indeed, "the specification confirms that these claims disclose an improved user interface for electronic devices, particularly those with small screens."  *Core Wireless*, 880 F.3d at 1363.  The '634 Patent explains that wireless mobile devices[4] present "a number of challenges to the designer . . . Wireless devices are usually small relative to less portable computing devices."  '634 Patent, 1:33-37.  The '634 Patent asserts that when a mobile device user:

> is notified of a new event such as a new IM message, the user is required to check each of their IM service applications separately, via their respective activation icons, to determine which IM service is responsible for the new event.  Checking each service is inconvenient.  Moreover, there is a demand to have information made available to a user quicker than previously available in order to optimize the control of the wireless device.

*Id.* at 1:60-67.  At this stage in the litigation, these statements in the patent specification support the conclusion that the '634 Patent claims are drawn to a particular technological improvement in mobile devices rather than an abstract idea.  *See Core Wireless*, 880 F.3d at 1363.  Indeed, the patent specification's statements are contrary to Defendants' arguments that "[n]othing changes for the user" through the display of this information.  *See, e.g.* Facebook Reply at 11.  The patent specification suggests that the display of this additional information gives the user more information upfront because the user no longer has to open various messaging services to learn who has sent a new message, and on what messaging platform.  "This conclusion is particularly proper on a motion to dismiss under Rule 12(b)(6), where all factual inferences drawn from the specification must be weighed in favor of . . . the non-moving party."  *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1261-62 (Fed. Cir. 2017) (concluding at motion to dismiss stage

---

[4] Facebook Defendants assert that the claimed "wireless communication device" in the '634 Patent "in theory, could encompass a giant wireless display screen on the Goodyear Blimp or a wireless electronic billboard."  Facebook Reply at 13.  It is not clear if BlackBerry disputes this assertion, but to the extent BlackBerry does, the parties' dispute would support the conclusion that the Defendants' § 101 dispute for the '634 Patent might be better left for determination after claim construction.  *Cf. Interval Licensing*, 2018 WL 3485608, at *8 (Patent eligibility dispute addressed after claim construction).

that claims were not directed to an abstract idea).  Like the claims at issue in *Core Wireless*, the '634 Patent claims and specification suggest that the claimed invention is drawn to an improved user interface for electronic devices.  *Core Wireless*, 880 F.3d at 1363.

### 3. *Mayo/Alice* Step Two

Even assuming the '634 Patent claims are drawn to an abstract idea, fact questions would also preclude dismissal at this stage.  Despite the now-ubiquitous nature of using numeric characters to update graphical icons on small electronic devices, considering the invention in the light most favorable to BlackBerry as is required at the pleading stage, and particularly considering the invention through the lens of a person of ordinary skill in the art at the time it was filed in 2003, it would be premature to conclude as a matter of law that the claimed steps taken individually or as an ordered combination were well-understood, routine, and conventional, including the step of updating a graphic icon on a mobile device with a numeric character in response to compiling a specific type of data.  *Berkheimer*, 881 F.3d at 1370 (finding certain dependent claims reciting steps such as "storing a reconciled object structure in the archive without substantial redundancy" presented fact questions precluding a summary judgment determination).

In its reply brief, Snap argues at both steps one and two of the *Alice* framework that "appending a numeric character to a graphical icon is a conventional way to implement the idea of displaying a sender count to a user."  Snap Reply at 14-16.  Snap submits that at least two patent applications cited "within the intrinsic record" of the '634 Patent reflect the idea of using numeric characters to modify graphical icons.  Snap Reply at 16, 16 n.9.  Without further information regarding these two prior art references or an opportunity for BlackBerry to respond to Snap's arguments, the Court declines to rely on Snap's assertions and these references alone to conclude that the '634 Patent claims are drawn to "well-known," "routine," and "conventional" elements.[5]  As Snap observes, "[w]hether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art."  Snap Reply at 16 n.9 (quoting *Berkheimer*, 881 F.3d at 1369); *see also Berkheimer*, 881 F.3d at 1369 ("The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional.").

---

[5] Of course, the Court finds these prior art references are certainly relevant at least in the context of invalidity challenges under 35 U.S.C. §§ 102, 103 with respect to, for example, Claim 1 of the '634 Patent.

For these reasons, Defendants' Motions would be **DENIED** without prejudice with respect to the '634 Patent.

B. The '351 and '929 Patents

*1. Background of the Patents and the Asserted Claims*

Both the Snap and Facebook Defendants also argue that the '351 and '929 Patents are patent ineligible. Facebook Motion at 3-4, 7-12, 16-19, 21-22; Snap Motion at 19-23. The '929 Patent is a continuation of the '351 Patent and thus both share substantially the same specification. The '351 and '929 Patents also share the same title, "System and Method for Pushing Information to a Mobile Device." The '351 Patent issued on October 23, 2012, and the '929 Patent issued on March 18, 2014.

