QUINN EMANUEL URQUHART &
SULLIVAN, LLP
James R. Asperger (Bar No. 83188)
jamesasperger@quinnemanuel.com
Patrick T. Schmidt (Bar No. 274777)
patrickschmidt@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
Ray R. Zado (Bar No. 208501)
rayzado@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Jordan R. Jaffe (Bar No. 254886)
jordanjaffe@quinnemanuel.com
Jeffrey W. Nardinelli (Bar No. 295932)
jeffnardinelli@quinnemanuel.com
Zachary C. Flood (Bar No. 312616)
zackflood@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

BLACKBERRY CORPORATION
Edward R. McGah, Jr (Bar No. 97719)
emcgah@blackberry.com
Vice President, Deputy General
Counsel—Litigation
41 Ticknor Place
Laguna Niguel, CA 92677
Telephone: (650) 581-4750

Attorneys for Plaintiff BlackBerry Limited

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLACKBERRY LIMITED, a Canadian corporation,<br><br>Plaintiff,<br><br>v.<br><br>FACEBOOK, INC., a Delaware corporation, WHATSAPP INC., a Delaware corporation, and INSTAGRAM, INC., a Delaware corporation, and INSTAGRAM, LLC, a Delaware limited liability company<br><br>Defendants. | Case No. 2:18-cv-01844-GW-KS<br>**LEAD CONSOLIDATED CASE**<br>Related Case: 2:18-cv-02693-GW-KS<br><br>**BLACKBERRY'S OPENING CLAIM CONSTRUCTION BRIEF**<br><br>Hon. George H. Wu<br>Tutorial Date: March 21, 2019<br>Hearing Date: April 1, 2019<br>Courtroom: 9D |

## **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ...................................................................................... 1

II.  THE ASSERTED PATENTS ..................................................................... 1

III. LEGAL STANDARD ................................................................................ 2

IV.  ARGUMENT ............................................................................................ 3

    A.   Disputed Terms For Common Patents ............................................ 3

        1.   The '351 and '929 Patents ..................................................... 3

            (a)   Background of the '351 and '929 Patents ..................... 3

            (b)   "proxy content server" ('351 Patent, claims 1, 9, 14, and 21) ...................................................................... 4

            (c)   "content information" ('351 Patent, claims 1 and 14; '929 Patent, claims 1, 2, 9, and 10) .................................. 7

            (d)   "meta tag for one or more advertisements to be displayed with the content information" ('929 Patent, claims 1, 2, 9, and 10) ............................................ 9

            (e)   "when the information relevant to the detected triggering event comprises advertisement, transmitting the advertisement to the mobile device instead of the content information that includes the meta tag" ('929 Patent, claims 2 and 10) ...................... 12

        2.   The '634 Patent ................................................................... 15

            (a)   Background of the '634 Patent ................................... 15

            (b)   "wireless communication device" ('634 Patent claims 1, 7) ............................................................. 16

            (c)   "icon" ('634 Patent claims 1, 4, and 7) ..................... 19

            (d)   "messaging correspondent" ('634 Patent claims 1, 7) ........................................................................... 20

            (e)   "a numeric character representing a count of the plurality of different messaging correspondents for which one or more of the electronic messages have been received and remain unread" ('634 Patent claims 1, 7) ............................................................. 21

        3.   The '713 Patent ................................................................... 23

            (a)   Background of the '713 Patent ................................... 23

    (b) "predetermined duration of time" ('713 Patent claims 2, 4, 6, 8) ..................................................24

  B. Disputed Terms For Facebook-Only Patents ...........................26

   1. The '120 Patent ..............................................................26

    (a) Background of the '120 Patent .........................26

    (b) "notification" ('120 Patent, claims 9, 13, 15, 20, 21, 24)............................................................................26

   2. The '961 Patent ..............................................................28

    (a) Background of the '961 Patent .........................28

    (b) "reducing mod q" ('961 Patent, claim 23) ......................29

   3. The '236 Patent ..............................................................31

    (a) Background of the '236 Patent .........................31

    (b) "message transmission mode" ('236 Patent, claim 15)............................................................................32

  C. Disputed Terms For Snap-Only Patents ................................33

   1. The '327 and '084 Patents ............................................33

    (a) Background of the '327 and '084 Patents .......................33

    (b) "determine /determining at least one action spot within a predetermined distance from the current location of the mobile device" ('327 Patent claims 1, 13; '084 Patent claims 1, 9)............................34

    (c) "activity level" ('327 Patent claims 1, 2, 13, and 15; '084 Patent claim 1) ......................................................36

V. CONCLUSION .....................................................................................38

**TABLE OF AUTHORITIES**

**Page**

<u>**Cases**</u>

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*,
    616 F.3d 1283 (Fed. Cir. 2010) ..................................................................... 26

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010) ..................................................................... 21

*BlackBerry Ltd. v. Snap Inc.*,
    Case No. 18-2693, Docket No. 74 (C.D. Cal. Sept. 27, 2018) ....................... 1

*Braintree Labs., Inc. v. Novel Labs., Inc.*,
    749 F.3d 1349 (Fed. Cir. 2014) ....................................................................... 2

*Bright Response, LLC v. Google Inc.*,
    No. 2:07-CV-371-CE, 2010 WL 2522424 (E.D. Tex. June 18, 2010) .......... 14

*Comaper Corp. v. Antec, Inc.*,
    596 F.3d 1343 (Fed. Cir. 2010) ....................................................................... 7

*Computer Docking Station Corp. v. Dell, Inc.*,
    519 F.3d 1366 (Fed. Cir. 2008) ..................................................................... 18

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005) ..................................................................... 15

*Dow Chem. Co. v. Sumitomo Chem. Co. Ltd.*,
    257 F.3d 1364 (Fed. Cir. 2001) ..................................................................... 29

*Elekta Instr. v. OUR Sci. Int'l*,
    214 F.3d 1302 (Fed. Cir. 2000) ..................................................................... 31

*Eon Corp IP Holdings LLC v. Aruba Networks Inc*,
    62 F. Supp. 3d 942 (N.D. Cal. 2014) ............................................................ 15

*Epistar Corp. v. Lowes Cos., Inc.*,
    326 F. Supp. 3d 952 (C.D. Cal. 2018) ............................................................ 7

*Golight, Inc. v. Wal-Mart Stores, Inc.*,
    355 F.3d 1327 (Fed. Cir. 2004) ....................................................................... 2

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
    527 F.3d 1379 (Fed. Cir. 2008) ...................................................................23

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
    755 F.3d 1367 (Fed. Cir. 2014) ...................................................................25

*Hoganas AB v. Dresser Indus., Inc.*,
    9 F.3d 948 (Fed. Cir. 1993) ..............................................................21, 36

*Info-Hold, Inc. v. Muzak LLC*,
    783 F.3d 1365 (Fed. Cir. 2015) ...................................................................14

*Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*,
    336 F.3d 1308 (Fed. Cir. 2003) .....................................................................3

*Luminara Worldwide, LLC v. Liown Elecs. Co.*,
    814 F.3d 1343 (Fed. Cir. 2016) ...................................................................18

*Medrad, Inc. v. MRI Devices Corp.*,
    401 F.3d 1313 (Fed. Cir. 2005) ...................................................................12

*Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*,
    370 F.3d 1354 (Fed. Cir. 2004) .............................................................23, 24

*Monsanto Co. v. Syngenta Seeds, Inc.*,
    503 F.3d 1352 (Fed. Cir. 2007) ...................................................................13

*Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*,
    831 F.3d 1350 (Fed. Cir. 2016) ...................................................................15

*MyMail, Ltd. v. Am. Online, Inc.*,
    476 F.3d 1372, 1376 (Fed. Cir. 2007) .........................................................5

*Oatey Co. v. IPS Corp.*,
    514 F.3d 1271 (Fed. Cir. 2008) ...................................................................34

*Pfizer Inc. v. Ranbaxy Labs.*,
    457 F.3d 1284 (Fed. Cir. 2006) ...................................................................13

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ...........................................................2, 3, 23

*Poly-Am., L.P. v. API Indus., Inc.*,
    839 F.3d 1131 (Fed. Cir. 2016) .............................................................18, 19

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    711 F.3d 1348 (Fed. Cir. 2013) ................................................................19, 31

*Process Control Corp. v. HydReclaim Corp.*,
    190 F.3d 1350 (Fed. Cir. 1999) .................................................9, 23, 29, 36

*SightSound Techs., LLC v. Apple Inc.*,
    809 F.3d 1307 (Fed. Cir. 2015) ......................................................................19

*Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*,
    743 F.3d 1359 (Fed. Cir. 2014) ......................................................................13

*Tech. Patents LLC v. T-Mobile (UK) Ltd.*,
    700 F.3d 482 (Fed. Cir. 2012) .................................................................38, 39

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
    247 F.3d 1316 (Fed. Cir. 2001) ......................................................................32

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015) ........................................................................................3

*Texas Instr. v. ITC*,
    988 F.2d 1165 (Fed. Cir. 1993) ......................................................................32

*Thorner v. Sony Comput. Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) .......................................................9, 19, 31

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997) ......................................................................36

*UltimatePointer, L.L.C. v. Nintendo Co. Ltd.*,
    816 F.3d 816 (Fed. Cir. 2006) ........................................................................18

*Vanderlande Indus. Nederland BV v. U.S. Int'l Trade Comm'n*,
    366 F.3d 1311 (Fed. Cir. 2004) ......................................................................29

