COOLEY LLP
HEIDI L. KEEFE (178960)
(hkeefe@cooley.com)
MARK R. WEINSTEIN (193043)
(mweinstein@cooley.com)
MATTHEW J. BRIGHAM (191428)
(mbrigham@cooley.com)
3175 Hanover Street
Palo Alto, CA  94304-1130
Telephone:   (650) 843-5000
Facsimile:   (650) 849-7400

COOLEY LLP
MICHAEL G. RHODES (116127)
(rhodesmg@cooley.com)
101 California Street, 5th Floor
San Francisco, CA  94111-5800
Telephone:   (415) 693-2000
Facsimile:   (415) 693-2222

*Attorneys for Defendants*
*FACEBOOK, INC., WHATSAPP INC.,*
*and INSTAGRAM, LLC*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLACKBERRY LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>FACEBOOK, INC., WHATSAPP INC., and INSTAGRAM LLC,<br><br>Defendants.<br><br>────────────<br><br>SNAP INC.,<br><br>Defendant. | Case Nos.  2:18-cv-01844; 2:18-cv-02693 GW(KSx)<br><br>**FACEBOOK DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF INVALIDITY UNDER 35 U.S.C. § 101 (U.S. PATENT NOS. 8,296,351 AND 8,676,929)**<br><br>Hearing Date:  August 29, 2019<br>Time:  8:30 A.M.<br>Ctrm:  9D<br><br>Assigned to the Hon. George H. Wu |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................. 1

II.     LEGAL STANDARD ....................................................................... 2

III.    THE '351 PATENT IS NOT PATENT ELIGIBLE ........................... 3

    A.    Overview of the '351 Patent ....................................................... 3

    B.    The '351 Patent Is Directed to an Abstract Idea Under Step 1 ................ 6

    C.    The '351 Patent Recites No Inventive Concept Under Step 2 ............... 10

        1.    The Claimed "Mobile Device" and "Wireless Network" Recite No Inventive Concept ..................................................... 12

        2.    Storage of Data in "Channels" Based on "Pre-Defined Information Categories" Recites No Inventive Concept ............. 13

        3.    The "Proxy Content Server" Recites No Inventive Concept........ 14

IV.     THE '929 PATENT IS NOT PATENT ELIGIBLE ......................... 18

    A.    The '929 Patent Is Directed to an Abstract Idea Under Step 1 ............... 20

    B.    The '929 Patent Recites No Inventive Concept Under Step 2 ................ 21

V.      CONCLUSION ................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affinity Labs of Tex. v. DIRECTV,*
    838 F.3d 1253 (Fed. Cir. 2016) ............................................................. 12

*Affinity Labs of Texas v. Amazon.com,*
    838 F.3d 1266 (Fed. Cir. 2016) ............................................................. 12

*Akamai Techs. v. Limelight Networks,*
    629 F.3d 1311 (Fed. Cir. 2010), *vacated on other grounds,*
    419 F. App'x 989 (Fed. Cir. 2011) ........................................................ 21

*Alice v. CLS Bank Int'l,*
    573 U.S. 208 (2014) ....................................................................*passim*

*Anderson v. Liberty Lobby,*
    477 U.S. 242 (1986) ............................................................................. 2

*Bilski v. Kappos,*
    561 U.S. 593 (2010) ............................................................................. 2

*Bridge & Post v. Verizon Commc'n,*
    No. 2018-1697, 2019 WL 2896449 (Fed. Cir. July 5, 2019) ....................... 7, 21, 25

*BSG Tech v. Buyseasons,*
    899 F.3d 1281 (Fed. Cir. 2018) ..................................................... 8, 9, 11

*Celotex v. Catrett,*
    477 U.S. 317 (1986) ............................................................................. 2

*ChargePoint v. SemaConnect,*
    920 F.3d 759 (Fed. Cir. 2019) ........................................................ 3, 11

*Content Extraction & Transmission v. Wells Fargo Bank, Nat'l Assn.,*
    776 F.3d 1343 (Fed. Cir. 2014) ............................................................. 15

*Diamond v. Diehr,*
    450 U.S. 175 (1981) ..................................................................... 11, 12

*Elec. Power Grp. v. Alstom S.A.,*
    830 F.3d 1350 (Fed. Cir. 2016) ........................................................ 8, 10

# TABLE OF AUTHORITIES
### Continued

**Page(s)**

*Intellectual Ventures I v. Capital One Bank (USA)*,
792 F.3d 1363 (Fed. Cir. 2015) ........................................................................*passim*

*Intellectual Ventures I v. Erie Indem.y*,
850 F.3d 1315 (Fed. Cir. 2017) .............................................................. 14, 15, 20

*Intellectual Ventures I v. Symantec*,
838 F.3d 1307 (Fed. Cir. 2016) ............................................................................ 11

*OIP Techs. v. Amazon.com*,
788 F.3d 1359 (Fed. Cir. 2015) ............................................................................. 2

*SAP Am. v. Investpic*,
898 F.3d 1161 (Fed. Cir. 2018) ........................................................................... 12

*Soremekun v. Thrifty Payless*,
509 F.3d 978 (9th Cir. 2007) ................................................................................. 2

*Sound View Innovations v. Hulu*,
No. 17-4146, 2019 WL 2619639 (C.D. Cal. Apr. 30, 2019)................................. 2

*Spectra-Physics v. Coherent*,
827 F.2d 1524 (Fed. Cir. 1987) ........................................................................... 24

*Synopsys v. Mentor Graphics*,
839 F.3d 1138 (Fed. Cir. 2016) ............................................................................. 3

*In re TLI Commc'ns Patent Litig.*,
823 F.3d 607 (Fed. Cir. 2016) ..............................................................2, 8, 10, 14

*Two-Way Media v. Comcast Cable Commc'ns*,
874 F.3d 1329 (Fed. Cir. 2017) ........................................................................... 12

*Ultramercial v. Hulu*,
772 F.3d 709 (Fed. Cir. 2014) .........................................................................2, 18

**Statutes**

35 U.S.C. § 101.................................................................................................*passim*

Case Nos. 2:18-cv-01844;
2:18-cv-02693 GW(KSx)

iii

MEMO. OF P&A ISO
MSJ OF INVALIDITY
('351, '929 PATENTS)

# TABLE OF AUTHORITIES
### Continued

**Page(s)**

**Other Authorities**

Fed. R. Civ. P.
   12(b)(6) ............................................................................................................ 1
   56(a) ................................................................................................................. 2

# I.  INTRODUCTION

The '351 and '929 patents are directed to the abstract idea of sending advertisements or other content to a user based on a "triggering event," such as a time or location.  Businesses have promoted products and services in this manner for generations, for example, by sending coupons for a free dessert on a customer's birthday or handing a customer a coupon when they walk by a certain store. The patents implement this age-old idea using conventional computer technology; they solve no technological problem and offer no advancement in computer technology.  They simply take the abstract idea and apply it using known computer techniques.

