**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1  QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
2    James R. Asperger (Bar No. 83188)
     jamesasperger@quinnemanuel.com
3    865 S. Figueroa St., 10th Floor
     Los Angeles, CA 90017
4    Telephone: (213) 443-3000
     Facsimile: (213) 443-3100
5
     Kevin P.B. Johnson (Bar No. 177129)
6    kevinjohnson@quinnemanuel.com
     555 Twin Dolphin Drive, 5th Floor
7    Redwood Shores, CA 94065
     Telephone: (650) 801-5000
8    Facsimile: (650) 801-5100

9  BLACKBERRY CORPORATION
     Edward R. McGah, Jr (SBN 97719)
10   Vice President, Deputy General Counsel
     – Litigation
11   41 Ticknor Place
     Laguna Niguel, California 92677
12   Telephone: (+1) 650-581-4750

13  Attorneys for Plaintiff,
    BlackBerry Limited

14

15               IN THE UNITED STATES DISTRICT COURT

16            FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 17  BLACKBERRY LIMITED, a Canadian corporation, | ) ) | Case No. 2:18-cv-01844-GW-KS **LEAD CONSOLIDATED CASE** |
| 18 | ) ) | Related Case: 2:18-cv-02693-GW-KS |
| 19                Plaintiffs, | ) ) ) | |
| 20                v. | ) ) | **BLACKBERRY LIMITED'S** |
| 21  FACEBOOK, INC., a Delaware | ) ) | **OPPOSITION TO DEFENDANTS' COMBINED** |
| 22  corporation, WHATSAPP INC., a Delaware corporation, and | ) ) ) | **MOTION FOR SUMMARY JUDGMENT OF INVALIDITY** |
| 23  INSTAGRAM, LLC, a Delaware limited liability company | ) ) ) | **UNDER 35 U.S.C. § 101 (U.S. PATENT NOS. 8,296,351,** |
| 24 | ) ) | **8,676,929, AND 9,349,120)** |
| 25                Defendants, | ) ) | Hearing Date: Sept. 5, 2019 |
| 26  SNAP INC., a Delaware corporation | ) ) | Time: 8:30 A.M. |
| 27                Defendant. | ) ) | Ctrm: 9D Judge: Hon. George H. Wu |
| 28 | | |

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 2

APPLICABLE LAW ........................................................................................... 4

ARGUMENT ....................................................................................................... 5

I.    The Court Should Deny Summary Judgment of invalidity of the '351 Patent ................................................................................................. 5

    A.    The Invention Of The '351 Patent ................................................. 5

    B.    Step 1: The '351 Patent Is Directed To Patentable Subject Matter ............................................................................................ 6

        2.    Defendants Ignore the Claimed Improvement in Computer Network Technology ................................... 12

        3.    The Claims Recite A Non-Preemptive Specific Implementation ........................................................... 18

    C.    Step 2: The '351 Patent Claims Additional Inventive Elements ....................................................................................... 19

II.    The Court Should Deny Summary Judgment of invalidity of the '929 Patent ............................................................................................... 25

    A.    The Invention Of The '929 Patent ............................................... 25

    B.    Step 1: The '929 Recites an Additional Technical Solution ...... 26

    C.    Step 2: The '929 Patent Claims Additional Inventive Elements ....................................................................................... 30

III.    The Court Should Deny Summary Judgment of invalidity of the '120 Patent ............................................................................................... 32

    A.    The Invention Of The '120 Patent ............................................... 32

    B.    Step 1: The '120 Patent Is Directed To Patentable Subject Matter .......................................................................................... 33

    C.    Step 2: The '120 Patent Claims Additional Inventive Elements ....................................................................................... 37

        1.    Silencing New Message Receipt Notifications On A Per-Thread Basis While Still Displaying The Message Was Not Well-Understood, Routine, Or Conventional ....................................................................... 37

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

2.   Defendants Fail To Consider The Claims Of The
'120 Patent As An Ordered Combination ........................ 39

CONCLUSION .......................................................................................... 40

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-ii-

Case No. 2:18-cv-01844 GW(KSx)
Case No. 2:18-cv-02693 GW(KSx)

BLACKBERRY'S OPPOSITION TO DEFENDANTS' COMBINED MOTION FOR SUMMARY JUDGMENT OF INVALIDITY

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# TABLE OF AUTHORITIES

**Page(s)**

## <u>Cases</u>

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121 (Fed. Cir. 2018) ..........................................................................30

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014) ...............................................................................4, 18

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
  841 F.3d 1290 (Fed. Cir. 2016) ........................................................18, 19, 30

*Ancora Techs., Inc. v. HTC America, Inc.*,
  908 F.3d 1343 (Fed. Cir. 2018)..........................................................12, 17

*Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016)........................................................25, 28, 39

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018)...............................................4, 19, 20, 25, 31

*Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*,
  No. 2018-1697, 2019 WL 2896449 (Fed. Cir. July 5, 2019).14, 15, 16, 28, 29

*BSG Tech LLC v. Buyseasons, Inc.*,
  899 F.3d 1281 (Fed. Cir. 2018) ..........................................................16

*Cable Elec. Prods., Inc. v. Genmark, Inc.*,
  770 F.2d 1015 (Fed. Cir. 1985) ...............................................................4

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
  880 F.3d 1356 (Fed. Cir. 2018)...............................................4, 6, 16, 36, 37

*Cristobal v. Siegel*,
  26 F.3d 1488 (9th Cir. 1994)....................................................................21

*Data Engine Techs. LLC v. Google LLC*,
  906 F.3d 999 (Fed. Cir. 2018)........................................................6, 16, 21, 37

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  773 F.3d 1245 (Fed. Cir. 2014)........................................6, 14, 17, 22, 23, 28

05710-00015/11017170.1

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016) ............................6, 7, 12, 13, 15, 17, 22, 29

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    879 F.3d 1299 (Fed. Cir. 2018) ............................................... 16, 17, 28

*GoDaddy.Com LLC v. RPost Commc'ns Ltd.*,
    2016 WL 3165536 (D. Ariz. June 7, 2016)
    *aff'd,* 685 F. App'x 992 (Fed. Cir. 2017) ........................................ 30

*Intellectual Ventures I LLC v. Capital One Bank*,
    (USA), 792 F.3d 1363 (Fed. Cir. 2015) ................................... 13, 14

*Intellectual Ventures I LLC v. Erie Indem. Co.*,
    850 F.3d 1315 (Fed. Cir. 2017) ....................................... 21, 29, 37

*Intellectual Ventures I LLC v. Symantec Corp.*,
    838 F.3d 1307 (Fed. Cir. 2016) ................................................ 37

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016) .......................................... 13, 18

*Mformation Technologies, Inc. v. Research in Motion Ltd.*,
    764 F.3d 1392 (Fed. Cir. 2014) ................................................ 40

*Research Corp. Techs. v. Microsoft Corp.*,
    627 F.3d 859 (Fed. Cir. 2010) ................................................. 18

*SRI International, Inc. v. Cisco Systems, Inc.*,
    No. 2017-2223, 2019 WL 3162421, (Fed. Cir. July 12, 2019) ...................... 12

*Trading Techs. Int'l, Inc. v. IBG LLC*,
    921 F.3d 1084 (Fed. Cir. 2019) ................................................ 16

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017) ................................................ 17

*Universal Electronics Inc. v. Roku, Inc.*,
    2019 WL 1877616 (C.D. Cal. Mar. 5, 2019) ..................................... 39

*Vaporstream, Inc. v. Snap Inc.*,
    No. 2:17-cv-00220-MLH(KSx), 2018 WL 1116530 (C.D. Cal. Feb.
    27, 2018) ........................................................ 4, 20, 25, 32, 40

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## **Statutory Authorities**

35 U.S.C. § 101................................................................................1, 2, 4

35 U.S.C. § 282............................................................................................4

## **Rules and Regulations**

Fed. R. Civ. P. 56(c) .....................................................................................4

Fed. R. Civ. P. 56(e) ...................................................................................21

## **Other Authorities**

Jim Boyce, *Microsoft Outlook Version 2002: Inside Out* (2001) ............................38

## INTRODUCTION

The Court should deny Defendants' Motion for Summary Judgment ("the Motion") that the asserted claims of U.S. Patent Nos. 8,296,351 (the "'351 Patent"), 8,676,929 (the "'929 Patent"), and 9,349,120 (the "'120 Patent") (together, the "Challenged Patents") are directed to ineligible subject matter under 35 U.S.C. § 101. Defendants' flawed Motion depends upon an overgeneralization of the claim language and a studied ignorance of the specific challenges and the technological environment in which the inventions were intended to operate.  Not only do these arguments fail to carry Defendants' summary judgment burden, the record before the Court actually points toward the opposite result.  The *admissible* evidence, as well as the undisputed expert testimony, supports a finding that the claimed inventions are, in fact, directed to non-abstract, concrete solutions to specific technological problems arising in the field of wireless communications for mobile electronic devices.

The '351 and '929 Patents describe a novel architecture for storing, packaging and delivering content and advertising information to mobile devices in a faster and more efficient manner than previously possible.  BlackBerry conceived these inventions at a time when information on the Internet was designed for delivery and display on desktop computers, not mobile devices—where bandwidth, battery life, and screen size are critical considerations.  To address the constraints of mobile devices, these inventions reduce the bandwidth and time required for mobile users to consume relevant content and advertisements.  This specific technological improvement is non-abstract and patentable.

The '120 Patent addresses a problem that became acute largely after the popularization of smartphones—namely incessant new message notifications.  The invention permits users to selectively silence such notifications on a per-thread basis, suppressing notifications for only some rather than all communications.  Again, this invention represents a specific and substantial improvement over the all-or-nothing approach in prior messaging systems, and is patent eligible.  Accordingly, the

Challenged Patents are non-abstract and valid. The Court should deny Defendants' Motion once and for all.

## BACKGROUND

Twice before in this case—at the conclusion of the motion-to-dismiss and claim construction proceedings—the Court cited factual issues that precluded any resolution of Defendants' § 101 theories. Dkt. 68 at 10-12, 23 n.16; Dkt. 156 at 12, 17. Since that time, Defendants have failed to uncover any factual information that would carry their summary judgment burden. Nor do they rely on expert testimony. Rather, at best, Defendants' Motion invites the Court to simply ignore the same factual issues that precluded judgment as a matter of law at the motion to dismiss stage.