BlackBerry alleges that Snap infringes "at least claims 1 and 14" of the '351 Patent and "at least claims 1 and 9" of the '929 Patent. *Snap Case*, Docket No. 1 ¶¶ 189, 208. BlackBerry alleges that Facebook Defendants infringe "at least claims 1 and 14" of the '351 Patent and "at least claims 1, 2, 9 and 10" of the '929 Patent. *Facebook Case*, Docket No. 15 ¶¶ 312, 331. Defendants refer to Claim 1 of the '351 Patent and Claims 1 and 9 of the '929 Patent to support their motions. *See* Facebook Motion at 3-4, 7-12; Snap Motion at 19-23. Claim 1 of the '351 Patent recites:

> 1. A system for pushing information to a mobile device, comprising:
>> a proxy content server that receives information over a computer network from an information source and stores the information to one of a plurality of channels based on pre-defined information categories, wherein the plurality of channels comprise memory locations included in at least one of the proxy content server or a proxy content server database;
>> the proxy content server to receive a feedback signal over a wireless network that indicates a position of the mobile device, and to use the feedback signal to select a channel for transmission of the information from the selected channel over the wireless network to the mobile device, wherein the information comprises at least one of static advertising information, dynamic advertising information, default advertising information, or content information, and wherein a combination of the static advertising information with one of the dynamic or default advertising information comprises an advertisement or an information bulletin.

'351 Patent, Claim 1. Claim 14 of the '351 Patent is the only other independent claim of the '351 Patent and also recites "[a] system for pushing information to a mobile device." Claim 14

includes the additional requirement that the proxy content server select a channel in response to a "triggering event."  Dependent claims of the '351 Patent claim further details, for instance, about the computer network and claimed information as well as additional details about the functionality of the components within the claimed systems.  *See, e.g.*, '351 Patent, Claim 21 ("The system of Claim 14, further comprising: the proxy content server database coupled to the proxy content server that stores data relating to the mobile device, wherein the data is also used by the proxy content server to select the channel for transmission over the wireless network to the mobile device."); *see also id.* at Claim 9.

Claim 1 of the '929 Patent recites:

> 1. A method for pushing information to a mobile device, the method comprising:
>     detecting a triggering event comprising a time triggering event;
>     determining, by a server, information relevant to the detected triggering event from among information stored in one of a plurality of memory location channels, wherein the information is stored in the one of the plurality of memory location channels based on a category of the information matching a pre-defined category of the one of the plurality of memory location channels;
>     when the information relevant to the detected triggering event comprises content information, inserting to the content information, by the server, a meta tag for one or more advertisements to be displayed with the content information, wherein the meta tag identifies the one or more advertisements and advertisement display requirements, and wherein the one or more advertisements are selected based on the detected triggering event; and
>     transmitting the content information that includes the meta tag to the mobile device.

'929 Patent, Claim 1.  Claim 9 of the '929 Patent is a system claim that similarly refers to identifying information in response to a triggering event and inserting a meta tag for advertisements to be displayed with content information.  The dependent claims of the '929 Patent provide specific limitations, for example, relating to the timing and specifics of the triggering event and the insertion of the meta tag.  *See, e.g.*, '929 Patent, Claim 14 ("The server of claim 9, wherein the meta tag includes at least a name of each of the one or more advertisements and a cross reference value for a user on the mobile device to connect with a source of the one or more advertisements."); *see also id.* at Claim 6.

### 2. *Mayo/Alice*

Defendants argue that the '351 and '929 Patents are drawn to "the abstract idea of

targeted advertising for content delivered to mobile phones." Snap Reply at 17. BlackBerry disputes this. For instance, BlackBerry characterizes the '351 Patent as related to "a new solution for *how* content and advertising information are efficiently maintained (at a proxy content server), packaged (using default, static, and dynamic information) and sent to a mobile device after a feedback signal indicating location." Consolidated Opposition at 16-17. BlackBerry argues that the patents are directed to a specific "improved architecture" provided by a "proxy content server" that "gathers those information sources, stores the information to particular channels, and selects a particular channel for transmission to a mobile device based on specific feedback received from the mobile device." *Id.* at 14. Defendants challenge BlackBerry's emphasis on the proxy content server, arguing that there is no evidence that it is "anything other than a generic prior art network component." Facebook Reply at 6; *see also* Snap Reply at 17 ("Despite BlackBerry's suggestions to the contrary, the claimed 'proxy content server' of the '351 Patent is nothing more than a computer server, one of the basic elements of any computer network.").

Even assuming without deciding that the claims of the '929 and '351 Patent are drawn to an abstract idea, factual issues preclude dismissal. Considering the claims and allegations in the Complaint and First Amended Complaint in the light most favorable to BlackBerry, the parties have submitted a factual dispute regarding whether the "proxy content server" and its specific architecture as recited in the claims is a well-understood, routine, and/or conventional computer component. Courts have found, both in the context of step one and step two of the patent eligibility framework, that claims directed to a specific architecture for organizing data or computer components may be patent eligible. *Visual Memory*, 867 F.3d at 1261-62; *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016); *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). Here, as BlackBerry observes, the claims refer to organizing advertising information into a "plurality of memory location channels" based on pre-defined categories. Consolidated Opposition at 15-16.