## **<u>Statutory Authorities</u>**

35 U.S.C. § 101 ...................................................................................................19

35 U.S.C. § 112 ...............................................................................13, 14, 15

**Table of Citations**

| Exhibit Number or Docket Entry | Document Title |
|---|---|
| Dkt. 15-1 | U.S. Patent No. 7,372,961 ("the '961 Patent") |
| Dkt. 15-2 | U.S. Patent No. 8,209,634 ("the '634 Patent") |
| Dkt. 15-3 | U.S. Patent No. 8,279,173 ("the '173 Patent") |
| Dkt. 15-4 | U.S. Patent No. 8,301,713 ("the '713 Patent") |
| Dkt. 15-5 | U.S. Patent No. 8,429,236 ("the '236 Patent") |
| Dkt. 15-6 | U.S. Patent No. 8,677,250 ("the '250 Patent") |
| Dkt. 15-7 | U.S. Patent No. 9,349,120 ("the '120 Patent") |
| Dkt. 15-11 | U.S. Patent No. 8,296,351 ("the '351 Patent") |
| Dkt. 15-12 | U.S. Patent No. 8,676,929 ("the '929 Patent") |
| Snap Dkt. 1-1 | U.S. Patent No. 8,825,084 ("the '084 Patent") |
| Snap Dkt. 1-2 | U.S. Patent No. 8,326,327 ("the '327 Patent") |
| Dkt. 110-2 at 2 | Declaration of Kevin Almeroth, Ph.D. Regarding Claim Construction ('236, '351, and '929 Patents) ("Almeroth Decl.") |
| Dkt. 110-2 at 121 | Declaration of Joseph J. Laviola, Jr., Ph.D. Regarding Claim Construction ('634 Patent) ("Laviola Decl.") |
| Dkt. 110-2 at 178 | Declaration of Patrick McDaniel, Ph.D. Regarding Claim Construction ('084 and '327 Patents) ("McDaniel Decl.") |
| Dkt. 110-2 at 240 | Declaration of Craig Rosenberg, Ph.D. Regarding Claim Construction ('713 and '120 Patents) ("Rosenberg Decl.") |
| Dkt. 110-2 at 278 | Declaration of Aviel Rubin, Ph.D. Regarding Claim Construction ('961 Patent) ("Rubin Decl.") |
| 634.1 | '634 File History, September 8, 2011 Response to Office Action |
| 634.2 | Excerpts from Deposition of Mehrdad Jahangiri (January 30, 2019) |
| 713.1 | Excerpts from Deposition of Craig Rosenberg (February 8, 2019) |
| 961.1 | Foldoc Dictionary of Computing ("mod") |
| 961.2 | Foldoc Dictionary of Computing ("modulo operator") |
| 961.3 | Microsoft Computing Dictionary (5th Ed. 2002) ("modulo) |
| 961.4 | IEEE 100 Authoritative Dictionary of IEEE Standards Terms (7th Ed. 2000) ("modulo") |
| 961.5 | Hankerson et al., Coding Theory and Cryptography (2nd Ed. 2000) |
| 961.6 | Merriam-Webster Online Dictionary ("reducing") |
| 961.7 | Collins Dictionary (10th Ed. 2009) ("reduce") |

| Exhibit Number or Docket Entry | Document Title |
| --- | --- |
| 961.8 | Merriam-Webster's Collegiate Dictionary (11th Ed. 2005) ("reduce") |
| 961.9 | Random House Webster's College Dictionary (2nd Ed. 2000) ("reduce") |
| 961.10 | Longman Dictionary of American English (4th Ed. 2008) ("reduce") |
| 961.11 | '961 File History, June 28, 2006 Response After Final Rejection |
| 961.12 | IEEE 100 Authoritative Dictionary of IEEE Standards Terms (7th Ed. 2000) ("modulo") |
| 961.13 | United States Patent No. 5,724,279 |
| 961.14 | The Computer Glossary:  The Complete Illustrated Dictionary (9th Ed. 2001) ("modulo") |
| A | Defendants' Joint Invalidity Contentions (October 29, 2018) |

## I.     INTRODUCTION

BlackBerry Limited respectfully submits this brief addressing the parties' claim construction disputes.  BlackBerry proposes constructions for each of the disputed claim terms grounded in intrinsic and extrinsic evidence.  Five experts analyzed the intrinsic evidence and concluded that a person of ordinary skill in the art would have understood the meaning of the terms as proposed by BlackBerry.  Defendants put forth only inconsistent attorney argument.    Defendants propose results-oriented constructions, often divorced from intrinsic evidence, with the sole purpose to manufacture unwarranted noninfringement or invalidity positions.  The one constant of Defendants' arguments is the attempt to rewrite the claims without basis, at times adding limitations out of thin air while at other times attempting to strip the claim language of any meaning.  Because BlackBerry's proposed constructions reflect the appropriate meaning of the terms under well-settled claim construction principles, BlackBerry respectfully requests the Court adopt them.

## II.    THE ASSERTED PATENTS

In this action, BlackBerry Limited ("BlackBerry") asserts that Facebook, Inc., WhatsApp Inc., Instagram, Inc., and Instagram, LLC (collectively, "Facebook") infringe nine BlackBerry patents: 7,372,961 ("the '961 Patent"), 8,209,634 ("the '634 Patent"), 8,279,173 ("the '173 Patent"), 8,296,351 ("the '351 Patent"), 8,301,713 ("the '713 Patent"), 8,429,236 ("the '236 Patent"), 8,676,929 ("the '929 Patent"), 8,677,250 ("the '250 Patent"), and 9,349,120 ("the '120 Patent").    In a related action,[1] BlackBerry asserts that Snap Inc. ("Snap," and together with Facebook, "Defendants") infringes the '634, '351, '713, and '929 Patents as well as two other BlackBerry patents: 8,326,327 ("the '327 Patent") and 8,825,084 ("the '084 Patent").  The inventions claimed in these asserted patents are described more fully below.

---

[1]  The Court consolidated the two actions for pretrial purposes.  *See BlackBerry Ltd. v. Snap Inc.*, Case No. 18-2693, Docket No. 74 (C.D. Cal. Sept. 27, 2018).

## III.   LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). And so, claim construction begins with an analysis of the claim language. *Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1354–55 (Fed. Cir. 2014) ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves."). "[T]he words of a claim are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1313 (internal quotation marks omitted). That "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.*

"The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* The specification is part of the "intrinsic" evidence and is "the single best guide to the meaning of a disputed term." *Id.* (quotation omitted). Though claims are read in light of the specification, it is usually inappropriate to read limitations from the specification into the claims. *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1331 (Fed. Cir. 2004). "[T]he line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." *Phillips*, 415 F.3d at 1323.

In addition to the words of the claim and the specification, courts "should also consider the patent's prosecution history, if it is in evidence." *Id.* at 1317 (citation omitted). "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id.* (citations omitted). "Yet because the prosecution history represents an ongoing negotiation between the PTO and the

applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

Courts may also consider extrinsic evidence, such as dictionaries, treatises, and expert testimony, to provide technology background or to explain the meaning of a term as it would be understood by a person of ordinary skill in at the time of the invention. *Id.* at 1317-18. However, extrinsic evidence is less helpful when divorced from the context of the invention. *See Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1313-14 (Fed. Cir. 2003); *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 840-41 (2015).

## IV.   ARGUMENT[2]

### A.   Disputed Terms For Common Patents

#### 1.   The '351 and '929 Patents

##### (a)   Background of the '351 and '929 Patents

The '351 and '929 Patents are directed to an improved architecture for storing, packaging and delivering content and advertising information to mobile devices. At the time of the invention, an enormous amount of content was available from such sources as World-Wide-Web servers on the Internet. '351 Patent at 1:32-43. In general, those information sources were designed for desktop computers, not mobile devices where bandwidth, battery life and screen size are important.

The '351 Patent provides a solution to this then-new technological problem by making relevant portions of the information sources available to a mobile device over a wireless network. The '351 and '929 Patents describe, among other things, a "proxy content server" that provides targeted advertising information (*see, e.g.*, '351 Patent at

---

[2]  The parties set forth various agreed constructions in their joint claim construction statement. Dkt. 110. Pursuant to additional meet and confer efforts, the parties have now further agreed that "flag" from the asserted claims of the '120 Patent need not be construed and is subject to its plain and ordinary meaning.

4:28-46; '929 Patent at 4:33-51) and "aggregates existing information, such as Internet or Intranet content, from one or more Information sources, and pushes the information to a mobile device" ('351 Patent at 2:59-62; '929 Patent at 2:64-3:1). The "proxy content server" selects a particular channel for transmission to a mobile device based on specific feedback received from the mobile device. The proxy content server improves the mobile user experience by efficiently transmitting content and advertising data together, "so that the mobile device user has a consistent and transparent experience of receiving both information content and advertising content." '351 Patent at 2:63-66; '929 Patent at 3:1-4; Almeroth Decl. ¶ 82; *see also id.* ¶¶ 81-86.

The '929 Patent shares essentially the same specification as the '351 Patent. It uses the same fundamental architecture as the '351 Patent, but includes additional functionality, including a "meta tag," to further facilitate the delivery of relevant and timely advertising information to mobile users. '929 Patent at Abstract; Almeroth Decl. ¶¶ 81-86. For example, once the proxy content server detects a "triggering event" relating to time, it checks to see whether a device is interested in receiving information relating to that trigger. '929 Patent at 11:45-66; *id.* at claim 1. If the server concludes that the content should be sent to the mobile device, the server may embed "meta tags" into the content. *Id.* at 11:66-12:16. This "meta tag" architecture saves bandwidth by sending an embedded control sequence that references the full advertisement, rather than sending the full advertisement.