Facebook previously sought dismissal under Rule 12(b)(6) based on § 101. BlackBerry avoided that earlier motion by relying on the conclusory allegations in its pleadings and by arguing that the § 101 determination should not occur until after claim construction.  BlackBerry further suggested that there was something magical about the claimed "proxy content server," the claimed storage of information into "channels," the recitation of "default," "static," and "dynamic" advertising information, and the claimed use of "meta tags," that transformed the claims into something more than the abstract idea.  BlackBerry was wrong.

The claim construction and discovery process revealed that the concepts embodied by the claims add nothing to the abstract ideas to which the claims are directed.  For example, the parties stipulated that the "channels," recited in every claim, simply refers to "memory locations" – which on its face could cover any kind of generic computer memory.  The parties also stipulated that "default," "static," and "dynamic" advertising information correspond to well-known categories of real-world advertising.  With respect to "proxy content server" and "meta tag," the Court found that no construction was necessary.  The Court observed that even BlackBerry's proposed constructions of those terms – proffered in an attempt to bolster its § 101 position – added nothing to what the existing claim language already said.

Now, with the claim construction process concluded and a fuller evidentiary record, the claims of the '351 and '929 patents are ineligible, and Facebook's motion for summary judgment should be granted.

## II. LEGAL STANDARD

The Court is well-aware of the two-step test for assessing patent subject-matter ineligibility challenges under 35 U.S.C. § 101, so the basic framework need only be briefly addressed. In the first step of the test, the court determines whether the claims "are directed to a patent-ineligible concept," such as an abstract idea. *Alice v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014). If so, the court then determines whether the claims recite an "inventive concept" sufficient to "transform the nature of the claim into a patent-eligible application." *Ultramercial v. Hulu*, 772 F.3d 709, 715 (Fed. Cir. 2014); *Alice*, 573 U.S. at 214, 217. For example, relying on a telephone, computer, or the internet to "perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible." *OIP Techs. v. Amazon.com*, 788 F.3d 1359, 1363 (Fed. Cir. 2015); *In re TLI Commc'ns Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016) (finding claims ineligible where the "specification does not describe a new telephone, a new server, or a new physical combination of the two").

Patent eligibility under 35 U.S.C. § 101 is a threshold issue of law. *See Bilski v. Kappos*, 561 U.S. 593, 602 (2010). Federal Rule of Civil Procedure 56 requires the court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact to defeat summary judgment." *Sound View Innovations v. Hulu*, No. 17-4146, 2019 WL 2619639, at *4 (C.D. Cal. Apr. 30, 2019) (quoting *Soremekun v. Thrifty Payless*, 509 F.3d 978, 984 (9th Cir. 2007)).

## III.   THE '351 PATENT IS NOT PATENT ELIGIBLE

### A.   Overview of the '351 Patent

The '351 patent relates to transmitting information, such as advertising information, to a user based on a "triggering event" such as time or location.  (*E.g.*, '351, claims 1, 14; '351, 4:39-46; SUF Nos. 1, 13, 14.[1])  For example, the specification explains:  "if the user is hungry around a meal time, then the user may have a strong desire and interest to view a special meal coupon for a restaurant."  ('351, 4:52-55; SUF No. 7.)  "[B]ulletins and advertising" information can thus be released based on criteria such as "geographical location, time of day," and so forth.  ('351, 4:63-67; SUF No. 8.)  The '351 patent issued from a patent application filed on March 18, 2010, allegedly claiming priority to a series of earlier patent applications, the earliest being a provisional application filed on July 23, 2001.  (SUF No. 3.)

BlackBerry's earlier briefing spent pages expounding on supposed features of the '351 invention that were not reflected in the claims.  But this motion will focus on what actually matters under Federal Circuit law – the claims themselves. *E.g.*, *Synopsys v. Mentor Graphics*, 839 F.3d 1138, 1149 (Fed. Cir. 2016) ("The § 101 inquiry must focus on the language of the Asserted Claims themselves."); *ChargePoint v. SemaConnect*, 920 F.3d 759, 769 (Fed. Cir. 2019) ("The breadth of the claim language here illustrates why any reliance on the specification in the § 101 analysis must always yield to the claim language.").

As a result of the recent narrowing of asserted claims, BlackBerry is now asserting only claims 1 (independent), 14 (independent), and 21 (dependent) against Facebook.  (SUF No. 13; Keefe Ex. 15.)  Representative claim 14, directed to a system for delivering content based on a "triggering event," reads in full:

> 14.   A system for pushing information to a mobile device, comprising:

---

[1] "SUF" refers to the Facebook Defendants' Statement of Uncontroverted Facts and Conclusions of Law, filed concurrently herewith.

[a]     a proxy content server that receives information over a computer network from an information source and stores the information to one of a plurality of channels based on pre-defined information categories, wherein the plurality of channels comprise memory locations included in at least one of the proxy content server or a proxy content server database;

[b]     the proxy content server to select a channel in response to a triggering event for transmission of the information from the selected channel over the wireless network to the mobile device, wherein the information comprises at least one of static advertising information, dynamic advertising information, default advertising information, or content information, and wherein a combination of the static advertising information with one of the dynamic or default advertising information comprises an advertisement or an information bulletin.

('351, claim 14 (bracketed notations "[a]" and [b]" added); SUF No. 16.) The '351 specification explains that the claimed "triggering event" in limitation **[b]** can correspond to a particular time, "such as lunchtime, suppertime, or some other significant time of the day." ('351, 13:25-26; SUF No. 9.)