Indeed, if anything, factual developments in discovery have bolstered the patent eligibility of the Challenged Patents. For example, testimony from two separate inventors of the '351 and '929 Patents has confirmed that those Patents are directed to a specific, improved server architecture designed to address the bandwidth, power, and processing constraints inherent in transmitting information to mobile devices over limited wireless networks. Additionally, BlackBerry's expert witnesses have opined that the inventions of all three Challenged Patents are directed to concrete solutions for technical problems that arose in the specific field of technology to which each patent is directed. BlackBerry's experts have further opined that the relevant elements of the claimed invention were not well-known, routine, or conventional to a person of ordinary skill in the art at the relevant time ("POSITA"). Accordingly, the recent discovery not only precludes Defendants' Motion, it actually weighs in favor of a conclusive finding that the asserted claims are patent-eligible.

Defendants' Motion attempts to argue that the Court's prior motion-to-dismiss and claim construction rulings compel a summary judgment ruling in their favor. Mot. 3, 32. This is wildly misleading. In denying Defendants' Motion to Dismiss as to the '351 and '929 Patents, the Court previously held that "the parties have submitted a factual dispute regarding whether the 'proxy content server' and its

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

specific architecture as recited in the claims provide for a well-understood, routine, and/or conventional computer component." Dkt. 68 at 12. As the Court correctly noted, "Courts have found, both in the context of step one and step two of the patent eligibility framework, that claims directed to an unconventional architecture for organizing data or computer components may be patent eligible." *Id.* (collecting cases). Defendants cite to no discovery since this prior ruling sufficient to meet its burden to show by clear-and-convincing evidence that these patents contain no more than well-understood, routine, or conventional components or functionality.

Similarly, with respect to the '120 Patent, the Court denied Defendants' prior motion to dismiss because the claimed flag and override system for automatically identifying and silencing particular messages, coupled with the requirement to display silenced messages "in a different manner" helped to demonstrate that "the claims are drawn to a technological improvement over other communication device messaging systems . . . ." *Id.* at 24. The Court expressly rejected the Facebook Defendants' argument that the '120 Patent claims fail to describe the "how" of overriding a currently-enabled notification setting, noting that "with no factual evidence to support or refute the claim language, the Court finds the amount of 'how' claimed in the '120 Patent is sufficient for patent eligibility purposes at the motion to dismiss stage." *Id.* at 25. Once again, Defendants present no additional factual evidence sufficient to meet its burden for showing invalidity.

Contrary to Defendants' suggestion, the Court's claim construction order is entirely consistent with these prior motion-to-dismiss rulings. Although the Court declined to construe the "proxy content server" term of the '351 Patent and the "meta-tag" term of the '929 Patent, in both cases, the Court noted that "nothing in this Order should be deemed to suggest that the Court has reached a determination regarding whether . . . [these terms] as claimed . . . [are] routine, conventional, and/or well-understood computer component[s]." Dkt. 157 at 12, 16-17. Likewise, with respect to the '120 Patent, the Facebook Defendants admit that the Court was not asked to

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

construe (much less determine the § 101 impact of) the "flag," "override," and "display" requirements.  In sum, Defendants' Motion is a transparent attempt to re-litigate the same issues that they have previously presented and lost, with no additional evidence beyond bare attorney argument to support their position that no factual dispute exists.  The Court should deny the Motion so that the parties can focus their efforts on the merits of BlackBerry's infringement claims.

## APPLICABLE LAW

Summary judgment is only proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Defendants bear the burden of establishing this absence of a genuine issue of material fact.  *Id.*; *Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1022 (Fed. Cir. 1985).  A conflict between the experts' opinions on a material issue defeats summary judgment.  *See, e.g., Vaporstream, Inc. v. Snap Inc.*, No. 2:17-cv-00220-MLH (KSx), 2018 WL 1116530, at *6 (C.D. Cal. Feb. 27, 2018) (Huff, J.).  A party asserting invalidity under U.S.C. § 101 bears the burden of establishing invalidity by clear and convincing evidence.  *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1364 (Fed. Cir. 2018) (citing 35 U.S.C. § 282).  A challenger must first demonstrate that the claims as a whole are "directed to a patent-ineligible concept" such as an abstract idea.  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014).  As the Supreme Court has instructed, courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law."  *Id.* at 2354.  If the challenger carries its burden at step one, it must then also show that the claims lack an "inventive concept"—when considered both individually and as a combination, the claim elements are no more than "well-understood, routine, and conventional to a skilled artisan in the relevant field."  *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).  The "inventive concept" inquiry is an analysis

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

of historical fact at the time of the invention.  *Aatrix Software, Inc. v. Green Shades Software, Inc.,* 882 F.3d 1121, 1128 (Fed. Cir. 2018*).*

## ARGUMENT

### I.   THE COURT SHOULD DENY SUMMARY JUDGMENT OF INVALIDITY OF THE '351 PATENT

#### A.   The Invention Of The '351 Patent

To understand the *how* of the claimed invention, it is important to first look at the *why*.  The Challenged Patents are directed to technological solutions to specific technical problems recognized by the inventors and the patent itself, and thus are not abstract under applicable precedent.  The '351 Patent is addressed to the technological problem of delivering different types of information to resource-constrained mobile handheld devices over data limited wireless networks.  Almeroth Decl. ¶¶ 49, 62-69.  The earliest description of the '351 invention, contained within the July 23, 2001 provisional application (No. 60/307,265), is instructive.  As that application describes, conventional mobile devices relied upon a "synchronization" or "pull" method to obtain information from a particular information source of interest.  Ex. 7 at 1.  While this approach was consistent with "the traditional Internet model" at the time, the inventors realized that "the amount of data to be reconciled between the service provider and the mobile device can become very large leading to bandwidth difficulties, particularly when the mobile device is communicating via a wireless packet-switched network or over a traditional paging network."   Ex. 7 at 2-3.  Additionally, the inventors recognized that directly synchronizing mobile devices with individual information sources placed an unreasonable burden on mobile devices themselves, which are inherently constrained in terms of battery and processing power.  Brown Depo. Tr. (Ex. 11) at Q. 54; Mousseau Depo. Tr. (Ex. 12) at Q. 117.

The invention of the '351 Patent addresses this technological problem in multiple ways.  First, the Patent teaches a novel server architecture that includes a "proxy content server" that allows wireless devices to access relevant, up-to-date content and advertising information directly from a central aggregation point, thus

avoiding the burden of individual wireless devices having to directly synchronize with multiple different information sources. '351 Patent at 1:50-52, 2:19-27, 2:59-63, Fig. 1; Almeroth Decl. ¶ 63. Second, information aggregated by the proxy content server is intelligently organized and collected into "channels," based on, for example, "user specific information categories," which enable control of information involving use of triggering events and/or mobile device feedback signals that indicate "geographic location, the time of day, a user command, or some other type of information." '351 Patent at 3:58-60, 4:28-63, Claim 1. This increases the relevance and timeliness of information made available to the end user, ensuring that scarce transmission resources are used in the most efficient manner possible. *Id.* at 4:63-67, 5:44-47. Third, the proxy content server of the '351 Patent is further configured to distinguish between "static," "dynamic," and "default" advertising information of a particular advertiser. *Id.* at 6:54-57. As the Patent recognizes, these different types of advertising information change, and require updating at the server, over different periods of time. *Id.* at 7:35-49. By treating these categories of advertising information separately, an update to one type does not require an update to all, which further conserves scarce computing resources in the wireless devices and networks. Almeroth Decl. ¶ 67.

## B. Step 1: The '351 Patent Is Directed To Patentable Subject Matter

### (a) The '351 Patent Recites Concrete Solutions to Specific Technical Problems In The Field Of Wireless Communication

Claims directed to technological solutions are patent eligible. *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1007-08 (Fed. Cir. 2018) (focusing on the "particular way" in which the *actual* "technical solution" solved the prior art's "technological problem"); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-39 (Fed. Cir. 2016) . Also eligible are claims that are "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks" (*DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014)) and that "recite a specific improvement over prior systems, resulting

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

in an improved user interface for electronic devices" (*Core Wireless*, 880 F.3d at 1363).  For example, claims that "improve the functioning of the computer itself" or "improv[e] an existing technological process" are not directed to abstract ideas. *Enfish,* 822 F.3d 1327at 1335 (quoting *Alice*, 134 S.Ct. at 2358–59).

> **(b)   The '351 Patent Teaches A Novel "Proxy Content Server" Architecture For Aggregating Various Types Of Information**

*First*, the '351 Patent addresses an information synchronization problem between mobile devices and information sources.  This problem is distinctly technical—conventional systems could not effectively synchronize large amounts of advertising and content information from potentially thousands of individual information sources with potentially tens of thousands of mobile devices over a resource-constrained wireless network.  Almeroth Decl. ¶ 56.  Although "some paging networks offer[ed] services to automatically 'push' . . . information," they were limited to pushing "small amounts of information" to "alphanumeric paging devices." '351 Patent. at 1:39-41; Ex. 7 at 1-2 ("simple paging solutions also have size limitations and most cannot 'push' out more than about 170 characters of text."). Also, the "automatic push" solution of paging networks was undesirable because it "provided the user with no control over content delivery and [did] not allow temporary suspension of pushed information." Ex. 7 at 2.  Thus, a new solution for leveraging the techniques of "push" networks was necessary, particularly in light of the bandwidth inefficiencies in syncing large amounts of information. Ex. 7 at 1. ("[T]he amount of data to be reconciled between the service provider and the mobile device can become very large leading to bandwidth difficulties . . . .").

The '351 Patent provides the "proxy content server" as an architectural solution to this then-new technological problem.  In particular, the proxy content server operates as a specialized gateway between the many information sources and mobile devices.  '351 Patent at 2:19-27, 2:57-63, Fig. 1.  Instead of each mobile device synchronizing with each information source, each mobile device need only

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

synchronize with a single proxy content server to obtain certain information.  This provides significant bandwidth and processing relief to both information sources and mobile devices by dramatically lowering the number of synchronizations to obtain the same amount of information.  Ex. 12 at Q121; Almeroth Decl. ¶¶ 63-64.  As a result, the proxy content server architecture "solves the problem of the extremely high costs of wireless services by supporting the pushing of advertising and information to the mobile data communications device."  Ex. 7 at 4.  This efficient transmission of various types of information improves the mobile user experience, providing the user "a consistent and transparent experience of receiving both information content and advertising content."  '351 Patent, at 2:63-66.