Snap argues that language in the patent specification conclusively shows that the proxy content server is a known, conventional computer component. *See* Snap Reply at 17 (citing '351 Patent at 2:57-59). However, Snap's cited portions of the specification do not state that sorting advertising information into "memory location channels" based on pre-defined categories and then transmitting that information to devices based on particular signals/events, as recited by the

claims, was well-understood, routine, or conventional activity for a proxy content server before the invention was filed. Without more information, the Court at this stage cannot conclude as a matter of law that the claims are drawn to patent-ineligible subject matter.[6]

Defendants' Motions would be **DENIED** without prejudice as to the '351 and '929 Patents.

C. The '713 Patent

*1. Background of the Patent and the Asserted Claims*

Only Snap moves for a determination that the '713 Patent is patent ineligible.[7] Snap Motion at 3-8. The '713 Patent issued October 30, 2012, and is titled "Handheld Electronic Device and Associated Method Providing Time Data in a Messaging Environment."

BlackBerry alleges that Snap infringes "at least claims 1, 5, and 9 of the '713 Patent." *Snap Case*, Dkt. 1 ¶ 132. Snap refers to Claim 1 of the '713 Patent to support its Motion. *See, e.g.*, Snap Motion at 3. Claim 1 of the '713 Patent recites:

1. A method of operating an electronic device, the method comprising:
        outputting an electronic conversation comprising a plurality of indications,
                each indication being representative of at least a portion of a
                corresponding messaging communication between the electronic
                device and a second electronic device;
        identifying a first messaging communication between the electronic device
                and the second electronic device occurring at a first time, the first
                messaging communication having a corresponding first indication

---

[6] If the proxy content server is a routine, conventional, and well-understood element, legal authority would suggest that at least the independent claims of the '351 Patent are drawn to patent-ineligible concepts. *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1369 (Fed. Cir. 2015) (finding claims drawn to providing tailored web pages patent ineligible and observing at step one, "[t]here is no dispute that newspaper inserts had often been tailored based on information known about the customer − for example, a newspaper might advertise based on the customer's location."); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) (finding claims regarding recording digital images, classifying them, and transmitting them to a server patent-ineligible and observing at step one that the claims are drawn to the "concept of classifying an image and storing the image based on its classification."); *Return Mail, Inc. v. United States Postal Serv.*, 868 F.3d 1350, 1368 (Fed. Cir. 2017) ("Encoding and decoding mail recipient information − including whether the sender wants a corrected address − are processes that can, and have been, performed in the human mind."). The Court declines to make a determination on the issue on the current record. *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012) ("[I]t will ordinarily be desirable − and often necessary − to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter."); *Berkheimer*, 881 F.3d at 1369 (declining to dismiss certain dependent claims at issue to the extent they presented a factual question as to whether they were drawn to improvements to computer functionality).

[7] Although Facebook Defendants do not raise a patent eligibility argument with respect to the '713 Patent in their Motion, the Facebook Defendants preserve their right to raise a § 101 challenge against the remaining asserted patents, stating, "Defendants will address the numerous validity issues − including issues arising under Sections 101, 102, 103, 112 − of the remaining patents at the appropriate stage." Facebook Motion at 1 n.3.

> representative of at least a portion of the first messaging communication and which is one of the plurality of indications;
> determining that a predetermined duration of time has elapsed since the first time without additional communication between the electronic device and the second electronic device during that duration of time;
> detecting an input to the electronic device following said identifying and determining steps, said input occurring at a second time; and
> responsive to said detecting an input, outputting in the electronic conversation, a time stamp representative of the second time.

'713 Patent, Claim 1.  Claims 5 and 9, the two other independent claims of the '713 Patent, are a method claim and a device claim, respectively.  Both are similarly drawn to determining whether a predetermined duration of time has elapsed in messaging communications and outputting a time stamp for the second, later time in the communications.  The dependent claims of the '713 Patent include claims, for example, adding the limitation that "the input is a resumption message." *See, e.g.*, '713 Patent at Claims 2, 5, and 10.  Other dependent claims further describe the placement of the time stamp on the display of the electronic device.  *See, e.g., id.* at Claim 4 ("The method of claim 3, wherein the time stamp is disposed between the first indication and the second indication."); *see also id.* at Claims 8, 12.

### 2. <u>Mayo/Alice</u> Step One

Snap argues that the '713 Patent is drawn to the abstract idea of "time stamping, an utterly unremarkable idea that has been practiced manually for centuries."  Snap Motion at 4. Snap lists various examples of manual time stamping, including "courts or other agencies stamping the date and time on documents that are received."  *Id.*  Snap argues that the "concept of time stamping communications after a predetermined duration" is also well-known.  *Id.*  Snap further notes that "[w]hile the specification of the Time Stamp Patent describes the purported invention as being useful for saving space on devices with small screens, the claims are not so limited."  *Id.* at 5 (citing '713 Patent at 3:2-8, 2:24-27).  Snap also notes that the '713 Patent has no limitations on what could be considered the claimed "predetermined duration of time."  *Id.*

As Snap observes, the Complaint itself acknowledges that the concept of using time stamps for electronic messaging was already well-known.  *Snap Case*, Dkt. 1 ¶ 127 ("At the time of the '713 Patent, timestamps were typically displayed for every message in a conversation or not at all.").  BlackBerry instead responds to Snap's § 101 position by asserting that the '713 Patent includes a "key concept":

> making a specific improvement to *the way that time stamp information is displayed* in an electronic conversation on a computer, specifically *by displaying a timestamp when the user is most likely to be interested in one*, rather than never displaying a timestamp (which under-informs users) and displaying a timestamp with each message (which unduly takes up valuable real estate and annoys users).