(b)   "proxy content server" ('351 Patent, claims 1, 9, 14, and 21)

| BlackBerry's Construction | Defendants' Construction |
|---|---|
| "server that aggregates information from an information source for distribution to a device" | "a computer that receives information over a computer network and provides it to another device" |

The term "proxy content server" appears to have been coined by the inventors of the '351 and '959 Patents.[3]  BlackBerry's proposed construction is the only proposal that gives meaning to each word in this coined phrase.  BlackBerry's proposed construction properly reflects the claim language—"proxy content server"—the specification describing the invention, and how one of ordinary skill in the art would understand the term.  Defendants' construction, on the other hand, is a transparent attempt to genericize the term, stripping it of any meaning, in an apparent attempt to set the stage for a renewed motion for invalidity under Section 101.  As discussed herein, doing so reads out express claim language and is contrary to the specification and the understanding of one of ordinary skill.

The '351 Patent describes the claimed "proxy content server" as having a concrete, specific meaning in relation with the novel architecture disclosed and claimed.  A "proxy content server" is not merely a cache or standard-purpose computer server.  Rather, as mandated *by the claim language itself*, it is a specialized server that (1) aggregates content and advertising information from one or more sources into pre-configured, categorized channels; (2) adaptively selects information from one of the channels based on, for example, user interests, a triggering event, or specific feedback information received from the mobile devices; and (3) transmits the information from the selected channel to mobile devices in a seamless fashion.  '351 Patent at 2:57-3:19, 4:28-46, claim 1; Almeroth Decl. ¶¶ 99-111.  BlackBerry's proposed construction gives proper meaning to the term "proxy content server" and to the specialized functionality it is required to perform by the claim language.

BlackBerry's proposed construction is also supported by the patent specification. The proxy content server "aggregates existing information 12, such as Internet or

---

[3]   The term is capitalized throughout the specification, further supporting that proxy content server is a coined term.  *See, e.g.*, *MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1374, 1376 (Fed. Cir. 2007) (holding Network Service Provider ("NSP") as a coined term because it is without meaning apart from the patent).

Intranet content, from one or more Information Sources 10, and pushes the information 12 to a mobile device 24." '351 Patent at 2:59-63; Almeroth Decl. ¶¶ 93–98. BlackBerry's proposed construction accounts for these important, inventive aspects of the proxy content server—namely, a configuration designed to ***aggregate*** information into a plurality of channels and select one of the channels for distribution based on a feedback signal, for example. *See, e.g.*, '351 Patent at Abstract; *id.* at 1:50-57.

The specification describes how BlackBerry's proposed construction enables the invention to operate as intended and claimed, including the aggregation providing the mobile device user with "a consistent and transparent experience of receiving both information content and advertising content." *Id.* at 2:63-66. This enables the proxy content server to "make[] intelligent choices, based on user location[] and content[,] as to when to insert advertising into the content data stream to the mobile device user." *Id.* at 5:27-57; Almeroth Decl. ¶ 104 ("[B]y aggregating information from information sources and sending the information to mobile devices, the proxy content server . . . reduce[s] user-perceived latency when receiving information and also reduce[s] bandwidth strain on information sources (which, absent the proxy content server, would consume bandwidth to facilitate direct communications with mobile devices).").

Defendants, on the other hand, ignore the claim term itself and instead substitute what they would prefer the claim say for purposes of their invalidity arguments. Defendants' proposed construction seeks to strip the term "proxy content server" down to a generic "computer" so they can renew their attack on the validity of the '351 Patent. But, as set forth above, the claim is not directed to any "computer," but rather a "proxy content server" that performs several specific functions as outlined in the claim itself. The proxy content server is thus a specific and specialized type of computer configured to achieve the specific purpose and claimed functionality of the '351 Patent.

Nothing in the intrinsic record describes or supports the expansive meaning that Defendants seek to impart on this coined term. Instead, the specification contradicts it. The specification uses the term "computer" outside of the phrase "computer network"

only once—not in reference to the proxy content server, but to the information sources as "a series of computers." '351 Patent at 2:28-31.  The specification never once refers to the "proxy content server" as simply a computer.

If a "proxy content server" were merely a "computer" the specification would make no sense to one of ordinary skill.  Many other structures recited in the claims and discussed in the specification, including a content server, an advertising server, a world-wide-web server, a base station device, and even a mobile device would suddenly also become "proxy content servers" which is plainly not how one of ordinary skill in the art would understand the claims or the invention.  The claim language and the specification clearly distinguish such structures from one another, rendering Defendants' proposed construction improper.  *Id.* at 2:28-56; *id.* at claim 1 (reciting each of "a proxy content server," "an information source," "a computer network," and "a mobile device" distinctly), Fig. 1 (illustrating each distinctly); Almeroth Decl. ¶ 96; *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) ("There is an inference . . . that two different terms used in a patent have different meanings."); *see also, e.g.*, *Epistar Corp. v. Lowes Cos., Inc.*, 326 F. Supp. 3d 952, 962 (C.D. Cal. 2018).  Because the claims expressly recite a "proxy content server," as distinguished from a more general class of computer hardware, a skilled artisan would have understood that the inventors intended to claim a specific type of server configured to accomplish the functionality recited by the additional claim limitations.  Almeroth Decl. ¶ 96.

BlackBerry respectfully requests the Court adopt its proposed construction:  that a proxy content server is a "server that aggregates information from an information source for distribution to a device.".

(c)  <u>"content information" ('351 Patent, claims 1 and 14; '929 Patent, claims 1, 2, 9, and 10)</u>

| BlackBerry's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning | "information, other than advertising information and meta tags, which is |

| BlackBerry's Construction | Defendants' Construction |
|---|---|
|  | displayed for viewing by the user" |

The term "content information" is neither a term of art nor defined by the specification.  Instead, the term has a well-understood meaning to those skilled in the art.  *See* Almeroth Decl. ¶¶ 149-55.  Defendants provide zero evidence of their own as to how this term would be understood by one of ordinary skill in the art.  Therefore, no construction is warranted.  *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1361 (Fed. Cir. 2013) ("If the claim term has a plain and ordinary meaning, our inquiry ends.").

Defendants have no good basis for arguing otherwise.  BlackBerry's proposal of plain and ordinary meaning was a compromise proposal in response to ***Defendants' proposal of plain and ordinary meaning*** for this term.  However, Defendants changed their minds at the eleventh hour before filing the Joint Claim Construction and Prehearing Statement, proposing "information, other than advertising information and meta tags, which is displayed for viewing by the user."  Dkt. 110.

Defendants' newfound proposal is another attempt to rewrite the claim language to create a noninfringement position.  Defendants overly complicate this simple term by importing extraneous limitations with no apparent support in the intrinsic record.  Under Defendants' construction, content information must be "displayed for viewing by the user."  The claims of the '351 and '929 Patents do not require content information to be displayed for "viewing by *the user*."  '351 Patent at claim 1; '929 Patent at claim 1.  The term "user" never appears in claim language.  Thus, there is no basis to add a "user" limitation to the claims under the guise of the relatively simple term "content information."  Moreover, there is no antecedent basis for "the user" and such language only serves to import ambiguity into the claim.  *See Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1356-57 (Fed. Cir. 1999) (construing claim to avoid antecedent basis issue).  Since Defendants' construction not only imports a

limitation into the claims, but one that lacks any support in the intrinsic evidence, the term should be construed according to its plain and ordinary meaning.  *See Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("[W]ords of a claim are generally given their ordinary and customary meaning.").

By proposing that this term include the extraneous requirement that "content information" must be "displayed for viewing by the user," Defendants likely seek to limit their exposure to infringement.  Defendants' rewriting of the term "content information" with limitations created from whole cloth (e.g., "the user") and contrary to the evidence before the Court on the understanding of one of skill in the art should not be adopted.  BlackBerry respectfully requests that the Court give this term its plain and ordinary meaning and decline to construe it.

(d)   "meta tag for one or more advertisements to be displayed with the content information" ('929 Patent, claims 1, 2, 9, and 10)

| BlackBerry's Construction | Defendants' Construction |
|---|---|
| "embedded control sequence inserted to indicate when advertising should be inserted for one or more advertisements to be displayed with the content information"<br><br>*[BlackBerry contends that the constituent term "meta tag" be construed as "embedded control sequence inserted to indicate when advertising should be inserted," and the remainder of the phrase (including "content information") be given its plain and ordinary meaning]* | "meta tag for one or more advertisements to be displayed at the same time as the content information"<br><br>"Meta tag" does not need to be construed and should be given its plain and ordinary meaning.  To the extent it is construed as BlackBerry contends, a "meta tag" is "one or more characters containing information about a file, record type, or other structure, where the characters and information cannot be viewed by a user." |

The specification of the '929 Patent provides a specific definition for the constituent term "meta tag."  As the specification states, "[m]eta tags *are* embedded control sequences that the Proxy Content Server 18 has inserted to indicate when advertising should be inserted."  '929 Patent at 8:32-34 (emphasis added).  A person of

ordinary skill in the art understands that this disclosure is an explicit definitional statement.   Almeroth Decl. ¶ 117; *Vitronics*, 90 F.3d at 1582 (holding that the specification is "the single best guide to the meaning of a disputed term," and "acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication").  This definition is also appropriately broader than other instantiations of the claimed "meta tag" that are described by the specification as mere embodiments. *See, e.g.*, '929 Patent at 8:35-38 ("These tags would normally include an advertising name, a corresponding advertising identifier and perhaps additional information like the number of advertising points for viewing the advertisement.").