Claim 21 depends from claim 14 and recites that the database "stores data relating to the mobile device," which is used "to select the channel for transmission over the wireless network to the mobile device." (SUF No. 17.)  Independent claim 1 is substantially similar to claim 14.  The only material difference for purposes of this motion is that, instead of a "**triggering event**," claim 1 recites receipt of "**a feedback signal** … **that indicates a position of the mobile device**."  (SUF Nos. 15, 16.) The '351 specification explains that a "position" can correspond to the "geographical location" of the device.  ('351, 4:39-41; SUF No. 11.)

Despite their excessive verbiage, the asserted claims describe a simple concept – selection and delivery of information based on a triggering event (*e.g.*, time or geographic location).  As demonstrated in the discussion below, the asserted claims do not add anything to this concept.

Limitation **[a]** above recites a "**proxy content server**" for receiving information from an information source and storing it into an information "channel"

based on "pre-defined information categories."  BlackBerry heavily relied on this technical-sounding limitation in opposing the previous motion.  The Court properly observed that "[i]f the proxy content server is a routine, conventional, and well-understood element, legal authority would suggest that at least the independent claims of the '351 Patent are drawn to patent-ineligible concepts."  (Dkt. 68 at 12, n.7.)

The claim construction process demystified the claimed "proxy content server." The Court found it unnecessary to construe "proxy content server," observing that the claims themselves "provide extensive information about the claimed proxy content server and how it functions and/or interacts with other components of the claimed system."  (*Id*. at 12.)  The claims themselves, in fact, make clear that this "proxy content server" does not have to do much at all – its sole responsibility in limitation **[a]** is to (1) "receive[] information over a computer network from an information source," and (2) "store[] the information to one of a plurality of channels based on pre-defined information categories."  ('351, claims 1, 14; Dkt. 47 at 15.)  The parties stipulated that "channel" simply refers to a "memory location."  (Dkt. 157 at 9.) The receipt and category-based storage of information in a server is a routine and conventional process as shown below.  (*See infra* Section III(B).)

Limitation **[b]** above simply recites the end result of the claim – selecting and then delivering information (from the selected "channel") to the mobile device in response to a triggering event.  The Background section in the specification admits that "[s]ystems for transmitting information from databases in a computer network, such as World-Wide-Web (WWW) servers on the Internet, over a wireless network to a mobile device are known."  ('351, 1:32-35; SUF No. 4.)

Limitation **[b]** devotes most of its words to identifying the unremarkable types of information that can be selected – "static advertising information, dynamic advertising information, default advertising information, or content information." These are basic types of information that one would encounter in everyday life. For example, the parties stipulated that "static advertising information" is "advertising

information that relates to the identity of an advertiser or that does not often change." (Dkt. 157 at 9; SUF No. 21.)  The specification explains that this may include "a logo," "a company banner," among other examples.   ('351, 7:37-39; SUF No. 22.) The famous golden arches of the McDonald's company logo provide a well-known example of "static advertising information."

The parties also stipulated that "dynamic advertising information" means "advertising information that regularly changes." (Dkt. 157 at 9.)  This can include "a special offering, a discount, a discount coupon, a sale, or other time-sensitive information." ('351, 7:42-44; SUF No. 23.)  A coupon offering "$1 off large fries with purchase of a Big Mac, good through August 30, 2019," would qualify as dynamic advertising information.

And "default advertising information" simply means "advertising information that changes rarely." (Dkt. 157 at 9.)  Examples include "a price list, a menu, or some other type of advertising information that does not often change" ('351, 7:46-49; SUF No. 24), such as the McDonald's menu or price list.  Finally, the claims recite a catch-all of "content information," which the Court construed as "information, other than advertising information and meta tags, which is capable of being displayed for viewing." (Dkt. 157 at 13; SUF No. 26.)

### B.     The '351 Patent Is Directed to an Abstract Idea Under Step 1

The claims of the '351 patent are directed to the abstract idea of selecting and providing information to a user based on a triggering event (such as time or the user's geographic location).  This abstract idea can readily be observed with almost any form of targeted advertising or content delivery.

The Federal Circuit found this precise concept an abstract idea under step 1 of *Alice*, because providing advertising or other content to a user based on "information known about the user" is a "fundamental … practice long prevalent in our system…." *Intellectual Ventures I v. Capital One Bank (USA)*, 792 F.3d 1363, 1369 (Fed. Cir. 2015) ("*IV/Capital One*") (citation omitted).  "There is no dispute that newspaper

inserts had often been tailored based on information known about the customer—for example, **a newspaper might advertise based on the customer's location**. Providing this minimal tailoring—e.g., **providing different newspaper inserts based upon the location of the individual**—is an abstract idea." *Id.* (underlining added).  The court made clear that the same reasoning applies to time: "Tailoring information based on the time of day of viewing is also an abstract, overly broad concept long practiced in our society." *Id.* at 1370.  "An advertisement **taking into account the time of day** and tailoring the information presented to the user based on that information is another 'fundamental... practice long prevalent in our system....'" *Id.* (citation omitted; emphasis added).  Under *IV/Capital One*, delivery of advertising or other content to a user based on either time or the user's location is an abstract idea under step 1 of *Alice* as a matter of law.  *See also Bridge & Post v. Verizon Commc'n*, No. 2018-1697, 2019 WL 2896449, at *1 (Fed. Cir. July 5, 2019) (stating the "concept of tailoring advertisements based on user data did not originate with these patents. The practice dates back at least to local radio and television advertisements, which played only for users located in specific cities and were published in-between otherwise national programs").[2]

That the claims of the '351 patent are directed to an abstract idea is so clear under Federal Circuit law that, unsurprisingly, BlackBerry attempted to obfuscate the step 1 analysis during the previous motion by injecting irrelevant details about the claimed "proxy content server" and its supposedly inventive "architecture" into the step 1 inquiry.  But those issues are properly addressed under step 2 as part of the "inventive concept" analysis.  As the Federal Circuit explained, the step 1 inquiry

---

[2] Dependent claim 21 does not change the nature of the abstract idea.  Claim 21 depends from claim 14 and recites storage of "data relating to the mobile device," which is used "to select the channel for transmission over the wireless network to the mobile device."  The claimed "data relating to the mobile device" can include information about the device's location.  ('351, 4:39-46; SUF No. 6.)  Transmitting content based on location is an abstract idea as explained in the text above.

looks at the "focus" of the claims or their "character as a whole." *Elec. Power Grp. v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016).  The claims found invalid in *IV/Capital One*, for example, recited "an interactive interface configured to provide dynamic web site navigation," but the Federal Circuit found those details irrelevant to the character of the claims under step 1, and assessed them under step 2.  *IV/Capital One*, 792 F.3d at 1369-70.  It is not until the second step of *Alice* that the court "scrutinize[s] the claim elements more microscopically" to determine if they recite an inventive concept.  *Elec. Power Grp.*, 830 F.3d at 1354.