This improvement is embodied in the claims of the '351 Patent, which recite *how* the proxy content server architecture addresses this technical problem.  The proxy content server receives information over a computer network," "stores the information to one of a plurality of channels," and "select[s] a channel for transmission of the information . . . over the wireless network to the mobile device" based on a triggering event or a feedback signal from the mobile device.  '351 Patent at 14:8-28.  By leveraging these techniques, the claimed architecture dramatically reduces the overall number of synchronization operations performed in the network.

      **(c)**      **The '351 Patent Teaches Techniques For Ensuring Delivery Of Timely And Relevant Information Over Resource Constrained Wireless Networks**

***Second***, the '351 Patent inventors recognized that conventional systems "provide[d] the user with no control over content delivery," and thus mobile devices often received irrelevant information over a wireless network.  Ex. 7 at 2, 3 ("[A] system that categorizing information and advertising into channels, that can be pushed and controlled by the mobile user, is still required.").  This routine transmission of irrelevant information to a mobile device needlessly burdened a bandwidth-constrained network.  Almeroth Decl. ¶¶ 59-60.  In addition, each mobile device consumed battery and processing resources to ingest irrelevant information.  *Id.*

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

To solve this problem, the proxy content server includes categorized channels to efficiently organize the information aggregated from the numerous available sources. The proxy content server does not simply compile, or even filter, information, but instead intelligently organizes each piece of information into a "channel," based on a predefined "category" and stores it in a memory location associated with that channel or category. '351 Patent at 3:58-65, 1:19-24.

These memory allocation techniques, in turn, allow the proxy content server to "make[] intelligent choices, based on user location[] and content as to when to insert advertising into the content data stream to the mobile device user." *Id.* at 5:44-47. Each particular user is interested in only a subset of the information collected by the server, so the server "combines the data into packages 20 based on each user's preference, and transmits or pushes the data packets 20 over the wireless network 22 to a mobile device 24." *Id.* at 3:10-13, 4:23-27, Fig. 1. In this manner, the proxy content server's channels promote efficient use of network bandwidth by enabling transmission of only relevant information to each mobile device. Almeroth Decl. ¶¶ 59-60; Ex. 11 at Q. 54; Ex. 12 at Q. 117. This avoids flooding mobile devices with irrelevant or unwanted information. Ex. 11 at Qs. 54, 55, 248, 261, 262, 286, 303; Ex. 12 at Qs. 117, 215; *see* '351 Patent, at 2:63-66. Even Snap's own corporate designee admitted how the intelligent categorization of information based on predefined categories improves overall system efficiency. █████████████

The '351 Patent claims recite this specific technical improvement. In particular, Claim 1 recites *how* the proxy content server stores information to a memory location associated with a channel "based on pre-defined information categories." Each channel at the server may correspond to "a category of information that the user may, or may not, be interested in receiving at her mobile device 24 at a given point in time or at a particular geographic location." '351 Patent at 4:39-46.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

To select relevant information for transmission, the proxy content server uses a feedback signal indicating a position of the mobile device to "select a channel for transmission of the information from the selected channel over the wireless network to the mobile device."  Using that signal, the proxy content server determines the channel and thus the type of information to package together and send to the device. When the server receives a signal such as the location of the device or other "triggering" event, it "determines if the content information or advertising information category assigned a particular channel 21 is relevant."  *Id.* at 4:39-46, 12:54-58.  Thus, recited in the claims themselves, are the specific requirements for how information is categorized and triggered to result in more relevant and timely transmissions to save scarce network resources.  Almeroth Decl. at ¶¶ 63, 64, 66.

> **(d)**   **The '351 Patent Teaches Techniques For Efficiently Handling Information That Changes At Varying Rates**

**Third**, the '351 inventors faced inefficiency in the varying frequency of updates to different types of advertising information.  For example, prior to the '351 Patent, in order to update an advertisement consisting of a logo and a promotional offer, information sources would have to transmit the entire updated advertisement (same logo and new promotional offer) to a mobile device.  In the process, information sources consumed bandwidth during transmission of redundant information (*i.e.*, the logo), and the server would needlessly expend processing power to ingest each transmission of redundant information.

To address this problem, the '351 Patent teaches using three separate categories of advertising information: (i) static information, which typically does not need to change, such as a company logo; (ii) default information, which typically rarely changes, such as a price list or menu; and (iii) dynamic information, which typically frequently changes, such as a temporary sale offer.  '351 Patent at 7:35-49.  By having the capability to distinguish between advertising information in these distinct categories, the proxy content server can keep all information up-to-date without

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

having to receive (from information sources) and/or transmit (to mobile devices) redundant information that has not changed in an intervening period.  For example, if an advertiser's logo (i.e., static information) already exists on a mobile device, the proxy content server may selectively transmit only an updated promotion (i.e., dynamic information) and not the logo.  Ex. 12 at Qs. 261-62, 281-83, 325.  This provides bandwidth savings in transmission of less information and mobile device battery savings in processing less data.  Ex. 12 at Q. 325; Almeroth Decl. at ¶ 67.

Again, the claims of the '351 Patent recite how this technical solution addresses the technical problem.  In particular, claim 1 requires that the proxy content server be capable of transmitting "at least one of static advertising information, dynamic advertising information, default advertising information, or content information, [] wherein a combination of the static advertising information with one of the dynamic or default advertising information comprises an advertisement or an information bulletin."  Thus, the '351 Patent teaches a server capable of more efficiently transmitting different types of advertising information, that change at varying rates over time, such that the information can be ultimately combined into an advertisement or advertising bulletin.  This insight cuts down on data transmission and battery usage.  Ex. 11 at Qs. 54, 55, 303; Ex. 12 at Qs. 117, 215.

### (e)   These Technological Solutions Render The '351 Invention Non-Abstract

The aforementioned technical benefits demonstrate that the '351 Patent is eligible at step 1.[1]  The Federal Circuit has held non-abstract similar claims drawn to

---

[1]   Defendants assert claim 1 is "representative" of the asserted claims, but they provide no analysis to demonstrate it is characteristic of all other claims.  Mot. 2.  It is not.  The Court rightly determined that "[d]ependent claims of the '351 Patent claim further details, for instance, about the computer network and claimed information as well as additional details about the functionality of the components within the claimed systems."  Dkt. 68 at 10 (referring to Claim 21).  For example, Claim 21 recites wherein data relating to the mobile device stored at a proxy content server database is "used by the proxy content server to select the channel."  '351 Patent at 16:7-12.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

distinct structures directed to a specific technological solution.  For example, in *Ancora*, the Federal Circuit held non-abstract claims directed to solving the technological problem of preventing unauthorized software use.  *Ancora Techs., Inc. v. HTC America, Inc.*, 908 F.3d 1343, 1348 (Fed. Cir. 2018).  These claims solved this problem via a "structure containing a license record [] stored in a particular, modifiable, non-volatile portion" of memory.  *Id.* at 1348-49.  As a result, the Federal Circuit found these claims recite an improvement in computer functionality that has "the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it."  *Id.* at 1349.

The claims of the '351 Patent are no different—they recite a specific proxy content architecture to solve the multi-faceted synchronization problem between information sources and mobile devices.  In particular, the '351 Patent's teachings address the need for information sources to directly interact with each mobile device, which proved to be costly and inefficient.  At the same time, the proxy content server's channel structure enables transmission of only relevant information, promoting efficient use of bandwidth and mobile device resources.  Almeroth Decl. ¶¶ 63-66; Ex. 11 at Qs. 54, 55, 248, 256; Ex. 12 at Qs. 117, 215.  Because the '351 inventions provide a technological solution to specific technical problems associated with resource-constrained mobile devices, they pass muster under step one.  *Enfish*, 822 F.3d at 1335-36 (finding claims non-abstract because the "focus of the claims is on the specific asserted improvement in computer capabilities."); *SRI International, Inc. v. Cisco Systems, Inc.*, No. 2017-2223, 2019 WL 3162421, (Fed. Cir. July 12, 2019) (finding claim "improves the technical functioning of the computer and computer networks by reciting a specific technique for improving computer network security.").

### 2. Defendants Ignore the Claimed Improvement in Computer Network Technology

Defendants' argument that the '351 Patent is addressed to an abstract idea relies on a gross overgeneralization of the claimed invention.  So much so that Defendants

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1   address both the '351 and '929 Patents at the same time, over-abstracting the claims

2   to "collecting and sending information to a user based on the user's location or a time

3   of day."   Mot. 8.   This is improper.[2]   The Federal Circuit routinely admonishes

4   Defendants' approach of "describing the claims at [] a high level of abstraction and

5   untethered from the language of the claims," because it "all but ensures that the

6   exceptions to § 101 swallow the rule."   *Enfish*, 822 F.3d at 1337; *see McRO, Inc. v.*

7   *Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) ("[C]ourts must

8   be careful to avoid oversimplifying the claims by looking at them generally and failing

9   to account for the specific requirements of the claims.") (internal quotes omitted).

10           Moreover, Defendants only arrive at their alleged abstract idea by deliberately

11   ignoring claimed features of the invention.   Defendants simply disregard the recited

12   types of information, including the "combination of the static advertising information

13   with one of the dynamic or default advertising information."   '351 Patent at 14:25-

14   28; *see* '929 Patent at 16:15-17.   Defendants also ignore the recited feature of the '929

15   Patent wherein a server determines "information relevant to the detected triggering

16   event" from a specific categorized channel.   '929 Patent at 14:15-21.   As a result,

17   Defendants overlook the recited function that supports how these inventions improve

18   bandwidth and battery efficiency in wireless mobile communications.

19           Defendants comparison of the '351 and '929 Patents to the abstract idea of

20   *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1370 (Fed.