Opposition to Snap at 2 (emphasis added).

Although BlackBerry places emphasis on the purported invention's selective *display* of the timestamp, at least Claim 1 of the '713 Patent does not provide any information about how or where a timestamp is actually displayed on the device.[8]  To the extent BlackBerry would take the position that a claim's sole recitation that a component must be displayed is sufficient to confer patentability even when there is no basis to find that the display confers a technological improvement, this is contradicted by the caselaw.  *See, e.g.*, *Interval Licensing*, 2018 WL 3485608, at *2.  Indeed, the '713 Patent specification shows that, at least as to the independent claims, there is no required format for displaying the time stamp.  '713 Patent at 7:34-37 ("[T]he appearances of the various time stamps herein [are] completely exemplary, and . . . the time stamps could be provided in any format without departing from the concept of the invention.").

The fact that determining whether to set a timestamp is assigned a rule (of setting a "predetermined duration of time") also fails to save the claims from being abstract.  Again, there is nothing that ties the rule to a technological improvement.  The language of Claim 1 is broad enough that it would cover embodiments that may not actually improve when timestamp information is displayed.  In its Opposition, BlackBerry effectively concedes that there are no limits on what constitutes a "predetermined duration of time."  *See* Opposition to Snap at 2 (observing Snap's position that a predetermined duration of time "could be set at any duration of time" and arguing that the fact that there is a predetermined time duration in the first place is the key rather than directly challenging Snap's characterization); *see also* '713 Patent at 5:51-53.  Thus, the '713 Patent could cover predetermined time durations set to both miniscule and enormous lapses in time.  BlackBerry provides no basis as to how these embodiments would provide a technological improvement in the way time stamp information is displayed on a mobile device.  And as the Federal Circuit has previously found, the use of a rule alone does not

---

[8] In response to Snap's observation of this point, BlackBerry argues, "[a]s described in the Common Brief, n. 4, the eligibility determination freely allows for reasonable flexibility within the parameters set by the invention." Opposition to Snap at 4. Like Snap, the Court is not sure what this means. *See* Snap Reply at 9 ("It is unclear what BlackBerry is even trying to articulate here.").

necessarily make a set of claims non-abstract.[9]  *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016) ("*Symantec*") (rejecting patentee's argument at step two that claims were patent eligible because they applied business rules to email and finding claims drawn to patent-ineligible concept of screening emails); *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1095 (Fed. Cir. 2016) ("Although FairWarning's claims require the use of a computer, it is this incorporation of a computer, *not* the claimed rule, that purportedly "improve[s] [the] existing technological process" by allowing the automation of further tasks.") *cf. McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (Federal Circuit finding on Rule 12(c) motion that claims were not drawn to patent-ineligible concept where they relied on a first set of rules to automate lip synchronization, where there was no evidence that prior art animators were employing the same type of rules required by the claims and stating, "[t]his is unlike *Flook*, *Bilski*, and *Alice*, where the claimed computer-automated process and the prior method were carried out in the same way.").

### 3. <u>Mayo/Alice</u> Step Two

In arguing the claims are patent eligible under *Alice* step two, BlackBerry asserts that "the use of a selective timing mechanism was an inventive concept."  Opposition to Snap at 4.  However, as Snap observes, the "predetermined duration of time" aspect of the claims is a portion of the abstract idea itself.  Snap Reply at 8-9.  In the second step of the § 101 analysis, courts must determine what else there is *besides* the abstract concept itself that might confer patentability.  *See, e.g.*, *Symantec*, 838 F.3d at 1318 ("But the inquiry is not whether conventional computers already apply, for example, well-known business concepts like hedging or intermediated settlement.  Rather, we determine whether 'each step does *no more than require* a generic computer to perform generic computer functions.'" (emphasis in original)) (quoting *Alice*, 134 S.Ct. at 2359).  BlackBerry essentially fails to refute Snap's assertion that the claims only include conventional elements beyond the abstract idea itself.  Opposition to Snap at 4 ("Snap's argument that the claims include conventional elements such as a display, memory, and processor . . . have no bearing on the Section 101 analysis.").  The Court's independent review of Claim 1 of the '713 Patent shows that it is drawn to generic computer elements that fail to transform the abstract idea.  Indeed, beyond referring the two claimed electronic devices, Claim

---

[9] BlackBerry itself appears to recognize this point.  *See* Opposition to Facebook at 2-3 (In the context of addressing a different asserted patent stating, "[s]imply applying a rule to a set of records is an abstract concept, whether completed by human or machine").

1 does not actually recite any specific computer hardware components.