Consistent with this definition, claim 1 of the '929 Patent recites a server that inserts into content information "a meta tag for one or more advertisements to be displayed with the content information, wherein the meta tag identifies the one or more advertisements and advertisement display requirements," and transmits "the content information that includes the meta tag to the mobile device." '929 Patent at claim 1. Accordingly, the claim language indicates that a "meta tag" (1) is inserted into content information, (2) identifies information about advertisement, such as identity and display requirements, and (3) is transmitted with the content information to the mobile device. Almeroth Decl. ¶ 116.  In light of the specification's teachings, a person of ordinary skill in the art would have understood "meta tag" to be an "embedded control sequence inserted to indicate when advertising should be inserted." *Id.* ¶¶ 117-18.

Defendants primarily contend that "meta tag" has a plain and ordinary meaning, and that it requires no construction.  However, they fail to account for the explicit definition provided by the specification.  Alternatively, Defendants propose an entirely unsupported and unworkable construction.  For example, Defendants' ambiguous construction ignores the context provided by the claims and the specification. Defendants' construction imports "characters containing information about a file, record type, or other structure"—additional structure with no support in the specification.

Beyond the constituent term "meta tag," the remaining claim language has a plain and ordinary meaning to a person of ordinary skill in the art, and requires no further, specialized construction. *Id*. ¶ 119. On the other hand, Defendants' construction sounds a familiar theme—improperly importing a limitation that the advertisement must be displayed "at the same time" as the content information. There is no basis for this limitation. Although the claim language states that the "meta tag" is for "one or more advertisements to be displayed ***with*** the content information," this language most naturally includes advertisements that are displayed "in conjunction with," or "in association with," but not necessarily simultaneously with, the content information. *See id*. To take a simple example, one might say that advertisers display commercials "with" the broadcast of a television show without necessarily implying that the commercials and the television show must appear simultaneously on the viewer's screen.

Defendants' construction is also flawed because it improperly excludes disclosed embodiments that teach displaying advertisement at a different time then content. Specifically, Defendants' construction excludes the embodiment where the advertising information is inserted into the exact space indicated by the meta tag and "a new window or screen" is used to display the advertisement. '929 Patent at 8:44-49. A person of ordinary skill in the art understands that in this embodiment, only advertisement, not the content information, is displayed to the user in the new window or screen. Almeroth Decl. ¶¶ 118-19. Defendants provide no evidence to support a contrary understanding by a person of ordinary skill in the art. Because Defendants' construction excludes a disclosed embodiment, it should be rejected. *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1320 (Fed. Cir. 2005) ("A claim construction that does not encompass a disclosed embodiment is . . . 'rarely, if ever, correct.'").

By requiring this term to include the extraneous requirement that advertisements must be "displayed at the same time as the content information," Defendants likely hope to significantly limit their exposure to infringement and reasonable damages. The

Court should not adopt Defendants' construction because it lacks support from the intrinsic record and a skilled artisan.  BlackBerry respectfully requests the Court adopt its construction.

(e)  "when the information relevant to the detected triggering event comprises advertisement, transmitting the advertisement to the mobile device instead of the content information that includes the meta tag" ('929 Patent, claims 2 and 10)

| BlackBerry's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning | Claim 2 is Invalid: dependent claim broader than independent under 35 USC 112, par. 4 |

The parties dispute whether claim 2 is invalid.[4]  Claim 2, which is dependent on claim 1, further narrows the scope of claim 1 as is required of dependent claims.  35 U.S.C. § 112, ¶ 4 (2000) ("[A] claim in dependent form shall contain a reference to a claim previously set forth and then *specify a further limitation of the subject matter claimed*.") (emphasis added); *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1357-58 (Fed. Cir. 2007) ("To establish whether a claim is dependent upon another, this court examines if the new claim both refers to an earlier claim and further limits that referent.").  A party challenging the definiteness of a claim must show it is invalid by clear and convincing evidence.  *Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*, 743 F.3d 1359, 1368 (Fed. Cir. 2014); *see Pfizer Inc. v. Ranbaxy Labs.*, 457 F.3d 1284, 1292 (Fed. Cir. 2006) (holding a violation of § 112, ¶ 4 to the same standard as violations of other paragraphs of § 112).

In light of intrinsic evidence, a person of ordinary skill readily understands that claims 1 and 2 recite distinct conditional limitations that depend on whether the

---

[4] Defendants do not allege that claim 10 is invalid although it recites the term at issue.  As with claim 2, claim 10 recites additional functionality that the system must meet in order to satisfy the claims.  Almeroth Decl. ¶ 189.

information comprises content or advertisement.   Almeroth Decl. ¶¶ 184, 189-90. Claim 1 recites a conditional limitation that occurs when the information comprises content information.   *Id.* ¶ 189.   Claim 2 recites a conditional limitation that occurs when the information comprises advertisement.   *Id.*   These conditional limitations have support in the specification, which describes the proxy content server determining whether information relevant to a triggering event comprises content information or advertisement.  '929 Patent at 13:36-50; *id.* at Fig. 8 (illustrating decision diamond 409 determining if the information is content (claim 1) or advertisement (claim 2)); Almeroth Decl. ¶¶ 150, 189-90.   When the information is content, the proxy content server inserts a meta tag and sends the content and meta tag to the mobile device.  '929 Patent at 13:48-53; Fig. 8 (steps 411, 412, and 414); Almeroth Decl. ¶¶ 189-90.   When the information is advertising, it is sent to the mobile device.  '929 Patent at 13:47-48; *id.* at Fig. 8 (step 410); Almeroth Decl. ¶¶ 189, 190.

Thus, when properly read as including conditional limitations, the method of claim 1 involves a test to determine if the information received is "content information."   If this condition is not satisfied (e.g., if the information received is "advertisement") then the limitations following the conditional test do not apply.   Yet, critically, the conditional statement remains a limitation of the claim.  *Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1373 (Fed. Cir. 2015) ("Claims must be interpreted with an eye toward giving effect to all terms in the claim."); Almeroth Decl. ¶ 189.   Claim 2 goes on to narrow the independent claim by (1) incorporating the limitations of the independent claim, including the conditional statement that is invoked if the information received is "content information"; and (2) reciting the additional, distinct conditional statement that is invoked when relevant information is "advertisement." This satisfies the statutory requirement.   35 U.S.C. § 112, ¶ 4 (2000) ("[A] claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed."); '929 Patent at claim 2 ("The method of claim 1, further comprising").   It is in this manner that claim 2

provides supplemental steps to claim 1.[5]  *Compare Bright Response, LLC v. Google Inc.*, No. 2:07-CV-371-CE, 2010 WL 2522424, at *11 (E.D. Tex. June 18, 2010) (finding recited steps of a dependent claim supplement recited steps of the independent claim by "further describ[ing] the operation of the case base knowledge engine"), *with Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp*., 831 F.3d 1350, 1362 (Fed. Cir. 2016) (concluding that claim 10 is invalid under 35 U.S.C. § 112, ¶ 4 because "independent claim 1 excludes LDPE from the inner layers, while dependent claim 10 includes it").  Notably, the conditional limitations of claims 1 and 2 do not conflict because their recitations are triggered by different conditions—content versus advertisement—a distinction that is fully evident in the specification and claims.  *See* § IV.A.1(c); *see, e.g.*, '351 Patent at 4:14-27; *id.* at 4:47-52; *id.* at Fig. 1; Almeroth Decl. ¶¶ 150-51, and 189.

Claims 1 and 2 are not invalid for merely reciting a conditional claim.  "A claim is indefinite only when it is 'not amenable to construction' or 'insolubly ambiguous.'" *Eon Corp IP Holdings LLC v. Aruba Networks Inc*, 62 F. Supp. 3d 942, 950 (N.D. Cal. 2014) (quoting *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005); *see, e.g.*, *Eon Corp IP Holdings*, 62 F. Supp. 3d at 961-63 (example of conditional limitation found not indefinite).

Adoption of Defendants' construction would have a significant effect on this dispute by rendering asserted claim 2 invalid.  It would also be contrary to 35 U.S.C. § 112, ¶ 4, as claim 2 incorporates all limitations of the independent claim and recites the additional, distinct conditional statement that is invoked when relevant information is "advertisement."  Thus, the Court should construe this claim according to its plain and ordinary meaning.

---

[5]    Defendants allege that "a dependent claim cannot directly contradict the independent claim upon which it depends."  Ex. A at 139 ("Defendants' Invalidity Contentions").

2. **The '634 Patent**

(a)   Background of the '634 Patent

The '634 Patent is entitled "Previewing a New Event on a Small Screen" and claims priority to an application filed in 2003.  The '634 Patent explains that in 2003, due to the "proliferation of communications available on mobile devices," mobile users receive messages from a litany of separate applications, including "more than one Instant Message-type service, … corporate and personal email." '634 Patent at 1:18-22, 53:60.   Prior systems responded to each incoming message by showing a notification "on a major portion of the main screen," which for mobile users "has a small display area." *Id.* at 1:38-52.  The notification was not application-specific, forcing users "to check each of their … applications separately" to determine which application triggered the notification, a process which involves navigating to "a main or home screen and one or more sub-screens that may be navigated from the main screen." *Id.* at 1:41-43, 60:64.  This exercise "is inconvenient," leading to "a demand to have information made available to a user quicker than previously available in order to optimize the control of the wireless device." *Id.* at 1:64-68.

The invention of the '634 Patent provides a solution to this problem for small screens by visually modifying an icon to provide a count of certain specific events. When a new message arrives (e.g., an instant message), the invention avoids the need to navigate to multiple applications by modifying an icon associated with a given application "to include a numeric character representing a count of the plurality of different messaging correspondents for which one or more of the electronic messages have been received and remain unread." *Id.* at claim 1.  Figs. 3 and 4, reproduced below, shows an exemplary device screen showing how an icon may be visually modified in response to a new event.