The claimed "**proxy content server**" merely provides a technological means for carrying out the abstract idea of selecting and providing information to a user based on a triggering event.  The claims clearly focus on the delivery of information to the user – not the manner of storage of the information at the server.  This is clear from the preamble, which recites the purpose of the claims is to provide "[a] system for pushing information to a mobile device." ('351, claims 1, 14; SUF Nos. 13, 14.)

Moreover, *even if* the "proxy content server" were properly part of the analysis under step 1, the asserted claims would still be directed to an abstract idea. The claimed proxy content server merely stores information "based on pre-defined information categories," which itself qualifies as an abstract idea.  For example, the Federal Circuit has held that "classifying and storing digital images in an organized manner" is an abstract idea under step 1. *See In re TLI*, 823 F.3d at 613 (holding that "attaching classification data, such as dates and times, to images for the purpose of storing those images in an organized manner is a well-established 'basic concept' sufficient to fall under *Alice* step 1").

The Federal Circuit's decision in *BSG Tech v. Buyseasons*, 899 F.3d 1281 (Fed. Cir. 2018), is particularly instructive.  The Federal Circuit in *BSG* held that storing information in a database based on item classifications was an abstract idea under step 1 of *Alice*.  The court rejected the patentee's attempt to inject additional limitations about the database into the step 1 analysis, explaining that "the focus of

BSG Tech's claims is unrelated to how databases function.  Under the claimed methods, information inputted by users into a database is stored and organized in the same manner as information inputted into conventional databases capable of indexing data as classifications, parameters, and values." *BSG*, 899 F.3d at 1288.

Similarly here, even if the "proxy content server" had relevance to the step 1 analysis, the '351 patent recites its function in an exceedingly high-level, results-oriented fashion – it simply requires that the received information be stored in a memory location based on a category (like putting papers in a file in a file cabinet). ('351, claim 14 ("proxy content server … stores the information to one of a plurality of channels [*i.e.* memory locations] based on pre-defined information categories …").) The claims do not prescribe any process for this storage, nor do they purport to cover any advancement in computer storage.

In fact, storage of information in "memory locations" based on "pre-defined information categories" was a longstanding technique for organizing documents outside the realm of computers.  For example, Pat Dorff et al.*, File… Don't Pile!* (1994), in its second mass printing, describes various techniques for organizing and categorizing physical papers for personal or professional use.  (Keefe Ex. 2.) Dorff explains that a user can create a "Paperdex" to organize papers by first creating a set of pre-defined categories. (*Id.*, p. 84; SUF No. 30.)  The exemplary category list from Dorff (shown at right) provides a series of pre-defined information categories and assigns a corresponding category prefix code (*e.g.*, "WG/R") to each category.  (SUF No. 30.)  Once the pre-defined categories are created, a person can set up a separate physical hanging folder for each category to store a document based on the category to which it belongs:

**By Category**

Assign one filing *category* per hanging folder. Use the straight-line filing approach and arrange folders in alphabetical order according to the Prefix Code.

(*Id.*, p. 86; SUF No. 32.)[3]  The storage of information in a "channel" or "memory location" (*e.g.*, hanging folder) based on "pre-defined information categories" (*e.g.*, WS/R, WM/R, etc.) was a longstanding and "low-tech" concept existing well before the '351 patent.  It in no way describes a process specific to computer technology.

Because "the focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools," *Elec. Power Grp.*, 830 F.3d at 1354, the asserted claims of the '351 patent are directed to an abstract idea.  *E.g.*, *In re TLI Commc'ns*, 823 F.3d at 609, 612-613 (claims directed to taking, transmitting, and organizing digital images failed *Alice* step 1).

## C.    The '351 Patent Recites No Inventive Concept Under Step 2

Under the second step of *Alice*, claims are valid only if they recite an "inventive concept" sufficient to transform the claims into a patent-eligible invention.  *Alice*, 573 U.S. at 221.  A valid claim must include "additional features" beyond the abstract idea itself, which "requires more than simply stating the abstract idea while adding the words 'apply it.'"  *Id*. (internal quotations, citations and brackets removed); *see*

---

[3] An earlier (1986) edition of Dorff described the same basic technique for creating categories and storing papers in physical folders for each category.  (*E.g.*, Pat Dorff, *File ... Don't Pile!* (1986), pp. 65-70; Keefe Ex. 3; SUF Nos. 37-39.)

*also IV/Capital One*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible.").

In assessing patent eligibility under step 2, patent owners have a strong incentive to argue that a court cannot find a claim invalid under § 101 unless the *entire claim*, with all of its limitations, was "routine," "conventional," and "well-understood" under *Alice*.  But the Federal Circuit has explained that such an argument distorts the law of patent eligibility under § 101.

In *BSG*, for example, the Federal Circuit explained that the *Alice* decision, which invalidated claims for performing intermediated settlements on a computer, "did not consider whether it was well-understood, routine, and conventional to execute the claimed intermediated settlement method on a generic computer. Instead, the Court <u>only assessed whether the claim limitations other than the invention's use of the ineligible concept to which it was directed were well-understood, routine and conventional</u>."   899 F.3d at 1290 (underlining added).   The Federal Circuit has consistently adopted that approach.   *Id.*; *see also ChargePoint*, 920 F.3d at 773.

In other words, the issue under step 2 of *Alice* is whether the technological building blocks that the claims use to carry out the abstract idea were routine or conventional – not whether actual computer-based implementations of the abstract idea, themselves, were routine or conventional.

In fact, requiring that actual computer-based implementations of the claimed invention idea be identified would collapse § 101 into a novelty or non-obviousness analysis under § 102 and § 103, which would be improper.  The Supreme Court and the Federal Circuit have repeatedly explained that "[t]he 'novelty' of any element or steps in a process, or even of the process itself, is of *no relevance* in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter."  *Intellectual Ventures I v. Symantec*, 838 F.3d 1307, 1315 (Fed. Cir. 2016) (emphasis added by Fed. Cir.) (quoting *Diamond v. Diehr*, 450 U.S.