21   Cir. 2015) ("*IV/Capital One*"), is inapposite.   The broadly worded claim in *IV/Capital*

---

23           [2]   And disingenuous.   Facebook CEO Mark Zuckerberg holds a patent directed to
    targeted advertising on a client device.   U.S. Patent No. 8,775,325 (Ex. 8) at 1:64-67,
24   Claim 1 (granted July 8, 2014).   Nima Khajehnouri, head of Snap's entire advertising
    delivery and discovery content system, holds a patent directed to targeted
25   advertisement subject matter.   U.S. Patent No. 10,311,085 (Ex. 2) at 6:26-33
    ("Embodiments of the invention teaches . . . extracting intents and intent profiles of
26   users . . . and then (i) monetization of such intents via targeted advertisements.");

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

*One* recited "a display" that depicts "web pages tailored to an individual user based on "navigation data" and "the user's personal characteristics." *IV/Capital One* at 1369. The Federal Circuit pointed to the exceptional breadth of this claim in holding it directed to tailoring information based on user information and navigation data. *Id.* The claims in *IV/Capital One* recited a mere result that the information was provided based on navigation data and user characteristics—there was no *how*. *See id.* Here, by contrast, the '351 Patent claims specifically recite *how* content and advertising information are efficiently maintained (at a proxy content server, based on pre-defined information categories), selected (using a feedback signal to select a channel of information), packaged (using default, static, and dynamic information), and sent to a mobile device. Given the stark distinction between the claims of '351 Patent and *IV/Capital One*, the abstract idea implementations of tailored newspaper inserts and advertisements are inapplicable. Mot. 8-9; *see IV/Capital One* at 1370. Defendants' various analogies (e.g., newspaper inserts) fail to account for the transient nature of mobile device synchronization or the flood of information particular to the Internet, which introduced specific technical problems that did not arise in traditional contexts like newspapers. Mot. 8-9; *DDR Holdings*, 773 F.3d at 1258; Section I.A.

Defendants similarly fail in their attempt to analogize the '351 Patent claims to the invention held ineligible by the Federal Circuit in *Bridge & Post*.[3] Mot. 9; *Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, No. 2018-1697, 2019 WL 2896449, at *3 (Fed. Cir. July 5, 2019). In particular, the claims of U.S. Patent No. 8,862,747 invoked HTTP header fields, user identifiers, and encryption techniques to accomplish "an improvement in the success or monetization of tracking users with personalized markings in order to serve advertisements." *Id.* In other words, the claims at issue in *Bridge & Post* merely "invoke[d] computers as a tool" to achieve

---

[3] Defendants mishandle the Federal Circuit's opinion in *Bridge & Post* by pointing to claims of U.S. Patent No. 8,862,747 but applying analysis of unrelated U.S. Patent No. 7,657,594. Mot. 9.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

the abstract idea of improving "monetization" generally.  *Id.* at *5.  The '351 Patent claims instead recite a proxy content server, not as a tool to achieve some abstract idea, but as an improved architecture directed squarely to solving synchronization problems in a wireless network.  *See supra* Section I.A; *Enfish*, 822 F.3d at 1335-36, 1338.  The '351 claims focus distinctly on this improved structure—including how it efficiently maintains information and enables distinct transmissions to resource-constrained mobile devices.  '351 Patent at 1:50-52, 2:19-27, 2:59-63, Fig. 1; Ex. 11 at Qs. 55, 286; Ex. 12 at Q. 215; *see supra* Section I.A.

Defendants' comparison to the targeted marketing claims in *Bridge & Post* similarly fail.  Mot. 9.  The Federal Circuit held U.S. Patent No. 7,657,594 was directed broadly to the concept of using generic computer and network access functions for "determining directed media to provide to a user on a website."  *Bridge & Post*, 2019 WL 2896449, at *4.  Critical to the Federal Circuit's analysis, the method claim recited no structure, and instead required merely the generalized steps of "retrieving" information associated with an identifier, "analyzing" the information, and "placing directed media" based on that analysis—all-purpose functions to implement targeted marketing.  *Id.*  The '351 Patent instead provides specific, concrete improvements to specific technological challenges.  *See supra* section I.A.

For example, the architecture of the '351 Patent provides for a "proxy content server" to aggregate information on behalf of mobile device users to reduce the end-to-end strain on wireless networks while still providing users a degree of control over the flow of information to the mobile device.  '351 Patent at 1:50-52, 2:19-27, 2:59-63, Fig. 1; Ex. 12 at Qs. 121, 215.  The "proxy content server" intelligently stores information based on "pre-defined categories" to increase the timeliness and relevance of information, ensuring that scarce device and network resources are not wasted on unwanted information.  '351 Patent at 3:58-65, 1:19-24; Ex. 11 at Qs. 55, 248, 286; Ex. 12 at Qs. 117, 215.  And, the "proxy content server" accounts for the varying frequency of updates to different types of advertising information allowing

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

for more efficient storage and transmission of advertising information. '351 Patent at 7:35-49; Ex. 11 at Q. 248; Ex. 12 at Qs. 215, 375.  The mere fact that the novel architecture of the '351 Patent happens to improve the delivery of advertising information (as well as non-advertising information) does not render the invention ineligible.  Unlike *Bridge & Post*, the '351 invention provides a set of technological solutions to a specific set of technological problems.  Thus, Defendants' analogy fails.

Defendants' arguments that the '351 Patent recites a conventional database also miss the mark.  Mot. 11, 13 (relying on *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1287-88 (Fed. Cir. 2018).  The claim in *BSG Tech* recites "guiding database users by presenting summary comparison information to users before they input data." 899 F.3d at 1286.  The *BSG Tech* claims are unrelated to how a database functions, whereas the '351 claims directly focus on a nuanced and specific manner of aggregating and combining content and advertisement via the proxy content server, optimizing push delivery of data to mobile devices over bandwidth-constrained wireless networks.  *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303-05 (Fed. Cir. 2018)(holding the "flexible and nuanced [software-based] virus filtering" to constitute "non-abstract improvements to computer technology").  Such functionality goes far beyond merely "putting papers in a file in a file cabinet," which fails to appreciate the technological challenge faced by the inventors.  Mot. 12; *see* Section I.A.

Defendants are wrong in alleging that the Federal Circuit "distinguished *Core Wireless* and curtailed its reach."  Mot. 15. (citing *Trading Techs. Int'l, Inc. v. IBG LLC* ("*Trading Techs II*"), 921 F.3d 1084 (Fed. Cir. 2019)).  The claims in *Trading Techs II* represented an improvement in the regular human activity of trading "goods and shares in companies" and the broadly-worded claims "focus[ed] on improving the trader, not the functioning of the computer."  921 F.3d at 1383.  These claims were not directed to a technological improvement as in *Core Wireless*.  *Id.*  Indeed, in post-*Core Wireless* precedent, *Data Engine*, 906 F.3d at 1008, the Federal Circuit

expressly upheld as non-abstract inventions reciting "a specific solution to then-existing technological problems in computers and prior art electronic spreadsheets." *See also DDR Holdings*, 773 F.3d at 1257-58.  As in those cases, the inventions here also provide a technological solution to specific technical problems associated with resource-constrained mobile devices, such as connecting with various information sources over a bandwidth-constrained wireless network.  The inventions teach a nuanced and specific manner of aggregating, combining, and delivering content and/or advertisements to resource-constrained mobile devices over bandwidth-constrained wireless networks.  *Finjan*, 879 F.3d at 1303-05.

Defendants reliance on *Two-Way Media* is also misplaced.  Mot. 12, 16; *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329 (Fed. Cir. 2017). Contrary to Defendants' assertion that the '351 claims use only result-based functional language, the '351 claims are, in fact, more specific than those at issue in *Two-Way Media*.  The patent at issue in *Two-Way Media* does not recite an "improved scalable architecture" (Mot. 16), but rather a purely results-focused method for routing information using the functional limitations of "converting," "routing," "controlling," "monitoring," and "accumulating records."  The Federal Circuit held that this failed to "describe how to achieve these results in a non-abstract way."  874 F.3d at 1337.  The '351 Patent claims, by contrast, involve more than results-oriented functional limitations and instead describe the specific architecture behind the claimed computer improvement by reciting ***how*** information is selected (by a proxy content server based on a feedback signal) and what it is selected from (categorized channels on the proxy content server).  *Ancora Techs.*, 908 F.3d at 1349 (finding non-abstract a claim directed to "an improvement in computer functionality that has the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it."); *Finjan*, 879 F.3d at 1305-06.  This distinction is critical as it highlights why "the claims here are directed to an improvement in the functioning of a computer."  *Enfish*, 822 F.3d at 1338.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

### 3. The Claims Recite A Non-Preemptive Specific Implementation

The Supreme Court acknowledged the "concern that undergirds § 101 jurisprudence" is preemption. *Alice*, 573 U.S. at 223. This preemption concern arises when the claims are not directed to a specific invention and instead improperly monopolize "the basic tools of scientific and technological work." *McRO*, 837 F.3d at 1314 (Fed. Cir. 2016) (quoting *Alice*, 134 S.Ct. at 2354).

Defendants' Motion alleges that the '351 Patent is directed to various abstract ideas.[4] But, these abstract ideas can be performed by other means, including those that do not require a proxy content server, distinct categorized channels, use of a feedback signal, or a combination of different types of information. *Research Corp. Techs. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010) ("[I]nventions with specific applications or improvements to technologies in the marketplace are not likely to be so abstract that they override the statutory language and framework of the Patent Act."). For example, an information source may avoid the '351 Patent by simply collecting and sending information directly to a user based on the user's location or a time of day. Indeed, this was the exact problem faced by the inventors. *See supra* Section I.A. Because the '351 Patent claims specifically detail ***how*** to "produc[e] a certain result, or effect" using a set of non-abstract claimed structures (proxy content server, a plurality of channels, memory locations, proxy content server database, information source, computer network, mobile device, and wireless network), the claims are narrowly drawn to a distributed architecture to achieve technological solutions to multiple technological problems specific to computer networks. *See* Section I.A; *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d

---

[4] Defendants allege that the '351 Patent is directed to abstract ideas of "collecting and sending information to a user based on the user's location or a time of day" (Mot. 8), "delivering targeted ads to potential customers having mobile devices" (Mot. 11), "[c]ollecting and analyzing information, and presenting the results of that collection and analysis to users" (*id.*), and collecting and sending information in wireless communications (Mot. 2, 8, 12, 17).

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1290, 1301 (Fed. Cir. 2016) (finding an invention "tied to a specific structure of various components . . . is narrowly drawn to not preempt any and all generic [treatment] of data in a similar system.").

Defendants' proposal that the '351 Patent claims encompass all solutions for "receiving, analyzing, and sending information to a mobile device" is demonstrably false.  Mot. 12.  For example, U.S. Patent No. 8,775,325 granted in 2014 to Facebook recites receiving information ("receiving, by a social networking computer system, an advertisement request from an advertiser"), analyzing information ("identifying an indication in the advertisement request"), and sending information ("selecting . . . a story for the viewing user for display on the client device as a social advertisement" and "sending, by the social networking computer system, the social advertisement to the client device").  Ex. 8 at 19:44-20:19; *see also* U.S. Patent Nos. 9,125,015 (Ex. 9) (granted in 2015 to Facebook) and 9,749,233 (Ex. 10) (granted in 2017 to Facebook).