### 4. Representative Claims

In two conclusory sentences, the Snap Motion argues that Claim 1 is representative of all of the '713 Patent claims for purposes of making a patent ineligibility determination.   Snap Motion at 7-8.  BlackBerry disputes this position as to the dependent claims of the '713 Patent. Opposition to Snap at 3 ("As to the nine dependent claims, Snap provides only the conclusory assertion that these nine claims are 'directed to basic communication concepts and the location of the time stamp, which are all conventional.'").   Although in its Consolidated Opposition BlackBerry makes the sweeping assertion that it "does not concede that any claims are representative" (Consolidated Opposition at 9), BlackBerry does not specifically raise a dispute regarding whether Claim 1 of the '713 Patent is representative of the '713 Patent's other independent claims, Claims 5 and 9.  Because BlackBerry does not clearly dispute that Claim 1 of the '713 Patent is representative of Claims 5 and 9, and upon reviewing the language of those claims, the Court finds that it is appropriate to designate Claim 1 as representative of Claims 5 and 9.  *Berkheimer*, 881 F.3d at 1365 ("Courts may treat a claim as representative in certain situations, such as if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim or if the parties agree to treat a claim as representative.").  The Court, however, agrees that Snap has failed to meet its burden of proving patent ineligibility of the dependent claims of the '713 Patent.  The dependent claims include references to "resumption messages" and other concepts that have not been sufficiently addressed by Snap and which have been raised by BlackBerry, making it inappropriate to extend the patent ineligibility determination to those claims.

For these reasons, the Snap Motion would be **GRANTED** with prejudice with respect to Claims 1, 5, and 9 of the '713 Patent.  It would be **DENIED** without prejudice as to the remaining claims of the '713 Patent.

### D.  The '327 and '084 Patents

### 1. Background of the Patents and the Asserted Claims

As with the '713 Patent, only Snap moves for a determination that the '327 and '084 Patents are patent ineligible at this stage.  Snap Motion at 8-15.  The '084 Patent is a continuation of the '327 Patent, and thus the two patents share substantially the same specification.  The '327 and '084 Patents also share the same title, "System and Method for

Determining Action Spot Locations Relative to the Location of a Mobile Device." The '327 Patent issued on December 4, 2012, and the '084 Patent issued on September 2, 2014.

BlackBerry alleges that Snap infringes "at least claims 1, 10, and 13" of the '327 Patent and "at least claims 1 and 9" of the '084 Patent. *Snap Case*, Dkt. 1 ¶¶ 81, 105. Snap refers to Claim 1 of the '327 Patent to support is Motion with respect to both the '327 and '084 Patents. *See, e.g.*, Snap Motion at 8, 12, 15. Claim 1 of the '327 Patent recites:

> 1. A mobile device comprising:
>> a display; and
>> a processor module communicatively coupled to the display and
>>> configured to receive executable instructions to:
>>> display a graphical user interface on the display;
>>> receive data indicative of a current location of the mobile device;
>>> determine at least one action spot within a predetermined distance
>>>> from the current location of the mobile device, the at least
>>>> one action spot corresponding to a location where at least
>>>> one other mobile device has engaged in documenting action
>>>> within a predetermined period of time;
>>> signify the at least one action spot on the graphical user interface;
>>>> and
>>> provide an indication of activity level at the at least one action
>>>> spot.

'327 Patent, Claim 1. The other independent claims of the '327 Patent, Claims 10 and 13, are each drawn to a "method for providing action spots on a mobile device." Claims 10 and 13 similarly refer to determining an action spot within a predetermined distance from the current location of the mobile device, where at least one other mobile device has engaged in documenting action within a predetermined period of time, and identifying the action spot on the display of the mobile device using a graphical item. Dependent claims of the '327 Patent relate to, for instance, providing directions to the action spot and displaying a compass. *See, e.g.*, '327 Patent at Claims 4, 5, 6, 7, 16, 17, 18, and 19. Two of the dependent claims relate to running an "image acquisition application" and "displaying [an] image with the at least one activity spot." *See id.* at Claims 9, 20.

Claim 1 of the '084 Patent recites:

> 1. A server configured to:
>> receive data indicative of a current location of a first mobile device;
>> determine at least one action spot within a predetermined distance from
>>> the current location of the first mobile device, the at least one
>>> action spot corresponding to a location where at least one second

> mobile device has engaged in at least one documenting action, the
> documenting action including at least one of capturing images,
> capturing videos and transmitting messages;
> transmit the at least one action spot to the first mobile device; and
> transmit to the first mobile device, an indication of an activity level at the
> at least one action spot,
> wherein the activity level is based upon at least one of a number of images
> captured, a number of videos captured, and a number of messages
> transmitted.

'084 Patent, Claim 1.   Claim 9, the other independent claim of the '084 Patent, refers to determining an action spot within a predetermined distance and displaying a "graphical item" on the mobile device that includes a direction to travel to arrive at an action spot and a level of activity at the action spot based on "at least one of a number of images captured, a number of videos captured, and a number of messages transmitted."   The dependent claims of the '084 Patent, similar to the dependent claims of the '327 Patent, relate to displaying directions to the action spot, using graphical icons in various ways to identify a type of action at the action spot, and limiting action spots to only appearing based on defined distances and predetermined periods of time.  *See generally*, '084 Patent, Claims 2-8, 9-16.