FIG. 3

FIG. 4

(b)   "wireless communication device" ('634 Patent claims 1, 7)

| BlackBerry's Construction | Defendants' Construction |
|---|---|
| "small-screen wireless mobile device" | No construction required; in the alternative, "device that can communicate without wires" |

The parties dispute whether this term should be construed, and, further, if construed, whether it should be appropriately limited to a "small-screen wireless mobile device" as dictated by the intrinsic record and confirmed by the understanding of one of ordinary skill. Defendants, on the other hand, seek to divorce the claim language from the actual understanding of a person of skill and intrinsic record, and instead overly broaden the term to mean any "device that can communicate without wires." BlackBerry's proposed construction is correct and supports the proper understanding of the validity of the asserted claims over prior art involving large screen, non-portable electronic devices such as desktop computers.

Within the context of all the '634 Patent intrinsic evidence, a person of ordinary skill in the art would understand the term "wireless communication device" to mean a "small-screen wireless mobile device." Laviola Decl. ¶¶ 43-52. Here, the evidence that "wireless communication device" means a "small-screen wireless mobile device" is overwhelming.

First, the patentee expressly stated as much during prosecution.  To distinguish the invention from prior art during prosecution, the applicant argued that one particular reference did not anticipate or render obvious the claims because it did not teach "implementation on wireless communications devices, such as mobile PDAs."  Ex. 634.1 ('634 Prosecution History, Response to Office Action, Sept. 8, 2011, p. 14.).  To hammer home the point, the applicant specifically argued that the prior art reference was "concerned solely with desktop-type large screen devices having access to virtually unlimited screen space and processing power."  *Id.*  Such clear and explicit statements during prosecution result in disavowal of any broader meaning and support BlackBerry's construction.  *See, e.g.*, *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1376-77 (Fed. Cir. 2008) (holding the term "portable computer" to exclude built-in displays and keyboards based on applicant remarks distinguishing prior art for including such features); *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1135-37 (Fed. Cir. 2016) (holding the term "short seal" to require inward extension of the seal based on applicant distinction over prior art during prosecution).

Second, the title of the Patent itself supports this view.  The Patent is titled "Previewing a New Event on a Small Screen Device."  This further supports that the "device" claimed in the '634 Patent is a "small screen device."  *See UltimatePointer, L.L.C. v. Nintendo Co. Ltd.*, 816 F.3d 816, 823 (Fed. Cir. 2006) (holding the term "handheld device" to be limited to direct pointing based in part on the patent's title of "Easily-Deployable Interactive Direct Pointing System"); *accord* Laviola Decl. ¶ 46.

Third, the specification shows that patentee tightly tied together the notion of a small-screen wireless device with the claimed invention.  *See e.g.*, *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016) (holding that an inventor may disavow claims lacking a particular feature when the specification describes "the present invention" as having that feature).  The specification indicates that the invention's purpose is to improve small-screen mobile devices.  Laviola Decl. ¶¶ 47-48.  The '634 Patent seeks to provide "a method and apparatus that addresses one

or more . . . shortcomings" related to wireless mobile devices, including the small screen size of such devices.   '634 Patent at 2:1-2.   As the Patent explains, "Representing multiple services and functions to a user on a single wireless mobile device presents a number of challenges to the designer of a user interface, particularly a graphical user interface (GUI), for controlling the device." *Id.*   "Wireless devices are usually small relative to less portable computing devices such as laptops and desktop computers.   ***Inherently then***, a visual display such as an LCD or other screen component of ***the wireless mobile device has a small display area***." '634 Patent at 1:32-37 (emphasis added).   Such statements distinguishing features of the invention from the prior art further support a finding of claim scope disavowal.   *Poly-Am.*, 839 F.3d at 1136; *SightSound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1317 (Fed. Cir. 2015).

While any one of the aforementioned pieces of intrinsic evidence is sufficient to support BlackBerry's proposed construction, it is appropriate to consider their combined effect in the overall claim construction analysis.   *Poly-Am.*, 839 F.3d at 1137 ("[E]ven if these indications were not themselves sufficient, they, when taken together [with other indications], provide clear and unequivocal evidence that the inventor intended to disavow [] claim scope . . . .").   When properly considered together, it is evident that the invention is directed to solving a particular problem in the field of small-screen, mobile computing, and the patentee intended to limit the claim accordingly.   Thus, a person of ordinary skill in the art would understand the term "wireless communication device" to mean a "small-screen mobile device."   Laviola Decl. ¶ 50.   Moreover, the totality of the '634 applicant's statements in the Patent's title, specification, and prosecution history represent a clear disavowal of claim scope over large screened devices.   *Thorner*, 669 F.3d at 1365;

Defendants' construction attempts to define the term overly broadly to encompass any device that can communicate without wires.   In their reply in support of their Motion to Dismiss under 35 U.S.C. § 101, the Defendants asserted that a "wireless

communication device" could "encompass a giant wireless display screen on the Goodyear Blimp or a wireless electronic billboard." Dkt. 61 at 13. Such an absurd example is completely inconsistent with the way in which the patentee described the invention in the specification, and distinguished prior art in the prosecution history.

BlackBerry believes that this claim construction dispute is relevant to, but not dispositive of, validity issues in this case. Specifically, BlackBerry's proposed construction relates to validity of the asserted claims over prior art involving large screen, non-portable electronic devices such as desktop computers.

(c)    "icon" ('634 Patent claims 1, 4, and 7)

| BlackBerry's Construction | Defendants' Construction |
|---|---|
| "picture or symbol representing a computer application or function" | "graphical image" |

This is another instance where Defendants' seek to strip the claim language of meaning in order to enhance their attacks on validity. Here, the term "icon" is understood by those of ordinary skill in the art to mean a picture or symbol representing a computer application or function, consistent with its plain and ordinary meaning. BlackBerry's expert summarizes numerous technical, computing, and telecommunications dictionaries that define the term, with such definitions showing a broad consensus that an icon is as a picture or symbol "representing" or being a "representation of" a computing object, program, or function (or similar terminology) or otherwise "having meaning in the context of a human-computer interface." LaViola Decl. ¶ 66 (collecting definitions).

The specification's use the term "icon" is consistent. For example, the '634 Patent explains that for a wireless mobile device, "[f]or each type of service or function available via the device, a graphical image or icon is often rendered on a major portion of the main screen, which icon may be selected using a cursor or other means to launch a specific GUI for the selected service or function." '634 Patent at 1:48-52. Further,

"[i]ndividual applications are each represented by an application icon on a screen of a graphical user interface for the device." *Id.* at 3:37-39.

Defendants' proposed construction of a "graphical image" reads out a critical aspect of what a person of ordinary skill in the art understands an icon to be. Specifically, Defendant's proposed construction omits any requirement that an icon be representative of a computer application or function. Even a billboard could be an "icon" under Defendants' proposed construction, which one of Snap's own engineers agreed was not the case.[6] For the foregoing reasons, Defendants' proposal should be rejected and BlackBerry respectfully requests the Court adopt its proposed construction.

(d)   "messaging correspondent" ('634 Patent claims 1, 7)

| BlackBerry's Construction | Defendants' Construction |
|---|---|
| "distinct sender of an electronic message to the user of the wireless communication device" | "a person from whom messages may be received" |

The parties mainly dispute whether a "messaging correspondent" is limited to a person, or, more broadly, can encompass other types of senders. BlackBerry's construction, using language taken directly from the specification, is correct. "In an e-mail application, such as associated with one of icons 310, 312, a count may be of unread e-mail messages or ***distinct senders*** of unread e-mail." '634 Patent at 8:19-23 (emphasis added). Such a count "may be configurable for each application or instance thereof. For application icon 304 it may identify the number of ***distinct senders*** of unread IM messages and for application icon 308 distinct unread IM messages." *Id.* at 8:25-28 (emphases added). BlackBerry's proposed construction is also supported by the understanding of a person of ordinary skill. LaViola Decl. ¶ 75.

Defendants proposed construction is unsupported by any evidence as to the understanding of one of ordinary skill and is unhelpful. Defendants inject the improper

---

[6]   Ex. 634.2, Jahangiri Depo. at 77:23-78:17.

limitation "person" into their construction.  But the term "person" appears nowhere in the claims or in the specification beyond references to persons of ordinary skill.  It is thus improper to add to the construction to limit the claim.  *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993) ("It is improper for a court to add 'extraneous' limitations to a claim . . . ."); *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (holding a claim is invalid when construed in a manner that lacks written description in the specification).

Defendants likely intend to argue that their systems do not count "persons" therefore do not infringe under this construction.  As stated the addition of the term "person" into the construction is contrary to the intrinsic record.

(e)   "a numeric character representing a count of the plurality of different messaging correspondents for which one or more of the electronic messages have been received and remain unread" ('634 Patent claims 1, 7)

| BlackBerry's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning | Facebook: "a number that enables the user to track the number of correspondents from whom the user has received unread messages" <br> Snap: "the number of different messaging correspondents for which one or more of the electronic messages have been received and remain unread" |

The parties dispute whether this term needs construction, and further Snap and Facebook disagree on their respective proposals.  Aside from the included term "messaging correspondent," nothing in the intrinsic or extrinsic evidence indicates that any portions of the larger term require a special meaning.  Defendants' proposals are problematic in two respects:  First, they seek to improperly rewrite the claim language from "a numeric character representing a count" to "a number" (Facebook) or "the number" (Snap).  Second, Facebook's attempts to inject a new requirement that the

number "enable[] the user" to track the referenced count.   Neither of these results-driven modifications to the claim are proper or required.