175, 188-89 (1981)).   Stated differently, even if a claim recites something "[g]roundbreaking, innovative, or even brilliant," that is "not enough for eligibility." *SAP Am. v. Investpic*, 898 F.3d 1161, 1163 (Fed. Cir. 2018).   This reflects the tautology that an abstract idea is still an abstract idea, no matter how new or novel BlackBerry may claim it to be. *Id.* ("No matter how much of an advance in the finance field the claims recite, the advance lies entirely in the realm of abstract ideas, with no plausibly alleged innovation in the non-abstract application realm.").

Federal Circuit law is clear that "[t]o save a patent at step two, an inventive concept must be evident *in the claims*." *Two-Way Media v. Comcast Cable Commc'ns*, 874 F.3d 1329, 1338 (Fed. Cir. 2017) (italics added).   In this case, BlackBerry cannot identify any claimed feature that supplies an "inventive concept" that distinguishes the claims from the abstract idea to which they are directed.

### 1. The Claimed "Mobile Device" and "Wireless Network" Recite No Inventive Concept

Both independent claims recite "transmission of the information … over the wireless network to the mobile device."  This limitation supplies no inventive concept. The "Background of the Invention" freely admits that "[s]ystems for transmitting information from databases in a computer network, such as World-Wide-Web (WWW) servers on the Internet, over a wireless network to a mobile device are known." ('351, 1:32-35; SUF No. 4.)   The specification further acknowledges that "some paging networks offer services to automatically 'push' small amounts of information to alphanumeric paging devices, such as sports scores, weather reports, or stock information." ('351, 1:39-42; SUF No. 5.)   The Federal Circuit has similarly held that implementing an abstract idea using wireless devices does not supply an inventive concept under step 2 of *Alice*.   *See Affinity Labs of Texas v. Amazon.com*, 838 F.3d 1266, 1267-69 (Fed. Cir. 2016) (observing that "the concept of delivering user-selected media content to portable devices is an abstract idea."); *Affinity Labs of Tex. v. DIRECTV*, 838 F.3d 1253, 1258-59 (Fed. Cir. 2016) ("All that limitation does

is to confine the abstract idea to a particular technological environment—in this case, cellular telephones [, which] does not render the claims any less abstract.").

Indeed, wireless mobile devices were commercially available from multiple companies – including BlackBerry – and being reviewed by nationally published computer magazines. (*E.g.*, David Strom, *Three New Wireless E-Mail Devices*, Computerworld, November 8, 1999; Keefe Ex. 10; SUF No. 56.) BlackBerry itself announced in April 2000 – more than a year before the earliest patent application for the '351 patent – that it had agreed to sell 100,000 of its RIM 950 Wireless Handheld devices to BellSouth. (Keefe Ex. 11; SUF No. 57.)[4] Not surprisingly, therefore, the '351 patent does not claim any advancements in wireless or mobile device technology, and the claim language itself merely recites transmission of information "over the wireless network to the mobile device," with no detail about how such transmission is accomplished and no detail about how the transmitted information must be displayed. Transmission of information over a wireless network to a mobile device, therefore, was routine, conventional, and well-understood.

### 2. Storage of Data in "Channels" Based on "Pre-Defined Information Categories" Recites No Inventive Concept

Nor is there anything about the storage of data in "**channels**" based on "**pre-defined information categories**" that provides any inventive concept. As noted, the parties stipulated that the term "channel" simply refers to a "memory location," which could conceivably refer to any type of storage technology. Nothing in the '351 patent

---

[4] As explained in the '929 patent discussion below (*See infra* Section IV(B)), the specification also states that content may be displayed on "a wireless web-browser that enables the mobile device user to access and review HTML or WML based web pages with the mobile device **24**." ('351, 10:33-36.) As explained in Section IV(B) below, the wireless web browsers described in the specification were commonplace before the application for the '351 patent was filed. This provides further support for a finding that the claimed recitation of transmission "over the wireless network to the mobile device" supplies no inventive concept under step 2 of *Alice*.

suggests any improvement to computer memory or storage. As noted, the Federal Circuit has invalidated claims directed to "the abstract idea of classifying and storing digital images in an organized manner," which "fail[ed] to add an inventive concept sufficient to confer patent eligibility." *In re TLI*, 823 F.3d at 611.

The ability to store information into pre-defined categories using hanging physical folders, discussed above, could readily be applied to computers – store information into computer "folders" (also commonly known as "directories"), which serve the same purpose as the physical folders discussed earlier. As Dorff explains, "the directories or folders for your computer data are much like the Paperdexes™ for the categories in your office filing cabinets. The directories or folders guide you to the information you need." (Dorff, p.176; SUF No. 34.) Dorff explains that a user can create a tree of computer folders based on the same categories used to organize paper files. (Dorff, p.180 ("Based on the *Areas/Categories List* described in Chapter 2, here is how one computer tree might look …"); SUF No. 36.) Using a computer to store information into "pre-defined categories" cannot impart patent eligibility. The claims do not recite any particular technology for storage or creation of categories. *IV/Erie*, 850 F.3d at 1327.[5]

### 3. The "Proxy Content Server" Recites No Inventive Concept

Nor can BlackBerry, after the claim construction process, continue to credibly assert that the claimed "**proxy content server**" provides any inventive concept. BlackBerry's wish-list construction of "proxy content server" – proposed with full knowledge of an eventual § 101 challenge on summary judgment – would merely have required a "server that aggregates information from an information source for

---

[5]  In fact, unlike claims the Federal Circuit has invalidated under § 101 that involve storage of information in a database, the independent claims here do not impose such a requirement. The claims more broadly allow storage "in" the proxy content server, and provide no detail as to how to implement the claimed storage. ('351, claims 1, 14 ("…the plurality of channels comprise memory locations included *in at least one of* the proxy content server or a proxy content server database …") (emphasis added).)

distribution to a device." (Dkt. 157 at 10.)  In declining to adopt that construction (or any other), the Court observed that BlackBerry's proposal did not move the ball because "the concepts of the proxy content server aggregating and distributing information appear to already be reflected in the plain language of the claims themselves …." (*Id*. at 11.)