## C.    Step 2: The '351 Patent Claims Additional Inventive Elements

Should the Court reach step two, factual disputes preclude summary judgment. The same factual dispute that precluded Defendants' motion to dismiss also precludes the present Motion.  The Court already acknowledged "a factual dispute regarding whether the 'proxy content server' and its specific architecture as recited in the claims provide for a well-understood, routine, and/or conventional computer component." Dkt. 68 at 12.  As the Court correctly noted, "Courts have found, both in the context of step one and step two of the patent eligibility framework, that claims directed to an unconventional architecture for organizing data or computer components may be patent eligible."  *Id.* (collecting cases).

Recent Federal Circuit law further compels denial of Defendants' Motion.  In *Berkheimer*, the Federal Circuit confirmed that "whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field ***is a question of fact***."  881 F.3d at 1368 (emphasis added). In that case, the Federal Circuit held that the district court erred in concluding there

-19-                                    Case No. 2:18-cv-01844 GW(KSx)

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

are no underlying factual questions to the Section 101 inquiry at the summary judgment stage. *Id.* at 1369. Similarly, in *Vaporstream, Inc. v. Snap Inc.*, No. 2:17-cv-00220-MLH (KSx), 2018 WL 1116530, at *6 (C.D. Cal. Feb. 27, 2018) (Huff, J.), the Court noted that competing expert testimony as to whether a claim element is well-understood, routine, and conventional to a skilled artisan in the relevant field is sufficient to preclude summary judgment on the issue. *Id.*

At a minimum, the referenced evidence and expert testimony in this Opposition are sufficient to establish at least one factual dispute regarding whether the recited proxy content server is a well-understood, routine, and conventional element. *See, e.g.*, Almeroth Decl. ¶¶ 70-79. BlackBerry's expert witness—Dr. Kevin Almeroth—has opined that the invention of the '351 Patent was not well-understood, routine, and conventional to a POSITA. *Id.* This expert opinion is corroborated by the description of the invention in the patent specification, the provisional application, and the testimony of the inventors who have thus far been deposed.

According to a skilled artisan in the relevant field of mobile communications, the proxy content server is not a well-understood, routine, and conventional element. *Id.* Conventional proxy servers act as a document "gopher" by retrieving files at the request of desktop clients. Ex. 5 at 39-40, Fig. 18; Almeroth Decl. ¶¶ 72-73; Ex. 5 at 39-40. These proxy servers mainly focus on storing documents and internet security. Ex. 6 at 7:6-10 (describing that a proxy server at issue "functions as a conventional proxy server by passing through data communications between the computer 52 and user device 50."); Almeroth Decl. ¶ 73. There is no evidence that generic proxy servers were capable of storing received information "to one of a plurality of channels based on pre-defined information categories" and "selecting a channel for transmission of the information . . . over the wireless network to the mobile device" based on a feedback signal from the mobile device or a triggering event. Almeroth Decl. ¶¶ 73-79. As a result, conventional proxy servers fail to achieve benefits unique to the recited proxy content server architecture—significant bandwidth savings in

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

transmission of only relevant information and mobile device battery savings in processing less data (leading to a better user experience of longer battery life). Almeroth Decl. ¶¶ 75-79.

Notably, Defendants' provide no support, other than attorney argument, that the claimed invention was well-understood, routine, and conventional to a POSITA. Mot. 18-21.  Defendants provide no expert testimony in support of their Motion, let alone evidence regarding the perspective of a skilled artisan.  The only evidence provided by Defendants that was not previously before the Court is evidence in support of Defendants' assertion that "it was well known to have a 'proxy' server act as an intermediary." Mot. 21.  Defendants' reliance on texts describing generic proxy servers is inapposite.[5]  These texts are only directed to a conventional proxy server, not the recited proxy *content* server described and claimed by the '351 Patent.  For example, one text illustrates a generic proxy server interposing between the internet and a network—there is no capability to select channels based on a feedback signal or combine different types of information to push to a mobile device. *Id.*; Keefe Ex. 5, Fig. 1.1, at p.5.  None of these references disclose *a* mobile device, let alone a proxy content server that performs the recited function on behalf of the mobile device. Defendants' mere attorney argument and misinterpretations of Dr. Almeroth's statements fail to provide anything new for the Court to consider at this stage, and the Court should adhere to its recognition of a factual dispute. *See* Dkt. 68 at 12; App. 1.

Moreover, Defendants' reliance on *Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1328 (Fed. Cir. 2017) ("*IV/Erie*") (Mot. 20) is inapt, as the claims in that case recited a generic database and XML tag that did not amount to "any specific structure or improvement of computer functionality sufficient to render the

---

[5]  Defendants' provide no context from a sponsoring witness or proper foundation for the technical documents and texts upon which they rely, which means this "evidence" cannot carry Defendants' summary judgment burden.  "[U]nauthenticated documents cannot be considered in a motion for summary judgment. *Cristobal v. Siegel*, 26 F.3d 1488, 1494 (9th Cir. 1994); *see* Fed. R. Civ. P. 56(e).

1   claims not abstract." *Data Engine*, 906 F.3d at 1010 (distinguishing *IV/Erie*). Here,

2   by contrast, the '351 Patent claims recite a unique structure for aggregating and

3   processing information to efficiently and quickly make it available to mobile devices

4   over wireless networks. *Enfish*, 822 F.3d at 1337; *see supra* Section I.A.

5       The mere mention of advertisement does not render a patent per se ineligible

6   under step two. For example, in *DDR Holdings*, the Federal Circuit found an

7   inventive concept in claims that addressed the "Internet-centric problem" of third-

8   party merchant advertisements that would "lure . . . visitor traffic away" from a host

9   website. 773 F.3d 1245, 1248 (Fed. Cir. 2014). The Federal Circuit determined that

10  because the claims "specify how interactions with the Internet are manipulated to

11  yield a desired result," the interactions are "not merely the routine or conventional use

12  of the Internet." *DDR Holdings*, 773 F.3d at 1257. The '351 claims similarly stand

13  apart because they override the routine and conventional synchronization between an

14  information source and mobile device. The claimed solution, necessarily rooted in

15  the proxy content server architecture, instead aggregates information, manipulates it

16  into specific memory locations, and transmits only portions of relevant information

17  in order to address multiple technical problems that arose in conventional

18  synchronization. Ex. 11 at Qs. 55, 248, 286; Ex. 12 at Qs. 117, 215; *see* Section I.A.

19      Defendants' assertion that the '351 Patent recites only conventional functions

20  of a network server, Mot. 18-19, ignores the claim language. Rather than using only

21  broad functional language (e.g., solely claiming the steps of "receiving" and

22  "selecting" information), the '351 Patent claims recite distinct architecture for *how*

23  information is selected (by a proxy content server based on a feedback signal) and

24  what it is selected from (categorized channels on the proxy content server). '351

25  Patent at 14:8-28. Whereas a conventional proxy server simply ferries information to

26  a destination, the recited proxy content server selects which information to send from

27  categorized channels based on a feedback signal, "preferably mak[ing] intelligent

28  choices, based on user location, and content as to when to insert advertising into the

content data stream to the mobile device user." '351 Patent at 5:44-47; Almeroth Decl. ¶¶ 73-75; *DDR Holdings,* 773 F.3d at 1257-58 (holding unconventional a recited host website that receives an advertisement click and provides product details while maintaining the "look and feel" elements of the host website). The specification further describes how the proxy content server facilitates recited combination of different types of advertising information related to the selected channel for a consistent and transparent mobile experience ('351 Patent at 2:63-66) and delivers aggregated information to a mobile device (*id.* at 2:29-63). These functions are a far cry from routine proxy servers, which Defendants admit merely "act as an intermediary or middleman between multiple users devices and remote sites over the Internet," as well as a conventional network server (and the "content server" of the '351 Patent). Mot. 18-20; '351 Patent at 2:27-40, 2:51-56, Fig. 1.

Finally, Defendants misconstrue Dr. Almeroth's testimony and prior opinions offered during claim construction. Mot. 19-21; *see* App. 1 (comparing Defendants' statements to Dr. Almeroth's testimony). Dr. Almeroth noted that while the recited proxy content server and conventional proxy servers both demonstrate basic "proxy" attributes, the proxy content server provides improved structure and function. Almeroth Claim Construction Decl. (Dkt. 110-2) pp. 37-38, ¶¶99-100; Okano Ex. E at 146:5-11 (noting that "those parallels only extend so far because of the specialized nature or specificity of what the claims require of the proxy content server"). After describing the qualities of a conventional proxy server, Dr. Almeroth states "[h]owever, to accomplish the stated aim of the disclosed invention, the 'proxy content server' provides additional functionality to provide tangible improvements in the communication system," including "us[ing] specific aggregation procedures (i.e., channels based on pre-defined information categories) and distribution techniques (i.e., feedback signal, triggering event, meta tag) to combine targeted content and advertising information for transmission to mobile devices." Dkt. 110-2, pp. 38-40, ¶¶101-105. He stated that by aggregating information into channels based on

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

predefined categories, the proxy content server "does not simply perform the normal function of an intermediate cache," but instead "distribute[s] information by category instead of merely fulfilling a request for a stored file." *Id.* at ¶106-07. Dr. Almeroth also recognized the unconventional benefits resulting from the improved structure, including "increase[d] efficiency of communications and user-perceived latency by combining targeted information," as well bandwidth conservation. *Id.* at ¶111.

Dr. Almeroth, as well as Defendants' 30(b)(6) witnesses, acknowledged that the "proxy content server" was not well-known at the time of invention. Almeroth Rebuttal Claim Construction Decl. (Dkt. 125-1) p. 4 at ¶11 ("I am not aware of a 'proxy content server' existing in the early 2000s outside the context of the '351 and '929 patents."); Okano Ex. E at 88:11-20 ("Q. Doctor have you seen anything using your definition of proxy content server that existed prior to the priority date of the application of the ad server patents? A. "Sitting here now, nothing comes to mind.");

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████ Liu Rough Tr. 195:18-196:2 (Ex. 16) (same).