> 2. <u>*Mayo/Alice*</u>

Snap argues that the claims are directed to the abstract concept of "locating and mapping activity."   Snap Motion at 9.   Snap states, "[b]efore the days of cellphones, people routinely mapped their evenings out manually based on their locations and parties or other events they knew about."  *Id.*   Snap alternatively characterizes the claims of the '327 and '084 Patents as being drawn to data collection, data analysis, and display.  *Id.* at 10.

The '327 Patent specifically addresses shortcomings with alternative ways of researching the locations of events:

> When mobile devices are enabled for navigational functions, mobile devices can
> retrieve and display maps and directions to locations relative to the current
> location of the mobile device.  Typically, the maps and directions are limited in
> information. . . . In order to find information relating to events and happenings
> currently occurring proximate to the mobile device's present location, the user of
> the mobile device will have to search an external resource . . . and compare the
> locations of the found events and happenings to the mobile device's current
> location.   Such a process of manually researching events and happenings,
> determining the location of the events and happenings, and comparing the
> location of the events and happenings to the user's current location is tedious and
> results in user frustration.   Moreover, the results of the user's research of current

events and happenings can be incomplete and inaccurate, and the user can miss certain happenings that are close in proximity to the current location of the user's mobile device.

'327 Patent at 2:66-3:20.  The '327 Patent purports to solve these problems through the mobile device's automatic identification and display of "action spots."  Thus, like *Core Wireless*, "[a]lthough the generic idea of summarizing information certainly existed prior to the invention, these claims are directed to a particular manner of summarizing and presenting information in electronic devices."  *Core Wireless*, 880 F.3d at 1362.  At least at the pleading stage, finding the '327 and '084 patents ineligible under 35 U.S.C. § 101 would be premature.[10]

Importantly, the '327 Patent specification suggests not simply that the claimed invention automates human processes, but that it does so in a way that is an improvement on how humans previously located nearby events and activities and how they are displayed on a graphical user interface.  '327 Patent at 3:16-20 ("[T]he results of the user's research of current events and happenings can be incomplete and inaccurate, and the user can miss certain happenings that are close in proximity to the current location of the user's mobile device.").  This is reminiscent of *McRO*, where the claims at issue relied on a computer implementing a "first set of rules" for lip synchronization in a way that was not necessarily achievable through manual lip synchronization methods.  *McRO*, 837 F.3d at 1314 ("While the rules are embodied in computer software that is processed by general-purpose computers, Defendants provided no evidence that the process previously used by animators is the same as the process required by the claims."); *FairWarning*, 839 F.3d at 1094 (distinguishing *McRO* and explaining, "[t]he claimed rules in *McRO* transformed a traditionally subjective process performed by human artists into a mathematically automated process executed on computers.").  The Court is thus not persuaded, particularly at the pleading stage, that the claims of the '327 and '084 Patents are directed to an abstract concept.[11]

Accordingly, the Court would **DENY** the Snap Motion with respect to the '327 and '084 Patents.

---

[10]  Indeed, the issue herein may not be a § 101 problem at all but, rather, questions as to novelty, obviousness and/or prior art.

[11]  Even assuming the claims are drawn to an abstract idea rather than a technological improvement, a factual question regarding whether "action spots" and their corresponding "activity levels" are well-understood, routine, and/or conventional would preclude dismissal.  As BlackBerry observes, these concepts are specifically tied to mobile device activity, not simply a generic reference to activities and events.  Opposition to Snap at 6 (citing '084 Patent at 2:61-3:5).

E.  The '120 Patent

*1. Background of the Patent and the Asserted Claims*

The '120 Patent is only asserted against Facebook Defendants, and they alone argue it is patent ineligible.  Facebook Motion at 5-6, 14-19, 21-22.  The '120 Patent issued on May 24, 2016, and is titled "System and Method for Silencing Notifications for a Message Thread."

BlackBerry alleges that Facebook Defendants infringe "at least claims 1, 13, and 24" of the '120 Patent.  *Facebook Case*, Dkt. 15 ¶ 286.  Facebook Defendants rely on Claim 24 to support their Motion.  Facebook Motion at 5-6, 14-16, 18-19.  Claim 24 recites:

> 24. A non-transitory computer readable medium comprising processing instructions which when executed by a data processor cause the data processor to perform a method for silencing notifications for incoming electronic messages to a communication system, the method comprising:
>> receiving one or more selected message threads for silencing;
>> in response to receiving the one or more selected message threads, activating one or more flags, each flag in association with a selected message thread of the one or more selected message threads, wherein the one or more flags indicate that the associated one or more selected message threads have been silenced;
>> receiving a new incoming electronic message;
>> identifying the new incoming message as associated with the selected one or more message threads;
>> determining that a message thread associated with the new incoming message has been flagged as silenced using the one or more flags;
>> overriding at least one currently-enabled notification setting to prevent a notification pertaining to receipt of the new incoming message from being activated; and
>> displaying the new incoming electronic message in an inbox together with any message thread not flagged as silenced, while silencing any further notifications pertaining to receipt of the new incoming electronic message;
>> wherein the new incoming message thread flagged as silenced is displayed in the inbox in a different manner than any message thread not flagged as silenced.