A person of ordinary skill would readily understand the phrase in question based on its plain and ordinary meaning.  LaViola Decl. ¶¶ 77-83.  The specification further provides several examples disclosing the claimed functionality, which would further confirm for a person of ordinary skill that this phrase is being used consistent with its plain and ordinary meaning.  *Id.*  Accordingly, it is improper to construe the term as different from its plaint and ordinary meaning.  *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008) (rejecting a claim construction as being inconsistent with the ordinary meaning of the term "as interpreted in light of the specification"); LaViola Decl. ¶¶ 77-83.

Defendants' constructions are unhelpful and improper.  There is no need to change "a numeric character representing a count" to be a or the "number" as Defendants suggest.   The claim language is clear on its face and should be adopted.  *See Philips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."); *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1373 (Fed. Cir. 2004) ("If the meaning of a claim term is clear on its face, consideration of the remaining intrinsic evidence is restricted to determining if a deviation from the clear language of the claim is specified.").

In addition, Facebook's proposed construction only adds ambiguity into the claim.  Facebook again tries to insert "the user" into the claim language, a term found nowhere in the claim and with no antecedent basis.  As with its prior attempt to import a "user" limitation into the claim language, this one too should be rejected as improper.  *See Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1356-57 (Fed. Cir. 1999) (construing claim to avoid antecedent basis issue).

Defendants likely contend their constructions support noninfringement, though it is not currently clear to BlackBerry why that is the case.    The term "a numeric character representing a count of the plurality of different messaging correspondents for which one or more of the electronic messages have been received and remain unread" should be given its plain and ordinary meaning.

### 3. The '713 Patent

#### (a)    Background of the '713 Patent

The '713 Patent is directed to improving the user interface in an electronic messaging conversation between at least two handheld devices.  The '713 Patent recognizes that a displayed time stamp may be useful to device users of messaging devices. *E.g.*, '713 Patent at 1:63-65.  The '713 Patent also recognizes a downside to displaying time stamps, namely that time stamps occupy space on the display; particularly for handheld devices where screen space is valuable. *Id.* at 1:56-62.  Thus, the '713 Patent provides solutions for addressing the two competing considerations at issue in the display of time stamps within an electronic messaging communication between two devices.

The '713 Patent teaches the electronic device may, following a predetermined amount of time, output a time stamp corresponding to the last message in the conversation (called the "non-responded-to message") even without further exchange of messages. *Id.* at 5:31-44.  As another example, if following a break lasting at least the predetermined amount of time the conversation resumes with the exchange of a so-called "resumption message," the device may output a time stamp corresponding to the "resumption message." *Id.* at 5:62 to 6:2.

"Such relative time stamps provide to the user an expedited understanding of the timing aspects of the message.  That is, the user can understand an aspect of the time of transmission without having to refer to the current time.  This advantageously saves effort by the user because it eliminates the mental step of determining the current time

and subtracting therefrom an absolute time displayed by a time stamp to determine the elapsed time since transmission of the message." *Id.* at 8:26-33.   It also "advantageously saves valuable space on the display" and "advantageously avoids unnecessary visual clutter on the display." *Id.* at 8:34-38.

    (b) "predetermined duration of time" ('713 Patent claims 2, 4, 6, 8)

| BlackBerry's Construction | Defendants' Construction |
|---|---|
| "duration of time determined in advance" | "a length of time set in advance before the first messaging communication is sent" |

  Both parties agree this term should be construed.   Defendants' construction is mostly in agreement with BlackBerry's except for an unnecessary addition that the duration of time be "set … before the first messaging communication is sent."   That tacked-on limitation is not necessary and BlackBerry's proposed construction should be adopted as it faithfully reflects the meaning in the intrinsic evidence and the understanding of one of ordinary skill.

  The '713 Patent teaches and claims techniques for selectively displaying a time stamp in a messaging conversation based on whether a "predetermined duration of time" has elapsed since a "first messaging communication" at a "first time."   The claim requires that there be a "determination" as to whether a "predetermined duration of time has elapsed."   Of course, this logically requires that the predetermined duration of time be set, or fixed, in advance of the "determination."   Rosenberg Decl. ¶ 50; *see also* '713 Patent'713 Patent at 5:23-50.   Importantly, however, neither the claim, nor the intrinsic record, provide any limitation as to ***when***, in advance of the determination, the "predetermined duration of time must be set.   Under these circumstances, it is improper to place limitations on what would otherwise be the plain and ordinary meaning of the claim term.   *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1374 (Fed. Cir. 2014).

Defendants' proposed limitation that the "predetermined duration of time" be set before the "first messaging communication" is unwarranted. This limitation finds no support in the claims or intrinsic evidence. Defendants have stated that the notion of a "predetermined duration of time" implies a time that set in relation to some reference point. But, this is no reason to artificially limit the claim to systems in which the "predetermined duration of time" is set before the first messaging communication. As a person of ordinary skill in the art recognizes, a duration of time can be "predetermined" so long as it is set before it is "needed." Rosenberg Depo. at 61:2-62:2.

Defendants' proposed construction is also flawed because it reads out of the claims a disclosed embodiment from the specification. *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010) (concluding a construction that excludes a disclosed embodiment is "rarely, if ever, correct."). As the '713 Patent teaches, "the predetermined time duration may be ***variable*** depending upon the characteristics of the conversation." '713 Patent at 5:55-57 (emphasis added). For example, "if messages are being exchanged on a more infrequent basis, such as every nine minutes, the predetermined duration of time after which the first time stamp 84 is output may be adjusted to be twenty minutes, for example." *Id*. at 5:58-61. This embodiment makes clear that the "predetermined duration of time" can be set dynamically, and can be impacted broadly by any "characteristics of the conversation," including characteristics measured after the first messaging communication is sent. To accept Defendants' proposed construction would improperly exclude this embodiment from the scope of the claims.

Defendants' proposed construction is an attempt to create a noninfringement position for some (not all) of its accused systems that do not always set the predetermined time before a first communication. The Court should reject Defendants' results-driven construction which has no basis in the plain claim language, and which would exclude preferred embodiments from the specification. BlackBerry respectfully requests the Court adopt its proposed construction.

### B.   Disputed Terms For Facebook-Only Patents

#### 1.   The '120 Patent

##### (a)   Background of the '120 Patent

The '120 Patent is entitled "System and Method for Silencing Notifications for a Message Thread." The '120 Patent addresses a problem presented by multi-functional electronic devices bombarded with messages. In prior systems, users "receive[d] a notification each time an electronic message is received," such as an auditory, visual, or physical (vibration) alert. '120 Patent at 1:28-32. Such incessant notifications can be highly distracting, particularly given people use their devices not only for messages, but to "listen to music, watch video files, play games, view picture files, surf the internet wirelessly, etc." *Id.* at 7:60-66. That said, users do not want to silence notifications entirely, particularly for important or time-sensitive messages.

The '120 Patent invention solves this modern technological problem in a novel way by allowing users to ***select*** which messages trigger notifications, based on "message threads" grouped by, *e.g.*, people or subject-matter. Threads are silenced by setting "a flag … in a data record associated with the message thread"; where a flag is set for an incoming message, "any previously-enabled notification setting(s) may be overridden and notification module 310 may be prevented from producing notifications." *Id.* at 9:35-43; Fig. 7. All messages reach the device, but "silenced" ones are "displayed in the inbox in a different manner." *Id.* at 13:28-30; *id.* at claim 1.

##### (b)   "notification" ('120 Patent, claims 9, 13, 15, 20, 21, 24)

| BlackBerry's Construction | Facebook's Construction |
|---|---|
| Plain and ordinary meaning; alternatively, "user alert" | "an indication providing notice that an event has occurred" |

The parties dispute whether "notification" needs to be construed, and if construed the proper construction. BlackBerry proposes the plain and ordinary meaning for this term, which is consistent with the intrinsic record and understanding

of one of ordinary skill.   Defendants, on the other hand, propose a construction to improperly broaden the term beyond its appropriate meaning to support their prior art arguments.

In the context of electronic messaging, the term "notification" as used in the '120 Patent has a plain and ordinary meaning to a person of ordinary skill in the art. Rosenberg Decl. ¶ 78.   As a person of ordinary skill in the art recognizes, a "notification" in the context of electronic messaging refers to some form of visual, auditory, or physical cue to draw a user's attention to an occurrence that the user would not otherwise notice and at the time of the occurrence.  *Id*. ¶¶ 81-85.

The '120 Patent's specification repeatedly and consistently describes "notifications" consistent with its plain and ordinary meaning, and further in terms of user alerts per BlackBerry's alternative construction.  *See* '120 Patent at 1:30-33 ("Notifications could include, for example, auditory user alerts such as ring tones, visual alerts such as flashing lights or pop-ups and physical alters such as vibrations."). As the Patent teaches "there may be many different types of notification settings, including visual alarms (including, for example, pop-up messages, blinking lights of one or more colors, frequencies, etc.) and/or physical alarms such as vibrators or shakers." *Id*. at 9:26-31.  Accordingly, "when a user silences a thread, the user will no longer receive notifications (e.g. ring tones, flashing lights or vibrations) when a new message arrives belonging to the silenced message thread."  *Id*. at 13:19-22.