Indeed, the claims themselves make clear that the proxy content server is *exceedingly rudimentary* – the claims only require that it receive information from an information source, store that information based on an information category, and deliver that information to another device.  Nothing could be more routine or conventional.  *See Intellectual Ventures I v. Erie Indem.y*, 850 F.3d 1315, 1329 (Fed. Cir. 2017) ("*IV/Erie*") (holding that "sending and receiving information to execute the database search, e.g., receiving a request for information and delivering records," was "no more than the 'performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'"") (brackets in original; citation omitted); *see also Content Extraction & Transmission v. Wells Fargo Bank, Nat'l Assn.*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) ("The concept of data collection, recognition, and storage is undisputedly well-known.").  The "proxy content server" described and claimed in the '351 patent is no different from a conventional and garden variety server that receives, stores, and transmits information.[6]

If anything, *conventional* proxy content servers were *more* technologically sophisticated than the basic "proxy content server" recited in the '351 claims.  As the

---

[6]  In fact, the word "**proxy**" in the claimed "proxy content server" does not appear to impose any meaningful limitations for § 101 purposes.  The Court observed in its previous order that although "the '929 Patent claims use the more generic term 'server,' they include the same references to organizing data into memory location channels and transmitting specific data based on a triggering event …." (Dkt. 68 at 12.)  There does not appear to be any material difference, for purposes of step 2 of *Alice*, between the "proxy content server" of the '351 patent and the unadorned "server" recited in the claims of the '929 patent.

term "proxy" implies, a conventional proxy server acts as an intermediary or middleman between multiple user devices and remote sites over the Internet.  (David Johnson, *Microsoft Proxy Server 2* (1998), Fig. 1.1, at p.5; Keefe Ex. 4; SUF No. 40; *see also* David Wolfe, *Designing & Implementing Microsoft Proxy Server* (1997), pp. 5-6 ("real-world analogy for a proxy can be seen at high-priced art auction"); Keefe Ex. 8; SUF No. 54; Todd Spangler, *The Intranet Channel*, PC Magazine (June 10, 1997), p.157 ("Most push products today supply preconfigured channels of general-interest news and information.  To access this content, the push server caches the channel information from the Internet locally, acting as a proxy server so that network clients don't need to access the Internet for every update request."); Keefe Ex. 5; SUF No. 45.)  This is illustrated in the following 1998 textbook on the Microsoft Proxy Server 2.0 product:



**Figure 1.1**   A proxy server mediating between a private network and the Internet.

(David Johnson, *Proxy Server 2* (1998), Fig. 1.1, at p.5; Keefe Ex. 4; SUF No. 40.) Conventional proxy content servers also had the ability to store (or "cache") information locally.  (*Id.*, p.3 ("A *content caching server* provides improved network

16

performance, greater reliability, and reduced cost by storing frequently accessed remote data locally.  Caching servers have taken on the name of application proxies, or *proxy servers*, because they act as moderators or go-betweens for clients and remote hosts.") (italics in original); SUF No. 41.)  And in the case of Microsoft Proxy Server, it provided advanced firewall security and a multitude of other features.  (Johnson, *e.g.*, pp. 9-12; SUF No. 46.)  In the context of the Web, proxy servers by 1994 "started gaining wide interest in corporations and other institutions," and by 1998, "[t]he proxy server market ha[d] since skyrocketed along with the rest of the Internet growth." (Ari Luotonen, *Web Proxy Servers* (1998), p.18; Keefe. Ex. 9; SUF No. 55.)

But the claims here do not require that the "proxy content server" provide any of the advanced features of conventional proxy servers.  The claims only require that the proxy content server receive information from a single "information source," transmit information to a single "mobile device," and perform routine data storage and transmission functions.   ('351, claim 1 ("a proxy content server that *receives information* over a computer network from an information source and *stores the information*," "the proxy content server to *select a channel … for transmission* of the information … to the mobile device") (italics added).)  The patent does not claim to have invented proxy content servers, nor does it suggest that the claimed "proxy content server" provides any capabilities beyond those of conventional servers.

Finally, nothing in the "ordered combination" of elements supplies any inventive concept.  The sequence in the claims, in fact, tracks the order established by the abstract idea itself.  For example, representative claim 14**[a]** begins by reciting "a proxy content server that receives information over a computer network from an information source and stores the information to one of a plurality of channels," reciting a generic data-gathering sequence.  Information must, of course, be received by the server over the computer network *before* the server can store that information to a channel.  Limitation **[b]** then recites that the proxy content server "select[s] a channel in response to a triggering event for transmission of the information from the

17

selected channel over the wireless network to the mobile device," again tracking the sequence dictated by the abstract idea.  A proxy content server cannot select a channel or transmit "the information" in that channel under limitation **[b]** unless the information has been previously (a) retrieved from the information source and (b) stored to a channel, as recited in limitation **[a]**.  The sequence recited in the claims, in other words, merely follows the order one would follow to implement the abstract idea even outside the realm of computer technology.  The claimed sequence thus recites "only 'conventional steps, specified at a high level of generality,' which is insufficient to supply an 'inventive concept.'"  *Ultramercial*, 772 F.3d at 716 (citation omitted).

## IV.   THE '929 PATENT IS NOT PATENT ELIGIBLE

The '929 patent is a continuation of the '351 patent and shares substantially the same written description, and as shown below, is patent ineligible for many of the same reasons.  BlackBerry asserts claims 1, 9, and 16 of the '929 patent against Facebook.  Representative claim 1 is reproduced below:

> 1.   A method for pushing information to a mobile device, the method comprising:
>
> [a]   detecting a triggering event comprising a time triggering event;
>
> [b]   determining, by a server, information relevant to the detected triggering event from among information stored in one of a plurality of memory location channels, wherein the information is stored in the one of the plurality of memory location channels based on a category of the information matching a pre-defined category of the one of the plurality of memory location channels;
>
> [c]   when the information relevant to the detected triggering event comprises content information, inserting to the content information, by the server, a meta tag for one or more advertisements to be displayed with the content information, wherein the meta tag identifies the one or more advertisements and advertisement display requirements, and wherein the one or more advertisements are selected based on the detected triggering event; and
>
> [d]   transmitting the content information that includes the meta tag to the mobile device.

('929, claim 1 (bracketed notations "[a]," "[b]," etc. added); SUF No. 18.)

Independent claim 9 recites a "server" corresponding to the method of claim 1. Dependent claim 16 depends from claim 9 and recites "wherein the one or more advertisement comprises static advertisement, dynamic advertisement, or default advertisement."  (SUF No. 20.)