Defendants are also incorrect in contending there is nothing inventive in the ordered combination. Mot. 29. Defendants' oversimplification ignores that classifying advertising and content into pre-defined categories and storing them into memory locations enables the proxy content server to combine static, dynamic, and default advertising information, and then select only that information which is relevant to the mobile device—before sending it thereto. The capabilities of the proxy content server and its network architecture enable only a selective subset of information to be sent to a mobile device over a wireless network, with distinct benefits for network operators and mobile device users. Almeroth Decl. ¶ 76; *see* Section I.A. Moreover, the elements operated together to provide an improved system

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

for delivery of relevant and timely advertising information to mobile device users, a specific and substantial improvement over prior art systems.  *Id.*; *see Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*,  827 F.3d 1341, 1350 (Fed. Cir. 2016) ("[A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces.").

Defendants offer no record evidence—let alone the clear and convincing sort—to support its contention that the ordered combination was conventional and generic at the time of the invention in the field of network communications, or in any other field.  Mot. 28-29; *Vaporstream*, 2018 WL 1116530, at *6 (finding independent grounds for denying summary judgment in Defendant's failure to present evidence to show that the "specific combination of the elements performed in the specific order claimed in the patents-in-suit was conventional and generic at the time of the invention in the [relevant] field").  Defendants merely accompany attorney argument with misconstrued testimony from BlackBerry's expert Dr. Almeroth.  *See* App. 1.  Such lack of evidence cannot satisfy Defendants' burden to prove by clear and convincing evidence that the ordered combination lacks inventive concept.  At minimum, rendering summary judgment at this stage is inappropriate as there are factual disputes.  *Berkheimer*, at *5.

## II.   THE COURT SHOULD DENY SUMMARY JUDGMENT OF INVALIDITY OF THE '929 PATENT

### A.   The Invention Of The '929 Patent

The '929 Patent uses the same fundamental architecture as the '351 Patent, and also teaches the use of a "meta tag" that "relates to display of specific one or more advertisements with the content information."[6]  '929 Patent at Abstract.  Like the '351

---

[6]  Although the '929 patent recites a "server" instead of a "proxy content server," surrounding claim language recites the same features that establish the '351 Patent as non-abstract and drawn to an inventive concept.  *See* Section I; Dkt. 68 at 13 (The Court recognizing that "[a]lthough the '929 Patent claims use the more generic term "server," they include the same references to organizing data into memory location

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Patent, it is a solution directed to solving a problem specifically arising in sending information to wireless devices.  Specifically, once the server detects a "time triggering event," it determines content relevant to the time trigger from a categorized memory channel.  *Id.* at 11:45-12:16.  The server then embeds a "meta tag" into the content that specifies advertisement and display requirements based on the detected triggering event.  *Id.*  This meta tag is served along with content and consumes less data than the full advertisement because, for example, it teaches using "a cross reference value to reach the full advertising on the mobile device."  *Id.* at 12:11-15. This preserves bandwidth and device resources by sending a meta tag in lieu of the actual advertising information (which is are larger pieces of data), thereby allowing the mobile device to receive advertising information corresponding to the meta tag only when it actually accesses the content.  Ex. 11 at Q. 286; Ex. 12 at Qs. 220-22, 325, 326; Almeroth Decl. ¶ 87.  That is, rather than sending the full advertisement, the Patent describes sending an embedded control sequence referencing the full advertisement to be timely delivered to the device later—e.g., when the device is actually accessing or displaying the content to which the advertisement corresponds, thereby ensuring that bandwidth is not consumed sending advertisements that a user may never see.  *Id.* at 8:32-35; Ex. 11 at Q. 286; Ex. 12 at Qs. 220-22, 325, 326; Almeroth Decl. ¶ 87.

**B.    Step 1: The '929 Recites an Additional Technical Solution**

In addition to the technical problems addressed in the '351 Patent, the '929 Patent addresses an additional synchronization problem between mobile devices and information sources.  Conventionally, advertising information transmitted with content information was delivered as a single, unitary package.  However, it was not desirable to transmit large amounts of data given the bandwidth constraints at the time of invention.  Ex. 11 at Q. 55 ("request response protocol is, can be more expensive

---

channels and transmitting specific data based on a triggering event, as well as adding a meta tag to the data for transmission."); Dkt. 156 at 11.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

in that the device is constantly transmitting information."); Ex. 12 at Q. 221. In addition, the time between receiving and viewing a content/advertising combined piece of information could vary dramatically on a mobile device. As a result, information could be viewed at a time long after the associated advertising information was relevant. With no way to deal with this uncertainty, conventional synchronization systems consumed significant bandwidth in transmitting information that was not viewed in the relevant window. *See* Ex. 12 at Qs. 289. 323. Further, mobile devices expended significant resources receiving and processing information that became irrelevant. Ex. 11 at Q. 55.

The '929 Patent solves these problems by inserting a meta tag into content information before transmission to a mobile device. Since the meta tag is a "embedded control sequence[] that the Proxy Content Server has inserted to indicate when advertising should be inserted," it is a smaller piece of data. *Id*. at 8:32-35; Almeroth Decl. ¶¶ 86-88. As a result, this specific technique conserves bandwidth by reducing "over the air transmission of advertising information." Ex. 12 at Qs. 220-22, 325. Since the meta tag includes "a cross reference value to reach the full advertising on the mobile device," the mobile device conserves battery and processing resources in only seeking out the full advertisement when it is ready for viewing. '929 Patent at 12:11-15; Almeroth Decl. ¶¶ 86-88.

This improvement is embodied in the claims of the '929 Patent, which recite *how* the server architecture aggregates information and uses a meta tag control sequence to address this technical problem.[7] In particular, a server "detects a triggering event" including a time triggering event, "determines information relevant

---

[7] Defendants provide no analysis supporting that claim 9 is "representative." Mot. 5. It is not. For example, claim 16 recites that the advertisement comprises "static advertisement, dynamic advertisement, or default advertisement." The Court correctly noted that "[t]he dependent claims of the '929 Patent provide specific limitations, for example, relating to the timing and specifics of the triggering event and the insertion of the meta tag." Dkt. 68 at 11.

to the detected triggering event," inserts a meta tag into content information, "wherein the meta tag identifies "advertisements and relevant display requirements," and "transmit[s] the content that includes the meta tag to the mobile device." The '929 Patent recites specific steps using the meta tag to accomplish flexible advertisement distribution in a way that improves upon conventional wireless communications. *Finjan*, 879 F.3d at 1303-05 (holding the "flexible and nuanced [software-based] virus filtering" to constitute "non-abstract improvements to computer technology"); *see* Ex. 11 at Q. 287. Against the backdrop of Section I, the '929 claims teach a novel technological architecture to transmit data to mobile devices over a wireless network—including a meta tag in lieu of the advertisement to further save bandwidth over the wireless network and computational resources (and therefore battery usage) on the wireless device. Ex. 11 at Q. 286; Ex. 12 at Qs. 220-22.

Even with this recited technical architecture, Defendants provide an inane comparison of the "meta tag" to a "put ad here" space in a newspaper. Mot. 14. Notably, Defendants provide no evidence that that the mentioned practice of a "paste up" board of an old newspaper was conventional or prior art. *Id.* Even if they had provided evidence, Defendants' simplistic "put ad here" does not account for the ephemeral nature of mobile device synchronization or the overwhelming amount of information particular to the Internet, which introduced specific technical problems that did not arise in traditional contexts like newspapers. *DDR Holdings*, 773 F.3d at 1258. The meta tag is embedded within content information and packaged for transmission to a mobile device based on a triggering signal—a specific technical implementation that conserves bandwidth by not sending a full advertisement file. *See Bascom Glob.*, at *1350-51 (holding eligible claims that "recite a specific, discrete implementation of the abstract idea of filtering content" because they "improve an existing technological process"); Ex. 12 at Qs. 163, 325, 326.

Defendants are mistaken to rely on *Bridge & Post* to assert that the "meta tag" has no effect on the focus of the '929 claims. Mot. 9-10. In this case, the Federal

Circuit found a method claim reciting "embedding [an] alphanumeric string in an extensible field" portion of an HTTP header to be insufficient to create an inventive concept. *Bridge & Post*, 2019 WL 2896449, at *8. However, the Federal Circuit reached this conclusion because HTTP headers are conventionally used to store information. *Id.* The '929 Patent, however, recites a "meta tag" specifically inserted into content information by a server prior to transmission and identifies specific advertisements related to a detected triggering event—function recognized by this Court as unconventional. Dkt. 156 at 16 (finding that "the '929 Patent does not use the term 'meta tag' to mean hidden, descriptive text within HTML code.").

Defendants also err in relying on *IV/Erie* to allege that the '929 claims do not recite how meta tags lead to improvements in any aspect of computer technology. Mot. 24. The Federal Circuit noted in *IV/Erie* that merely reciting XML tags instead of other kinds of tags will not save a patent from abstraction. 850 F.3d 1315, 1328. Rather than reciting how an XML tag is implemented, the '929 Patent instead focuses on *how* the usage of unique "meta tags" alter wireless communications in a way that improves bandwidth efficiency in transmission, as well as processing and battery consumption at the mobile device. *Enfish*, 822 F.3d at 1338; Ex. 11 at Q. 286; Ex. 12 at Qs. 220-22; Almeroth Decl. ¶¶ 82-84. XML tags merely provide a fixed link to content whereas the recited meta tag enables a deferred selection of advertisement to be inserted to content. Ex. 12 at Q. 326; Almeroth Decl. at ¶ 84. As a result, the '929 Patent does not include a high-level recitation of an abstract idea, but instead recites a specific meta tag implementation the leads to tangible technical benefits in wireless communications. Ex. 11 at Q. 286; Ex. 12. at Q. 325; Almeroth Decl. ¶ 87.

Defendants misconstrue Dr. Almeroth's testimony to imply that he admitted the claimed "meta tag" could be text information, an HTML tag, or an XML tag. Mot. 6-7; *see* App. 1. However, Dr. Almeroth was clear—"it would depend on how they're used and what the system is and how they're described. And I'd have to do that analysis." Okano Ex. E at 261:3-17. He went on to explain that he did not "see

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

anything in the construction that would limit it to text[, an HTML tag, an XML tag] or not," as the claim "doesn't go to that level of detail." *Id.* at 24:8-23, 259:10-20; *see* App. 1.  Dr. Almeroth disagreed that there's necessarily a link between the recited "meta tag" and specific computer languages. *Id.* at 250:8-23.  Instead, he stated that the term "meta tag" is defined in the specification as "an embedded control sequence inserted to indicate when advertising should be inserted." *Id.* at 240:3-8.