'120 Patent, Claim 24.  Claims 1 and 13 of the '120 Patent are independent claims similarly directed to a system and method, respectively, for silencing messages in a thread if they have been flagged as silenced and reciting how those messages are displayed in the inbox.  The dependent claims of the '120 Patent relate to, for instance, the type of message and how it is displayed to various users.  *See, e.g.*, '120 Patent at 15 ("The method of claim 14, wherein a receipt notification for a new incoming electronic message is prevented only for a user who has

19

flagged the message thread as silenced."); *see also id.* at Claim 3.

      2. *Mayo/Alice* Step One

      Facebook Defendants make similar arguments regarding the '120 Patent to the arguments they made for the '634 Patent. *See* Facebook Reply at 10-15 (grouping together analysis for '120 and '634 Patents). They assert that "the idea of 'silencing' a message notification is certainly not unique to the digital context . . . , nor is the ability to 'un-silence.'" *Id.* at 13. In their arguments, the Facebook Defendants do not address the '120 Patent's recitation of displaying silenced messages "in a different manner" except to say that this limitation is "generic" and "high-level." *See id.* at 12. This limitation, however, in combination with a flag system for automatically identifying and silencing particular messages, is sufficient at the pleading stage to demonstrate that the claims are drawn to a technological improvement over other communication device messaging systems rather than being drawn to an abstract idea.[12] The '120 Patent explains that someone receiving electronic messages "may receive a notification each time a message or comment is sent or posted to a group site of which they are a member." '120 Patent at 43-46. BlackBerry argues that the claims of the '120 Patent "create[ ] an improved electronic user interface that evaluates incoming messages according to user selection, allows certain messages to trigger the device's standard notification behavior, but processes other messages in a specialized manner where they do not trigger notifications and are not displayed in the normal way." Opposition to Facebook at 3. Unlike the '713 Patent, which fails to provide any specifics about how a time stamp is displayed or the system for assigning time stamps (beyond the predetermined duration of time rule), the '120 Patent claims, at least on their face, include some specifics about how to process a silenced message when it is received (including by "overriding at least one currently-enabled notification setting") and requiring that it is displayed differently from other messages. *Core Wireless*, 880 F.3d at 1362 ("Although the generic idea of summarizing information certainly existed prior to the invention, these claims are directed to a particular manner of summarizing and presenting information in electronic devices."). The Court finds this sufficient at the pleading stage.

      The Court would **DENY** without prejudice Facebook Defendants' Motion as to the '120

---

[12] For similar reasons, even assuming *arguendo* the claims are directed to an abstract idea, the combination of claimed elements − including activating flags for particular message threads, overriding currently-enabled notification settings, and displaying silenced messages in a particular manner − are sufficient at the pleading stage to create a factual dispute as to whether the claims are not drawn to well-understood, routine, or conventional concepts. *Bascom*, 827 F.3d at 1350.

Patent.

F.  BlackBerry's Pre-Suit Indirect and Willful Infringement Claims

*1. Allegations against Both Defendants*

Defendants argue that BlackBerry's pre-suit indirect infringement and willful infringement allegations for many of the asserted patents should be dismissed because BlackBerry has failed to plead pre-suit knowledge of those patents.  Facebook Motion at 22-23, *see also id.* at 22 n. 11; Snap Motion at 24-25.  In the Consolidated Opposition, BlackBerry concedes that "[a]s to the '351, '713, '236, '929, '250, '173, and '120 Patents in the [First Amended Complaint against Facebook] and the '327, '084, '351, and '929 Patents in the Snap Complaint, BlackBerry only alleges knowledge by Defendants 'at least as early as the filing and/or service of this Complaint.'"  Consolidated Opposition at 20.  Snap argues that even though BlackBerry has made this concession, "BlackBerry's Complaint prays for relief for Snap's alleged indirect infringement without any limitation as to when damages could begin accruing."[13]  Snap Reply at 25 (citing Dkt. 1 at 69).  Considering both BlackBerry's concession regarding lack of pre-suit knowledge for many of the asserted patents and the deficiency identified by Snap regarding BlackBerry's indirect infringement allegations, the Court would **GRANT** Defendants' motions to dismiss BlackBerry's pre-suit indirect infringement allegations as to the '351, '713, '236, '929, '250, '173, and '120 Patents in the First Amended Complaint against Facebook and as to the '327, '084, '351, and '929 Patents in the Complaint against Snap.  BlackBerry may file amended complaints clarifying the post-suit nature of its indirect infringement allegations as to these asserted patent/Defendant combinations.