Facebook's proposed construction of the term as "an indication providing notice that an event has occurred" includes notification's root word "notice."  It is therefore circular and not particularly helpful.  Facebook's proposed construction also seeks to broaden the term far beyond what would be understood by a person of ordinary skill in the art.   Although Facebook relies on a number of ordinary English dictionary definitions to support its broad, generalized construction, little weight should be given to these definitions.  As explained by BlackBerry's expert, the term "notification" has a distinct meaning in the context of electronic messaging, Rosenberg Decl. ¶¶ 81-82, and

Facebook offers no testimony from a person of ordinary skill in the art to dispute this position. In these circumstances, general-usage dictionaries, which lack the necessary technical context, are notoriously unreliable. *See, e.g.*, *Vanderlande Indus. Nederland BV v. U.S. Int'l Trade Comm'n*, 366 F.3d 1311, 1321 (Fed. Cir. 2004) ("[A] general-usage dictionary cannot overcome credible art-specific evidence of the meaning or lack of meaning of a claim term."); *Dow Chem. Co. v. Sumitomo Chem. Co. Ltd.*, 257 F.3d 1364, 1373 (Fed. Cir. 2001) ("We have previously cautioned against the use of non-scientific dictionaries, lest dictionary definitions be converted into technical terms of art having legal, not linguistic significance.").

Facebook's position that a "notification" includes the appearance of a received message also contradicts the '120 Patent claims. Claim 1, for example, includes the requirement that messages associated with silenced threads be "displayed in the inbox in a different manner than any message thread not flagged as silenced." '120 Patent at claim 1. But, if the display of the message associated with the silenced thread is itself a "notification," the claim could never be performed because the thread would not be silenced in the first place. Such a nonsensical construction is improper. *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1357 (Fed. Cir. 1999) (cautioning against "a nonsensical construction").

BlackBerry respectfully requests the Court adopt its proposal and give this term its plain and ordinary meaning.

### 2.   The '961 Patent

#### (a)   Background of the '961 Patent

The '961 Patent relates to key generation in public key cryptosystems used for encrypting and protecting data transmitted over communication systems    . *See* '961 Patent at 1:5-12, 14-16. In relevant part, such cryptosystems use the concept of a

"public key" and a "private key"[7]: for example, if two parties want to exchange data, they each share their respective public keys.  The party sending data can encrypt it with the intended recipient's public key, and the recipient may apply his private key to decrypt it..  *See id.* at 1:14-16.   A critical aspect of the encryption process is the selection of the private key.  If someone can figure out the private key, they can decrypt the data on their own even if they are not the intended recipient, compromising the security of the encrypted data. *See id.* at 1:37-38.  ("The security of such systems does therefore depend on the private key remaining secret.")   For example, if the public or private keys are selected using a process that is biased toward some number or property, it makes is easier for bad actors to guess the private key, thereby compromising the security of the encrypted data.  *See id.* at 2:29-36.

The '961 Patent relates to one such source of potential bias in the generation of a key, which was observed in the FIPS 186-2 Standard mandated by the National Institute of Standards and Technology (NIST) at the time of the '961 Patent. Dkt. 15-1 at 2:36-46.  In particular, it was observed that this standard introduces a bias in private key generation by selecting a number for the private key that is generated by a random number generator and, if the number is larger than a desired range, reducing the number based on the result of a mathematical operation known as the "modulo" or "mod" operation (*i.e.*, taking the remainder of a number divided by another number, q).  *Id.* This reduction "mod q" was the source of the bias in the standard.  Id. at 2:47-59. Accordingly, the '961 Patent taught that this bias "is avoided by selecting the key and comparing it against the system parameters. If a predetermined condition is attained it is accepted. If not it is rejected and a new key is generated." *Id.*, Abstract.

(b)     "reducing mod q" ('961 Patent, claim 23)

---

[7]   A key in this context refers to a large number represented by a binary string of 0s and 1s, often hundreds to thousands of digits in length. *See* Dkt. 15-1, 1:57-64, 2:40-43(describing the hash value tested for use as a key as a number 160 bits in length.)

| BlackBerry's Construction | Facebook's Construction |
|---|---|
| Plain and ordinary meaning | "computing the remainder of dividing a value by q" |

The parties dispute whether the term "reducing mod q" requires construction. It is undisputed, however, that "mod q" is a well-known term of art and that the '961 Patent uses the term consistently with its plain and ordinary meaning. Rubin Decl. ¶ 53 (expert opinion that "'mod q' is and was, at the time of the '961 Patent, well known in the fields of mathematics and science to refer to a mathematical operation known as the 'modulo' operation, which returns the value of the remainder when dividing a number by a second number"); Exs. 961.1-5 (defining "mod"/"modulo" operator); *see also* Ex. 961.12-14 (Facebook identifying similar scientific dictionary definitions). Additionally, the term "reducing" has a plain meaning to both a POSITA and layman alike, and also requires no construction. Rubin Decl. ¶ 54 (expert opinion that "reducing" has a plain English meaning of "making smaller, diminishing, or lowering in number"); Exs. 961.6-10 (defining "reduce"/"reducing"/"reduction").

Facebook has not identified any intrinsic or extrinsic evidence that purports to define "reducing" at all, let alone in a way that would be consistent with its plain English meaning. *Thorner*, 669 F.3d at 1365 ("[W]ords of a claim are generally given their ordinary and customary meaning."). Nor is there any evidence to show that the inventors intended to impart anything other than the plain and ordinary meaning of "reducing" or "mod q." *Elekta Instr. v. OUR Sci. Int'l*, 214 F.3d 1302, 1307 (Fed. Cir. 2000) ("Absent an express intent to impart a novel meaning, claim terms take on their ordinary meaning."). The phrase "reducing mod q" thus has a plain and ordinary meaning that does not require construction. *Power Integrations, Inc.*, 711 F.3d at 1361 ("If the claim term has a plain and ordinary meaning, our inquiry ends.").

Facebook's proposed construction is, in fact, inconsistent with the plain and ordinary meaning. As explained by BlackBerry's expert, the plain and ordinary meaning of "reducing mod q," consistent with its use throughout the intrinsic evidence,

"refers to lowering a numerical value based on a modulo q."[8]  Rubin Decl. ¶ 55; *see, e.g.*, '961 Patent at 2:40-46, 5:10-12 (describing operations by which a value is lowered based on a mod q); Ex. 961.11 (6/28/2006 OA Resp.) at 6 (same); Rubin Decl. ¶¶ 58-62.

By contrast, Facebook's proposed construction unnecessarily introduces the term "***computing***" (*i.e.*, "computing [a mod q]").  However, neither the intrinsic record, nor any of the extrinsic sources cited by Facebook uses the word "computing" in connection with "reducing," "mod q," or the collective phrase "reducing mod q." Indeed, Facebook's extrinsic evidence does nothing more than provide definitions of "modulo q" in accordance with the opinion of BlackBerry's expert.  *See, e.g.*, Ex. 961.12 at 706 (defining "modulo" as "[a]n arithmetic that operation that yields the remainder of an integer division problem."); Ex. 961.13 at 1:17-19 (same); 961.14 at 252 (same).  Moreover, neither Facebook's extrinsic evidence nor its proposed construction directly address the term "reducing," which simply means (as discussed above) "making smaller, lowering, or diminishing in value"—not "computing."  By not addressing "reducing," Facebook's proposed construction fails to give meaning to all the words of the claim, effectively rendering "reducing" mere surplusage.  *See, e.g.*, *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1325 (Fed. Cir. 2001) (rejecting proposed construction that would render the phrase "mere surplusage"); *Texas Instr. v. ITC*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) (same).

BlackBerry respectfully requests the Court adopt its proposal of plain and ordinary meaning.

### 3.    The '236 Patent

(a)    Background of the '236 Patent

---

[8]    BlackBerry does not oppose a construction that adopts this plain and ordinary meaning.

The '236 Patent, filed on December 23, 2009, is entitled "Transmission of Status Updates Responsive to Status of Recipient Application." The '236 Patent explains that "modern mobile communications devices support a large variety of data-enabled applications, including applications that utilize data generated or collected at the mobile communications device." '236 Patent at 1:21-24. Collection and sending of status updates by a mobile device may be energy intensive and can drain the battery of a mobile device. The '236 Patent addresses the problem of resource drain caused by collection and sending of status updates by selectively changing the mode in which status updates and status messages are transmitted to a recipient application, depending on whether or not the recipient application is actively processing the transmitted status updates.

(b)   "message transmission mode" ('236 Patent, claim 15)

| BlackBerry's Construction | Facebook's Construction |
|---|---|
| "operating condition that controls the transmission of status messages" | "way in which status messages are transmitted" |

Both parties agree the term "message transmission mode" should be construed, but the parties primarily disagree on the language "way" versus "operating condition" in their proposed constructions. BlackBerry's proposed construction is consistent with the intrinsic record and the understanding of a person of ordinary skill in the art. Facebook's construction, on the other hand, unnecessarily limits the claim to only cover the "way" in which status messages are sent, and thus is contrary to other disclosed embodiments in the specification. BlackBerry suspects that Facebook intends to argue that its accused products do not include a "message transmission mode" because they do not adjust the "way" in which status messages are transmitted.

The term "message transmission mode" would be understood by a person of ordinary skill in the art as an "operating condition that controls the transmission of status messages." Almeroth Decl. ¶ 77. This construction best comports with the specification, which describes the various types of operating conditions that control

transmission of status messages expansively, stating, "[a] message transmission mode may be described by the amount of delay between status messages, the number of status updates in each status message, or by various other variables that control the transmission." '236 Patent at 9:14-17 (emphasis added).  BlackBerry's construction also accords with the commonly understood definitions of "mode" and "transmission mode" in a computing device.  Almeroth Decl. ¶ 77.