As the Court recognized in its prior order, the '929 patent claims recite many of the same concepts as the '351 patent.  (Dkt. 68 at 12 ("Although the '929 Patent claims use the more generic term 'server,' they include the same references to organizing data into memory location channels and transmitting specific data based on a triggering event, as well as adding a meta tag to the data for transmission.").)  For purposes of this motion, in fact, the only material difference is that limitation **[c]** of the '929 patent, shown above, recites "a **meta tag** for one or more advertisements to be displayed with the content information, wherein the meta tag identifies the one or more advertisements and advertisement display requirements."[7]  The claim is otherwise directed to the same concept of delivering information to a mobile device based on a triggering event.

BlackBerry relied heavily on the claimed "**meta tag**" in opposing the previous motion to dismiss, but as with the claimed "proxy content server" of the '351 patent, the claim construction process revealed the claimed meta tag to be yet another BlackBerry red herring.  Consistent with its treatment of the claimed "proxy content server," the Court found that "meta tag" did not require construction.  The Court observed that "the claim language itself already provides significant information about the claimed 'meta tag,' including that it is 'insert[ed] to' content information, identifies information about an advertisement (including advertisement display requirements), and is transmitted with the content information to the mobile device." (Dkt. 157 at 14.)  The Court also rejected BlackBerry's construction of "meta tag"

---

[7]  As noted in footnote 6, *supra*, the asserted claims of the '929 patent do not recite a "proxy content server," but instead merely recite a "server."

("embedded control sequence inserted to indicate when advertising should be inserted") because BlackBerry's proposal was needlessly complex and confusing, and was not required by the patent specification. (*Id*. at 15-16.)

### A.   The '929 Patent Is Directed to an Abstract Idea Under Step 1

The claims of the '929 patent are directed to the same abstract idea as the '351 patent discussed above – selecting and providing information to a user based on a triggering event.  In the case of the '929 patent, the asserted claims require the triggering event to relate specifically to time (not location).  ('929, *e.g.*, claim 1[a] ("detecting a triggering event comprising a *time triggering event* …."), claim 9 ("upon detection of a triggering event comprising a *time triggering event* ….") (italics added); SUF Nos. 18, 19.)  For the reasons provided in connection with the '351 patent, the asserted claims of the '929 patent are directed to an abstract idea under step 1 of *Alice*.[8]

The recitation of a "meta tag" does not change the focus of the claims or alter the abstract idea to which they are directed.  The claims of the '929 patent describe the claimed "meta tag" in entirely functional terms, as providing a means for identifying the advertising information and specifying requirements for its display.  ('929, claim 1 ("the meta tag identifies the one or more advertisements and advertisement display requirements").)  The claim does not specify how the claimed meta tag identifies advertisements, nor does it provide a single concrete example of "advertising display requirements."  Because it is simply a means to carry out the abstract idea, the claimed recitation of a "meta tag" is relevant at step 2 and not the focus of the claims under step 1.  *See IV/Erie*, 850 F.3d at 1328 ("The focus of the

---

[8]  Dependent claim 16 does not change the nature of the abstract idea to which the independent claims are directed.  Claim 16 depends from claim 9 and recites that "the one or more advertisement comprises static advertisement, dynamic advertisement, or default advertisement."  As explained in the discussion about the '351 patent, "static," "dynamic," and "default" advertising simply refer to basic types of advertising information one would encounter in everyday life.  (*See supra* Section III(A).)  Claim 16 is thus directed to the same abstract idea as the independent claims.

claims, therefore, remains at a high level on searching a database using an index.  The inclusion of XML tags as the chosen index building block, with little more, does not change that conclusion."); *Bridge & Post*, No. 2018-1697, 2019 WL 2896449, at *5.

And even if it were appropriate to consider the "meta tag" as part of the step 1 analysis, the result would be the same – the claim is directed to an abstract idea. The function of the claimed meta tag is analogous to templates used by newspapers to identify where advertisements will be placed relative to other content on a page.  The ability to identify  advertising, and to specify requirements for how and/or where to display that advertising relative to other content, is a longstanding practice not in any way limited to computers.

### B.    The '929 Patent Recites No Inventive Concept Under Step 2

For many of the same reasons explained for the '351 patent, the asserted claims do not recite any inventive concept.  This section will therefore focus on the key distinguishing limitation in the '929 patent, the claimed "meta tag."

In the computing context, the claimed "**meta tag**" encompasses routine techniques for organizing and placing information onto web pages.  As is well-known, web pages are written using Hypertext Markup Language ("HTML").  *E.g.*, *Akamai Techs. v. Limelight Networks*, 629 F.3d 1311, 1314 (Fed. Cir. 2010), *vacated on other grounds*, 419 F. App'x 989 (Fed. Cir. 2011).  HTML defines a series of "tags" that identify the objects to be presented on the page, and describe *how* they will be presented.  As explained by Marty Hall in the introductory chapter of his textbook, *Core Web Programming* (1998):

> Web pages are created using the HyperText Markup Language (HTML), which lets you mix regular text with "markup" tags describing the text.  These tag elements can describe the *appearance* ("display this in red") or *layout* ("arrange the following in a 3-row, 4-column table") of the

> text, but the majority simply describe the *content* ("this is a
> mean heading") and leave many of the appearance and
> layout decisions to the browser.

(Keefe Ex. 6, p.5 (italics in original; underlining added); SUF No. 46.)  HTML tags thus provide the ability to identify content in an HTML page and specify the requirements for its display – such as its color, layout or other display characteristics. For example, the following figures show actual 1999 web pages in which an advertisement for Amazon.com is interspersed with search results from a popular Internet search engine, AltaVista:



**Figure 2.27**   A text ad from Amazon.com on AltaVista.

(Robbin Zeff, *Advertising on the Internet* (1999), pp. 49-50 (Fig. 2.27, Fig. 2.28); Keefe Ex. 7; SUF Nos. 48-52.)[9]

Conventional HTML tags could thus perform precisely the same function of the

---

[9]  AltaVista was a "popular" search engine, considered one of the "Big Six" search engine providers.  (*E.g.*, Zeff, pp. 415, 337; SUF Nos. 49-50.)  HTML is a coding language "used to make Web pages," by "surrounding text with codes, called tags, that identify how the text should appear."  (Zeff, p. 413; SUF No. 51.)

claimed "meta tag" because they can be inserted into content and "identif[y] the one or more advertisements and advertisement display requirements."  ('929, claim 1.) The claimed "meta tag," in other words, merely attempts to capture the HTML tag technique that millions of web pages had already employed to identify and control the display of content and advertising information on websites.