As with the '351 Patent, there are also no preemption issues with the '929 Patent claims.  The '929 Patent does not cover "any means for performing its claimed function" (Mot. 24), because the claims specifically detail *how* to "produc[e] a certain result, or effect" using a specific server architecture and meta tag implementation. *Amdocs*, 841 F.3d at 1301 (finding an invention "tied to a specific structure of various components . . . is narrowly drawn to not preempt any and all generic [treatment] of data in a similar system.").   Defendants reliance on *GoDaddy.Com LLC v. RPost Commc'ns Ltd.*, is inapposite.   Mot. 24; No. CV-14-00126-PHX-JAT, 2016 WL 3165536, at *12 (D. Ariz. June 7, 2016), *aff'd,* 685 F. App'x 992 (Fed. Cir. 2017).  In that case, the Federal Circuit found no inventive concept because the specification described a recited "authenticator" as "all types of apparatus" capable of performing recited functionality. *Id.*  In contrast, the '929 Patent describes a specific "meta tag" as "embedded control sequences that the Proxy Content Server has inserted to indicate when advertising should be inserted." '929 Patent at 8:32-35.  As with the '351 Patent, even Defendants' abstract idea of "collecting and sending information to a user based on the user's location or a time of day" can be performed by other means, including those that do not require a meta tag inserted by a server into content information related to a triggering event.

## C.   Step 2: The '929 Patent Claims Additional Inventive Elements

For the same reasons related to the term "proxy content server," factual disputes preclude summary judgment regarding the '929 Patent. *Aatrix*, 882 F.3d at 1127 (Fed. Cir. 2018) (factual questions regarding whether term "data file" was routine and

-30-

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

conventional precluded dismissal).  Defendants are wrong that the recited meta tag was previously known in the form of an HTML image tag.  Mot. 25-28; Ex. 16 at 195:7-17.  The Court already decided that "the '929 Patent does not use the term 'meta tag' to mean hidden, descriptive text within HTML code."  Dkt. 157 at 17.  At the very least—particularly given that Defendants provide no expert testimony on this matter—a fact issue remains as to whether BlackBerry's particular implementation of advertising meta tags served along with non-advertising content in response to a triggering event is an "inventive concept."  Even if the meta tag or any other element of the '929 Patent was previously known, that does not mean they are "conventional" or "routine" for step two purposes.  *Berkheimer*, 881 F.3d 1360, 1369 (Fed. Cir. 2018) ("The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional.").

The recited meta tag provides flexibility in identifying "one or more advertisements and advertisement display requirements" related to a detected triggering event.  In particular, the meta tag tailors advertisement to each mobile device based on the detected triggering event by enabling a deferred choice of advertisement.  Ex. 12 at Q. 326 ("There could be scenarios where the information is not there yet and it's, it needs to be transmitted."); Almeroth Decl. ¶¶ 86-87.  The advertisement(s) identified by the meta tag also include static, dynamic, or default advertisement information.  '929 Patent at Claim 16.  In this manner the meta tag provides a flexible and unconventional solution to embed targeted advertising into displayed content, thus addressing existing technical problems in mobile device communications.  Ex. 11 at Qs. 286, 287; Ex. 12 at Q. 319.

Defendants ignore that the '929 Patent recites a specific implementation of a meta tag.  The Court aptly recognized that the claims require that the recited meta tag is "'insert[ed] to' content information [by a server], identifies information about an advertisement (including advertisement display requirements), [] is transmitted with the content information to the mobile device," and that "the advertisement (associated

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

with the meta tag) is itself selected based on a detected triggering event comprising a time triggering event." Dkt. 157 at 15.  As a result, the indicated HTML tags do not provide the same flexibility as recited meta tags.  The provided desktop related HTML image tags are written by a website developer, not inserted to content information by a server.  Mot. 25-26.  Nor is the information referenced by an HTML tag selected based on a detected triggering event comprising a time triggering event.  Instead of providing fixed links to content as with HTML, WML, and XML tags, the recited meta tag enables a deferred selection of advertisement to be inserted to content, wherein the advertisement is relevant to a detected triggering event.  '929 Patent at 14:22-31; Ex. 12 at Q. 326; Almeroth Decl. ¶¶ 84-88.  WML tags are similarly inapposite—Defendants fail to provide *any* evidence that WML tags function in the same way as the recited meta tags of the '929 Patent.  Mot. 27-28.

As with the '351 Patent, Defendants fail to prove by clear and convincing evidence that the ordered combination lacks inventive concept.  Defendants fail to provide *any* evidence to show that the specific ordered combination of recited elements was conventional and generic at the time of the invention in the field of network communications, or in any other field.  Mot. 28; *Vaporstream*, 2018 WL 1116530, at *6.  Defendants solely provide attorney argument.  Mot. 28.  Moreover, Defendants argument that the recited sequence lacks inventive concept because each step inevitably leads to the next is nonsensical and lacks support in case law.  *Id.*  It's also wrong—the abstract idea of collecting and sending information to a user can be performed without inserting a meta tag into content information.

## III. THE COURT SHOULD DENY SUMMARY JUDGMENT OF INVALIDITY OF THE '120 PATENT

### A. The Invention Of The '120 Patent

The '120 Patent is directed to a specific problem that only emerged with the advent of multi-functional electronic devices.  Specifically, in prior systems, users "receive[d] a notification each time an electronic message is received," such as an auditory, visual, or physical (vibration) alert.  '120 Patent at 1:28-32.  The Court found

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

that a "notification," as used in the '120 Patent refers to "some form of visual, auditory, or physical cue to draw attention to an incoming message that would not otherwise have been noticed, at the time of the incoming message." Dkt. 157 at 31. While these sorts of "notifications" are useful to alerting a user to receipt of a new message, the proliferation of mobile messaging was causing these new message "notifications" to become distracting in some circumstances. Rosenberg Claim Construction Decl. (Dkt. 110-2) pp. 267-68 ¶ 84. Given its unique nature, this emerging problem was specific to the field of electronic messaging. Rosenberg Decl. ¶¶ 41-48. Thus, there was a need in the art to address the distraction of incessant notifications, while still alerting the user to important or time-sensitive messages.

The '120 invention provided a specific and novel technological solution to this emerging problem by allowing users to select which messages trigger notifications, based on "message threads"—*e.g.*, logical groupings of message conversations organized by topic of conversation or activity. '120 Patent at 1:24-25. As taught by the '120 Patent, threads are silenced by setting "a flag … in a data record associated with the message thread." *Id*. at 9:35-38. When a new incoming message is determined to be associated with a flagged thread, "any previously-enabled notification setting(s) may be overridden and notification module 310 may be prevented from producing notifications." *Id.* at 9:35-43. Importantly, all messages are ultimately displayed in the same "inbox," though silenced message threads are "displayed in the inbox in a different manner." *Id.* at 13:28-30, claim 1. Thus, the invention of the '120 Patent enables users to selectively silence certain notifications on a per thread basis. Rosenberg Decl. ¶¶ 32, 49. At the same time, the invention visually conveys to the user which message threads are silenced, and which are subject to a more general notification setting. Rosenberg Decl. ¶ 50.

## B.    Step 1: The '120 Patent Is Directed To Patentable Subject Matter

The claims of the '120 Patent, on their face, are not directed to an abstract idea. To the contrary, the claimed invention is directed to a specific manner of using the

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

notification system and graphical interface of an electronic device to result in specific improvements in the interaction between device and user.

The '120 Patent deals with "notifications" for newly received electronic messages, and the patent claims a unique and detailed way for preventing such notifications from being provided only for certain types of newly received incoming messages. Specifically, the '120 Patent prevents notifications only for a "selected message thread" based on "a flag stored . . . in association with the selected message thread," and subsequently "prevent[ing] a receipt notification pertaining to [an] incoming electronic message associated with the selected message thread from being activated." '120 Patent, claim 1. As the claims describe, the selective prevention of a receipt notification is accomplished by "overrid[ing] a currently-enabled notification setting" after checking a specific flag. *Id*. These claimed features allow users to selectively silence new message notifications on a per-thread basis and thus "prevent notifications for only those message threads that the user deems the most problematic or disruptive, while allowing the user to receive notifications from other threads that the user still wants to be notified about." Rosenberg Decl. ¶ 49.

Moreover, the '120 Patent provides a particular way in which messages belonging to such silenced message threads are visually presented to the user, requiring that such messages be displayed "in an inbox together with any message thread not flagged as silenced" while also displaying the silenced thread "in a different manner than any message thread not flagged as silenced." '120 Patent, claim 1; Rosenberg Decl. ¶ 50. This claimed approach of continuing to visually display the silenced thread, albeit in a different manner, "provides a user benefit by allowing a user to recall that she has flagged a conversation as muted when she views her inbox," while still displaying the silenced thread in a visually distinctive manner. Rosenberg Decl. ¶ 58. Accordingly, the '120 Patent is not directed to abstract subject matter, but to a concrete and specific way in which a device physically interacts with a user as well as how such a device displays specific messages to the user.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1    Defendants overgeneralize the '120 Patent to argue that it is directed to "the

2  abstract idea of not being notified about new messages in a selected group or category

3  of messages." Defendants' Memo at 32 (Dkt. 239-1). Based on this generalization,

4  Defendants stretch to find an analogous brick-and-mortar model of the activity to

5  arrive at the example of a "person tell[ing] their administrative assistant to 'please

6  hold calls from Joe.'" This strained analogy, and in turn Defendants' over-abstraction

7  of the '120 Patent, fails for numerous reasons.

8    First, the analogy ignores numerous claim limitations. The '120 patent claims

9  require that the new message is displayed in an inbox in a different manner from those

10  message threads which are not silenced. In Facebook's analogy, however, the person

11  never learns of the call at all because the assistant is "holding" it. This is in some ways

12  the opposite of the invention of the '120 patent and ignores the improved user

13  interface and electronic device disclosed and claimed in the '120 patent.

14    Second, the '120 Patent deals with silencing notifications related to particular

15  *messaging thread*. A messaging thread is a concept unique to the realm of electronic

16  messaging with no brick-and-mortar analogue. Rosenberg Decl. ¶ 40. As the '120

17  Patent explains, a message thread may include a "group discussion" or "can relate to

18  a particular matter such as a particular topic of conversation or an activity," and each

19  message may "be included in the same message thread." '120 Patent, Col. 1:25-28,

20  1:33-34. Defendants do not contend that message threads were a longstanding

21  practice prior to computers or electronic messaging.