Regarding BlackBerry's willful infringement allegations, "a willfulness claim asserted in the original complaint must necessarily be grounded exclusively in the accused infringer's pre-filing conduct."  *Soteria Encryption, LLC v. Lenovo United States, Inc.*, No. CV 16-7958-GW-(JPRx), 2017 WL 3449058, at *3 (C.D. Cal. Feb. 27, 2017).  If further discovery into Defendants' knowledge and actions reveals information that BlackBerry believes support a claim for post-suit willful infringement, it may file an appropriate motion to amend its complaint for

---

[13] The Facebook Motion specifically clarifies that it "is directed solely at pre-suit, not post-suit, indirect infringement allegations.  [Facebook] Defendants recognize that this Court has permitted *post*-suit indirect infringement allegations to survive the pleadings stage based on knowledge of the patent through the complaint." Facebook Motion at 22 n.11 (citing *Soteria Encryption, LLC v. Lenovo United States, Inc.*, No. CV 16-7958 GW (JPRx), 2017 WL 3449058, at *2 (C.D. Cal. Feb. 27, 2017)).  Snap appears to take the same position in its motion and reply.  *See* Snap Motion at 25; Snap Reply at 25.

the Court's consideration.  For now, the Court would **GRANT** Defendants' motions to dismiss BlackBerry's willful infringement allegations as to the '351, '713, '236, '929, '250, '173, and '120 Patents in the First Amended Complaint against Facebook and as to the '327, '084, '351, and '929 Patents in the Complaint against Snap.

2. *Willful Infringement Allegations against Snap Regarding the '713 and '634 Patents*

Snap and BlackBerry separately dispute the sufficiency of BlackBerry's willful infringement allegations with respect to the '713 and '634 Patents.  *See* Opposition to Snap at 9; Snap Reply at 24-25.  To support its argument that its pleadings are sufficient, BlackBerry cites a paragraph of the Complaint stating, in part, that Snap "was made aware of the '713 Patent and Defendant's infringement through a notice letter sent from BlackBerry to Snap on January 27, 2017.  *Snap Case*, Dkt. 1 ¶ 138.  BlackBerry also cites another paragraph of the Complaint with similar allegations with respect to the '634 Patent.  *See id.* at ¶ 167.  Neither of BlackBerry's cited paragraphs suggest any type of egregious behavior that could serve as a basis for a willful infringement allegation.  *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S.Ct. 1923, 1936 (2016) (Breyer, J., concurring) ("[T]he Court's references to 'willful misconduct' do not mean that a court may award enhanced damages simply because the evidence shows that the infringer knew about the patent and *nothing more*.") (emphasis in original).  Accordingly, the Court would **GRANT** Snap's motion to dismiss BlackBerry's willful infringement allegations as to the '713 and '634 Patent.

3. *Willful Infringement Allegations against Facebook Defendants Regarding the '961 and '634 Patents*

Facebook Defendants and BlackBerry separately dispute the sufficiency of Blackberry's willful infringement allegations with respect to the '961 and '634 Patents.  *See* Opposition to Facebook at 5-6; Facebook Reply at 18-20.  The parties do not dispute that after BlackBerry sent letters to Facebook regarding, in part, the '961 and '634 Patents, BlackBerry and Facebook entered into a non-disclosure agreement ("NDA").  *See generally*, *id.*  The parties dispute whether the terms of the NDA prevent BlackBerry from relying on the notice letter to establish pre-suit knowledge of the '961 and '634 Patents.  *See, e.g.*, Opposition to Facebook at 5-6; Facebook Reply at 18-20.  Facebook Defendants and BlackBerry separately dispute whether BlackBerry may rely on statements made by Facebook's counsel after the NDA was signed to

support a willful infringement claim.  *Id.*

Neither side refers to legal authority as a basis for its position.  After reviewing the First Amended Complaint against the Facebook Defendants, the Court finds it is unnecessary to resolve this aspect of the parties' dispute.  Even assuming solely for purposes of the Facebook Motion that BlackBerry may rely on the notice letters and communications with the Facebook Defendants after an NDA was signed to support a claim for willful infringement, BlackBerry has failed to plead sufficient factual allegations to support a claim for willful infringement.[14]  Like its allegations against Snap regarding the '713 and '634 Patents, BlackBerry's willful infringement allegations against the Facebook Defendants regarding the '961 and '634 Patents do not suggest the type of egregious behavior that would serve as a basis for an ultimate finding of willful infringement.  *See Halo*, 136 S.Ct. at 1936 (Breyer, J., concurring).  Instead, they simply show that Facebook should have been aware of the '961 and '634 Patents by March 2016 and April 2016, respectively, and that Facebook declined to license those patents after discussions.

Accordingly, the Court would **GRANT** the Facebook Defendants' motion to dismiss BlackBerry's willful infringement allegations as to the '961 and '634 Patents.

## IV.  Conclusion

Based on the foregoing, the Court would **GRANT** Snap's Motion with prejudice as to Claims 1, 5, and 9 of the '713 Patent.  The Court would **GRANT** both Defendants' Motions as to BlackBerry's willful infringement and indirect infringement allegations, with leave for BlackBerry to amend its allegations regarding indirect infringement.  The Court would otherwise **DENY** Defendants' Motions without prejudice.

---

[14] For this reason, the Court also declines to take judicial notice of the NDA.  *See* Dkt. 31-2.