Facebook's construction is contrary to the intrinsic record.  Facebook's construction appears to improperly exclude disclosed embodiments that describe transmission modes in ways other than simply the "way in which status messages are transmitted" while in those modes.  For example, the specification explains that different transmission modes may "require the generation or collection of a threshold number of status updates before transmission of a status message." '236 Patent at 9:35-38; *see also* 9:14-48 (describing numerous different types of message transmission mode embodiments).  A construction that excludes these disclosed embodiments should be rejected.  *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification.").

BlackBerry respectfully requests that the Court adopt its proposed construction.

## C.   Disputed Terms For Snap-Only Patents

### 1.   The '327 and '084 Patents

#### (a)   Background of the '327 and '084 Patents

Both of the '327 and '084 Patents are entitled "System and Method For Determining Action Spot Locations Relative To The Location Of A Mobile Device." The '327 and '084 Patents share substantively identical specifications.  Prior to the '327 and '084 Patents, users could use an electronic device, such as a mobile phone, to locate nearby live events and happenings, but the process was tedious and inefficient.  Users searching for events were forced to consult multiple sources and/or applications.  Users

would then cross-reference the locations of those events with a map, such as a map application on a smart phone, but the mapping applications contained limited functionality.  '327 Patent at 3:2-20; '084 Patent at 3:9-27.

To improve the process, the '327 and '084 Patents, among other things, determine locations where one or more mobile devices are documenting real-world and current events, such as by taking pictures or videos or posting content to social media sites.  *See, e.g.,* '327 Patent at 3:6 to 4:23; '084 Patent at 4:4-32.  These locations are called "action spots," and are depicted on the user's mobile device in an improved and convenient user interface.  *See, e.g.,* '327 Patent at 4:24-44; '084 Patent at 4:32-53.

               (b)    <u>"determine /determining at least one action spot within a predetermined distance from the current location of the mobile device" ('327 Patent claims 1, 13; '084 Patent claims 1, 9)</u>

| BlackBerry's Construction | Snap's Construction |
| --- | --- |
| Plain and ordinary meaning | "determine / determining each action spot within a specific distance from the current location of the [first] mobile device, the specific distance being set prior to this determining step" |

The parties dispute whether this term should be subject to its plain and ordinary meaning apart from the constituent term "action spot," where the parties have an agreed construction.[9]  BlackBerry proposes the plain and ordinary meaning, consistent with the understanding of a person of ordinary skill in the art.  McDaniel Decl. ¶ 56.   Snap attempts to rewrite this phrase in an attempt to manufacture some noninfringement positions for this patent.  First, Snap seeks to inappropriately rewrite "determining at least one action spot" to be "determine *each* action spot."  Second, Snap seeks to

---

[9]   The agreed construction of action spot is "location or event where at least one activity is occurring relative to the current location of another mobile device." Dkt. 110 at 3.

change the determining of the action spot from being "within a predetermined distance from the current location" to be "within a *specific distance* from the current location." Neither of these added limitations are appropriate.

This limitation is readily understood by one of ordinary skill. As mentioned, the parties agree on the meaning of the term "action spot." A "predetermined distance" is merely "a distance—that is, some measure of geographic span—that is predetermined, meaning determined in advance." McDaniel Decl. ¶ 59. The term "current location of a mobile device" also "has a plain and ordinary meaning to a person of ordinary skill in the art: it refers to the geographic location of the mobile device at the present time." *Id.* ¶ 58. There is no need to construe this term. Claim construction "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.,* 103 F.3d 1554, 1568 (Fed. Cir. 1997).

If the Court elects to construe this term, Snap's proposal to replace "determine at least one action spot" with "determine each action spot" should be rejected because it rewrites the claim. Most fundamentally, the Patents simply do not require the determination of "each" action spot within a predetermined distance from the current location; one implementing the claimed invention is free to determine fewer than all possible available action spots. Further, the term "each" can only be used to refer to more than one item. Snap's construction thus requires more than one action spot even though the claim language expressly requires only "at least one." A claim may not be construed to impose an additional requirement. *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993) ("It is improper for a court to add extraneous limitations to a claim, that is, limitations added wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim.") (internal quotation marks omitted). Replacing "at least one" with "each" also creates internal inconsistency and removes the antecedent basis for the terms "action spot" and "at least one action spot." The Court should not adopt a construction that results in such antecedent basis issues. *See Process Control Corp.*, 190 F.3d at 1356-57.

There is similarly no basis to redraft the term "predetermined distance" to be a "specific distance" that is "set prior to this determining step."  A person of ordinary skill would readily understand the term as written (a distance determined in advance).  McDaniel Decl. ¶ 59.  The specification also provides ample guidance on how to implement this distance.  Snap's attempt to narrow the term further without basis should be rejected.

(c)    "activity level" ('327 Patent claims 1, 2, 13, and 15; '084 Patent claim 1)

| BlackBerry's Construction | Snap's Construction |
| --- | --- |
| "measure of the actions taken by one or more mobile devices" | "The number of actions where the [second] mobile device is being used to observe and make note of a location or event currently occurring at the location of the [second] mobile device" |

The parties mainly dispute whether Snap is correct to limit "activity level" to a measure of the activity of a single mobile device, rather than multiple mobile devices.  Snap likely intends to argue that because its "Snap Map" action spots show the number of actions for more than one mobile device, they do not meet this limitation.  Snap's proposal is incorrect and at odds with the entire purpose of the claimed invention.

The purpose of the stated invention is to help users find events and happenings around a mobile device's current location.   To do so it creates a map of one or more "action spots" which the parties have agreed means a "location or event where at least one activity is occurring relative to the current location of another mobile device."  Figure 3 (annotated) provides an exemplary user interface for the invention:

1
2
3
4
5
6
7
8



'327 & '084 Patent at Fig. 3

9    As shown here, the user interface shows two different action spots (shown in

10 green and red), one near the lake and the other on "Celeb Ct."  The green action spot is

11 larger than the red one, showing more activity there.  As the specification explains, a

12 greater "activity level" conveys that a given location is "more happening," "more

13 popular," or "a location where a large number of people have gathered to witness and

14 document a current event or happening."  '084 Patent at 6:48-56; '327 Patent at 6:39-

15 47; McDaniel Decl. ¶ 50.  In this way, the "activity level" indication lets the user easily

16 determine the popular current events and happenings are around their location.

17    The intrinsic record thus clearly indicates that the "activity level" is potentially a

18 measure of a multitude of device-using individuals, and not limited to a measure of

19 activity by just a single device.  McDaniel Decl. ¶ 50.  Were the Court to adopt Snap's

20 proposed construction, and limit "activity level" to the mere activity of a single device,

21 "activity level" could no longer convey that "a large number of people" are active at a

22 location.[10]  Rather, the invention is intended to measure the activity level of one or

23 many devices at a given location.  *Tech. Patents LLC v. T-Mobile (UK) Ltd.*, 700 F.3d

24

25

26    [10]   An example illustrates the problem.  Under Snap's proposal, if Location A

27 featured one device taking four photos and Location B featured 500 devices each taking

28 two photos, Location A would be deemed twice as "happening" as Location B (4 vs. 2), and the user would have no indication of the 500:1 attendance ratio.

482, 493 (Fed. Cir. 2012) (refusing to adopt construction that "ignore[d] a substantial amount of intrinsic evidence and the very purpose of the claimed invention.")

The specification repeatedly confirms this common sense reading.  It consistently uses "activity level" to describe the combined activity of all devices within a certain area.  For example, the specification explains that, to identify one or more "action spots," the user's mobile device determines locations at which *one or more* other mobile devices are documenting a then-occurring activity at that location, such as taking or posting pictures, videos, or messages. *See, e.g.*, '327 Patent at 3:6-4:23; '084 Patent at 4:4-32.  The device may then display these "action spots" *along with* an associated level of activity.  '327 Patent at 4:24-44; '084 Patent at 4:32-53.  This technique of measuring the activity of *one or more* other mobile devices at "action spots" provides the user "[w]ith a graphical indication of . . . *activity levels associated with the action spots* . . . ." *Id.*

The claim language is entirely consistent.  The claims require that the "activity level" describe an "action spot," not actions of a single device.[11] *See, e.g.*, '084 Patent at claim 1 ("indication of an activity level at the at least one action spot.")  The claims also provide that the "action spot" for which the "activity level" is provided is "a location where *at least one other mobile device* has engaged in documenting action." *E.g.*, '084 Patent at claim 1; '327 Patent at claim 1 (emphasis added).  Thus, the claims expressly contemplate the term "activity level" to describe a location where multiple devices are engaged in activity.

## V.   CONCLUSION

Based on the foregoing, BlackBerry respectfully requests that the Court adopt its proposed claim constructions.

---

[11]  The parties agree that an "action spot" is a "location or event where at least one activity is occurring relative to the current location of another mobile device."

1

Dated:  February 28, 2019

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully Submitted,

By */s/ James R. Asperger*

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

James R. Asperger (Bar No. 83188)
jamesasperger@quinnemanuel.com
Patrick T. Schmidt (Bar No. 274777)
patrickschmidt@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Ray R. Zado (Bar No. 208501)
rayzado@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Jordan R. Jaffe (Bar No. 254886)
jordanjaffe@quinnemanuel.com
Jeffrey W. Nardinelli (Bar No. 295932)
jeffnardinelli@quinnemanuel.com
Zachary C. Flood (Bar No. 312616)
zackflood@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

BLACKBERRY CORPORATION
Edward R. McGah, Jr (Bar No. 97719)
emcgah@blackberry.com
Vice President, Deputy General Counsel—
Litigation
41 Ticknor Place
Laguna Niguel, CA 92677
Telephone: (650) 581-4750

Attorneys for BlackBerry Limited