Nothing in the '929 patent suggests that there was anything technologically challenging about adapting these known HTML tag techniques to display content on wireless mobile devices.  The '929 patent does not suggest that it invented the ability to view web pages on wireless devices – and nor could it have, as wireless web browsers were already well-known.  To the contrary, the specification treats wireless web browsing as old hat, explaining that content may be displayed on "a wireless web-browser that enables the mobile device user to access and review HTML or WML based web pages with the mobile device **24**."  ('929, 10:36-39; SUF No. 12.) These types of web browsers were commonplace by the time the application for the '929 patent was filed.

For example, Microsoft had already released its Internet Explorer web browser for the "Pocket PC," a popular operating system for handheld mobile communications devices.  (*See* Craig Peacock, *Pocket PC Clear and Simple* (2001), p.66 ("Pocket Internet Explorer (IE) is a fully featured Web browser – just because the screen is small, doesn't mean you can't browse the Web on your Pocket PC."); Keefe Ex. 13; SUF No. 60; Steve Seroskek, *The Pocket PC* (2001), p.75 ("This program allows you to surf the Web just like you do on your desktop PC.  Internet Explorer for the Pocket PC has the capability to browse almost any Web site on the Internet."); Keefe Ex. 12; SUF No. 58.)  "Since its launch in April 2000, the Windows-powered Pocket PC has created a great deal of interest all over the world."  (Peacock, p.2; Keefe Ex. 13; SUF No. 61; *see also* Seroshek, p.2 ("Several original equipment manufacturers (OEMs), such as Casio, Compaq, Hewlett-Packard, and Symbol, build Pocket PCs."); Keefe Ex. 12; SUF No. 59.)

23

The '929 patent also explains that content may be displayed on a wireless web-browser that can review "*WML* based web pages with the mobile device **24**." ('929, 10:36-39 (italics added); SUF No. 12.)  WML is an acronym for "Wireless Markup Language," which describes yet another well-understood technique for delivering content to wireless mobile devices.  As explained in Ben Forta, *WAP Development with WML and WMLScript* (2000): "Wireless Markup Language (WML) is a markup language used for describing the structure of documents to be delivered to wireless devices. WML is to wireless browsers as HTML is to a browser on a desktop computer. WML was created to address the display, bandwidth, and memory limitations of mobile and wireless devices, such as cellular phones and wireless handheld computers." (Keefe Ex. 14, p.20; SUF No. 62.)  Similar to the HTML tags discussed above, WML has similar features for specifying display requirements, including line breaks, text formatting, and alignment for both text and images.  (*Id.*, p.21.)  WML was developed in the 1990s by a consortium of companies known as the Wireless Access Protocol (WAP) Forum.  (*Id.*)  Forta provided a list of 21 "more commonly available [WAP] devices" as of 2000, but warned that "new devices are being developed all the time, so don't read this list as a definitive list of what's available—it's not." (*Id.*, p. 13; *id.*, pp. 14-15 (Table 1.2); SUF Nos. 63-66.)

It therefore should come as no surprise that the '929 specification only briefly mentions display of content on "a wireless web-browser that enables the mobile device user to access and review HTML or WML based web pages" ('929, 10:36-39; SUF No. 12), with no further elaboration or explanation.  By the time the '929 patent application was filed, these techniques were so well-known that further elaboration would have been unnecessary.  *See, e.g.*, *Spectra-Physics v. Coherent*, 827 F.2d 1524, 1534 (Fed. Cir. 1987) ("A patent need not teach, and preferably omits, what is well known in the art.").  Nothing in the claims or the specification suggests any technological contribution or improvement to the display of content on wireless mobile devices.

1    And, as with the '351 patent, nothing in the "ordered combination" of the claim

2  elements supplies an inventive concept.  *See also Bridge & Post*, No. 2018-1697,

3  2019 WL 2896449, at *7 (stating "[e]ven as an ordered combination, the limitations

4  of claim 1 recite no more than a computer implementation of the abstract idea of using

5  persistent identifiers to implement targeted marketing, lacking anything 'significantly

6  more'").  The sequence in the claims, in fact, tracks the logical order one would need

7  to follow to carry out the abstract idea.  For example, representative claim 1**[a]** recites

8  "detecting a triggering event comprising a time triggering event," followed in claim

9  1**[b]** by "determining, by a server, information relevant to the detected triggering

10 event…."  There is nothing inventive about this sequence; a server obviously cannot

11 select information relevant to a "triggering event" before that triggering event is

12 detected.  And the meta tag cannot be inserted in the content in claim 1**[c]** until after

13 the content was selected (in claim 1**[b]**), and the content with the meta tag cannot be

14 transmitted in claim 1**[d]** before insertion of the meta tag in claim 1**[c]**.

15 **V.    CONCLUSION**

16    Defendants respectfully request that the Court enter summary judgment of

17 invalidity of the '351 and '929 patents under 35 U.S.C. § 101.

18

19

20

21

22

23

24

25

26

27

28

1   Dated:  July 9, 2019                    RESPECTFULLY SUBMITTED,

2

3                                           /s/ Heidi L. Keefe

4

5                                           COOLEY LLP
                                            HEIDI L. KEEFE (178960)
6                                           (hkeefe@cooley.com)
                                            MARK R. WEINSTEIN (193043)
7                                           (mweinstein@cooley.com)
                                            MATTHEW J. BRIGHAM (191428)
8                                           (mbrigham@cooley.com)
                                            3175 Hanover Street
9                                           Palo Alto, CA  94304-1130
                                            Telephone: (650) 843-5000
10                                          Facsimile:  (650) 849-7400

11

12                                          COOLEY LLP
                                            MICHAEL G. RHODES (116127)
13                                          (rhodesmg@cooley.com)
                                            101 California Street, 5th Floor
14                                          San Francisco, CA  94111-5800
                                            Telephone: (415) 693-2000
15                                          Facsimile:  (415) 693-2222

16

17                                          Attorneys for Defendants
                                            FACEBOOK, INC., WHATSAPP INC.,
18                                          and INSTAGRAM, LLC

19

20

21

22

23

24

25

26

27

28