22    Third, the receipt of incoming electronic messages, which the '120 Patent

23  pertains to, is fundamentally different than the receipt of a phone call. For example,

24  in the case of an electronic message, even if a receipt notification is prevented for a

25  received message, the message content is still received. In Defendants' administrative

26  assistant example, if the assistant follows the given instructions, then any call from

27  Joe will be declined and not received. With an electronic message, however, the

28  device still receives the message, even if there is no notification, which presents

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

additional issues not present in the realm of telephone communications, such as how to process and present a received silenced message. The '120 Patent specifically deals with these issues of processing and presenting. Again, such functionality has no pre-computing analogue and Defendants accordingly ignore this fact in their analogy.

Defendants also err in their contention that the '120 Patent does not solve a technical problem or address any problem unique to computer technology. Defendants' Memo at 33-34 (Dkt. 239-1). Instant messaging allows at-your-fingertips, near-instantaneous communications which results in the sending and receipt of a far greater number of messages, and resulting notifications, than was previously experienced with conventional messaging technologies. Rosenberg Decl. ¶¶ 36-40. The harm caused to user-attention due to the excess of receipt notifications in the context of electronic messaging is well documented in the academic literature. Rosenberg Decl. ¶¶ 41-48. This problem of distraction is further unique to the computing environment because people use their computing devices not only for messages but to "listen to music, watch video files, play games, view picture files, surf the internet wirelessly, etc.," so that messages on such a device cannot easily be ignored as with a call or letter. '120 Patent at 7:60-66.

The '120 Patent solves this modern technological problem in a novel way by allowing users to **select** which messages do not trigger notifications, based on "message threads" grouped by, *e.g.*, people or subject-matter. Threads are silenced by setting "a flag … in a data record associated with the message thread"; where a flag is set for an incoming message, "any previously-enabled notification setting(s) may be overridden and notification module 310 may be prevented from producing notifications." *Id.* at 9:35-43. All messages reach the device, but ones belonging to "silenced" threads are "displayed in the inbox in a different manner." *Id.* at 13:28-30; claim 1. Thus, the claims "are directed to an improved user interface for computing devices" – a subject matter expressly held to be patent-eligible by *Core Wireless*. 880 F.3d at 1362. By allowing users to selectively override notification

settings and view "silenced" messages in a visually distinct way, the '120 Patent claims "a particular manner of summarizing and presenting information in electronic devices. . . resulting in an improved user interface for electronic devices." *Id.* at 1362-63; *see also Data Engine*, 906 F.3d at 1008-1010 (Fed. Cir. 2018) (finding not abstract claims to "a specific interface and implementation for navigating complex three-dimensional spreadsheets using techniques unique to computers.").

Defendants cite unavailingly to two non-comparable cases, *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307 (Fed. Cir. 2016) ("*IV/Symantec*"), and *IV/Erie*, for the proposition that claims to filtering emails or merely collecting, classifying, or otherwise filtering data have been held abstract.  Defendants' Memo at 33 (Dkt. 239-1).  These cases are easily distinguishable as the '120 Patent is not directed to collecting, classifying or filtering data.  Instead, the '120 Patent claims the silencing of further notifications for a new message when they belong to a selected thread, and doing so in a *specific* way—using a flag associated with the thread to selectively override a currently-enabled setting.  The claims result in an improvement to the computing device that prevents new message notifications associated with the silenced thread while displaying such messages together with those for non-silenced threads but in a visually distinct way.  Accordingly, the claims of the '120 Patent are squarely non-abstract under *Core Wireless* and *Data Engine*.  *See Data Engine*, 906 F.3d at 1010 (distinguishing *IV/Erie* as not reciting "any specific structure or improvement of computer functionality sufficient to render the claims not abstract.").

## C.    Step 2: The '120 Patent Claims Additional Inventive Elements

### 1.    Silencing New Message Receipt Notifications On A Per-Thread Basis While Still Displaying The Message Was Not Well-Understood, Routine, Or Conventional

As BlackBerry alleged in its First Amended Complaint, a selective-silencing system that accepts all incoming messages represented "an unconventional and technological solution to an issue arising specifically in the context of electronic communications systems" and "a specific and substantial improvement over prior

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

messaging notification systems."  FAC ¶ 282.  BlackBerry has now offered expert testimony, from the perspective of a POSITA, to corroborate this allegation.  Prior to the '120 Patent, preventing notifications for incoming electronic messages was performed, at most, on a wholesale basis.  That is, notifications for incoming electronic messages were provided globally, either for all newly received messages in an application or for none at all.  Rosenberg Decl. ¶¶ 53-55.

Defendants' evidence does not suggest otherwise.  For example, Defendants rely on documentation describing how a user of Microsoft Outlook may use conventional electronic messaging functionality to enable or disable notifications for newly received messages.  Defendants' Memo at 38 (Dkt. 239-1) (citing Jim Boyce, *Microsoft Outlook Version 2002: Inside Out* (2001)).  But the conventional functionality, as depicted in this documentation, allows a user to set a global setting for ***all*** e-mails received—it does ***not*** disclose functionality to silence notifications on a per-thread basis.  Rosenberg Decl. Ex. H, p. 221; Rosenberg Decl. ¶ 54.  As opposed to the conventional method of globally enabling or disabling messages, the '120 Patent provided the non-routine and non-conventional functionality of allowing a user to silence new receipt notifications only for specific message threads.

Defendants rely on the above documentation for the proposition that "new messages received in particular Microsoft Outlook threads or conversations can be ignored such that they do not result in new message notifications."  However, Defendants provide no supporting expert testimony or any support other than bare attorney argument for what such documentation discloses.  A review of the documentation cited by Defendants shows that it makes no mention of silencing notifications.  Rather, it merely states that a user can select to "ignore" a given conversation, which merely results in "exclud[ing] those messages from [the user's] current view."  Dkt. 241-19 at p. 317.  The documentation for the Collabra Share email system likewise only discloses preventing the *display* of new messages for certain threads.  *See* Dkt. 241-20 at p. 170; Rosenberg Decl. ¶ 54.  Not only does this

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

functionality fail to suggest silencing a *notification* as required by the '120 claims, it also contradicts the claimed requirement that, while silencing notifications, the silenced thread be included amongst the displayed items in the users' inbox. Rosenberg Decl. ¶ 59. Thus, even Defendants' own evidence fails to support their assertion that silencing notifications on a per-thread basis while displaying them in an inbox together with non-silenced threads was well-understood, routine, or conventional. Rosenberg Decl. ¶¶ 54-55.

Further, regardless of the disclosures in Defendants' cited documentation, Defendants fail to provide any evidence supporting the contention that such system, or the specifically-cited functionality was well-understood, routine, or conventional. "Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art." *Universal Electronics Inc. v. Roku, Inc.,* 2019 WL 1877616 (C.D. Cal. Mar. 5, 2019) (Selna, J.). Defendants make no effort to sufficient to satisfy their summary judgment burden on an issue of patent invalidity that ultimately requires proof by clear and convincing evidence.

Because the functionality of selectively silencing a message thread while displaying messages belonging to a silenced thread together with non-silenced messages was not well-understood, routine, or conventional, this functionality provides an inventive concept to the '120 Patent.

### 2. Defendants Fail To Consider The Claims Of The '120 Patent As An Ordered Combination

"The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art." *Bascom,* 827 F.3d at 1350. Defendants have failed to provide any evidence or analysis of the '120 Patent's claims as an ordered combination. Rather they provide a single paragraph, citing no evidence or expert testimony, for the bare assertion that "[n]othing about the way elements are combined in the claim changes their ordinary and conventional behavior or otherwise provides an inventive concept." Defendants' Memo at 40 (Dkt. 239-1).

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Defendants latch on to boilerplate language included in the patent's specification to argue that specific combination of elements in the '120 patent are interchangeable. *Id.* However, a plain reading of the patent and its claims shows that the claim's limitations must occur in a specific order as claimed: first, a message is selected for silencing; then, in response to the selection, a flag is activated to indicate the thread has been silenced; then, a new incoming message is received and determined to belong to a message thread flagged as silenced based on the activated flag; then a currently-enabled notification setting is overridden to prevent a receipt notification and the new incoming message is displayed together with messages for non-silenced threads but in a visually distinct manner. This ordering of steps follows a set, logical flow. *See e.g.*, *Mformation Technologies, Inc. v. Research in Motion Ltd.*, 764 F.3d 1392, 1400 (Fed. Cir. 2014) ("As a matter of logic, a mailbox must be established before the contents of said mailbox can be transmitted.").

Therefore, contrary to Defendants' assertions, the '120 Patent claims a particular ordered combination. The ordered combination of the limitations of the '120 Patent's claims provide distinct benefits to a user beyond those provided by the limitations when considered in isolation. Rosenberg Decl. ¶¶ 57-58. Defendants, through their failure to address the ordered combination of the Patents' limitations, have failed to meet their burden of showing by clear and convincing evidence that the '120 Patent provides no inventive concept. *See Vaporstream*, 2018 WL 1116530 at *6 ("Here, Snap has failed to present any evidence showing that the specific combination of the elements performed in the specific order claimed in the patents-in-suit was conventional and generic at the time of the invention in the field of electronic messaging, or in any other field. As a result, this is an additional reason for denying Snap's motion for summary judgment.").

## **CONCLUSION**

For the foregoing reasons, BlackBerry respectfully asks the Court to deny Defendants' its Motion for Summary Judgment as described above.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

DATED: August 9, 2019

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  */s/ James R. Asperger*

QUINN EMANUEL URQUHART & SULLIVAN, LLP
   James R. Asperger (Bar No. 83188)
   jamesasperger@quinnemanuel.com
   865 S. Figueroa St., 10th Floor
   Los Angeles, CA 90017
   Telephone: (213) 443-3000
   Facsimile: (213) 443-3100

   Kevin P.B. Johnson (Bar No. 177129)
   kevinjohnson@quinnemanuel.com
   Victoria F. Maroulis (Bar No. 202603)
   victoriamaroulis@quinnemanuel.com
   555 Twin Dolphin Drive, 5th Floor
   Redwood Shores, CA 94065
   Telephone: (650) 801-5000
   Facsimile: (650) 801-5100

BLACKBERRY CORPORATION
   Edward R. McGah, Jr (SBN 97719)
   Vice President, Deputy General Counsel
   41 Ticknor Place
   Laguna Niguel, California 92677
   Telephone: (+1) 650-581-4750

   *Attorneys for BlackBerry Limited*