1  COOLEY LLP                          COOLEY LLP
2  HEIDI L. KEEFE (178960)             MICHAEL G. RHODES (116127)
   (hkeefe@cooley.com)                 (rhodesmg@cooley.com)
3  MARK R. WEINSTEIN (193043)          101 California Street, 5th Floor
   (mweinstein@cooley.com)             San Francisco, CA  94111-5800
4  MATTHEW J. BRIGHAM (191428)         Telephone: (415) 693-2000
   (mbrigham@cooley.com)               Facsimile:  (415) 693-2222
5
6  3175 Hanover Street
   Palo Alto, CA  94304-1130
7  Telephone:  (650) 843-5000
   Facsimile:    (650) 849-7400
8
9  *Attorneys for Defendants*
10 *FACEBOOK, INC., WHATSAPP INC.,*
   *and INSTAGRAM, LLC*
11
12                    UNITED STATES DISTRICT COURT
13                   CENTRAL DISTRICT OF CALIFORNIA
14
15
16 BLACKBERRY LIMITED,                 Case No.  2:18-cv-01844 GW(KSx)

17                 Plaintiff,          **DEFENDANTS' MEMORANDUM IN
                                       SUPPORT OF MOTION FOR
18 v.                                  SUMMARY JUDGMENT AND
                                       MOTION TO STRIKE**
19
   FACEBOOK, INC.,                     The Hon. George H. Wu
20 WHATSAPP INC., and
   INSTAGRAM LLC,                      Hearing Date:  February 20, 2020
21                                     Time:  8:30 a.m.
22                 Defendants.         Place:  Courtroom 9D
23
24
25
26         **REDACTED VERSION OF DOCUMENT FILED UNDER SEAL**
27
28

# TABLE OF CONTENTS

**Page**

I.    Introduction ..................................................................................................... 1

II.   U.S. Patent No. 7,372,961 ................................................................................ 1

III.  U.S. Patent No. 9,349,120 ............................................................................... 10

    A.    All Accused Products Continue to Provide Visual Notifications......... 11

    B.    Vibration Notification for Instagram for Apple iOS ............................ 14

IV.   U.S. Patent No. 8,209,634 ............................................................................... 15

    A.    Defendants Do Not Infringe the '634 Patent ........................................ 15

        1.    A Conversation or Chat is Not a "Messaging Correspondent".. 18

        2.    BlackBerry's Infringement Theory Is Barred by the Prosecution
             History Generated During the IPR Proceedings....................... 19

    B.    The '634 Patent Is Also Invalid Under § 101 ....................................... 21

V.    U.S. Patent No. 8,429,236 ............................................................................... 23

    A.    The '236 Patent Is Directed to an Abstract Idea (Step 1) .................... 24

    B.    The '236 Patent Recites No Inventive Concept (Step 2) ..................... 25

VI.   U.S. Patent No. 8,301,713 ............................................................................... 27

VII.  U.S. Patent No. 8,677,250 ............................................................................... 29

    A.    The '250 Patent Is Directed to an Abstract Idea (Step 1) .................... 29

    B.    The '250 Patent Recites No Inventive Concept (Step 2) ..................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alice v. CLS Bank Int'l,*
573 U.S. 208 (2014)........................................................................ *passim*

*Aylus Networks, Inc. v. Apple Inc.,*
856 F.3d 1353 (Fed. Cir. 2017) ............................................................. 21

*BSG Tech LLC v. Buyseasons, Inc.,*
899 F.3d 1281 (Fed. Cir. 2018) ......................................................... 9, 27

*Chamberlain Grp., Inc. v. Techtronic Indus. Co.,*
935 F.3d 1341 (Fed. Cir. 2019) ............................................................... 9

*ChargePoint, Inc. v. SemaConnect, Inc.,*
920 F.3d 759 (Fed. Cir. 2019) ......................................... 25, 26, 30, 32

*Interval Licensing LLC v. AOL, Inc.,*
896 F.3d 1335 (Fed. Cir. 2018) ................................................... 10, 28

*Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.,*
811 F.3d 1314 (Fed. Cir. 2016) ................................................. 26, 30, 32

*In re TLI Commc'ns LLC Patent Litig.,*
823 F.3d 607 (Fed. Cir. 2016) ................................................... 26, 30, 32

1

2    **I.      Introduction**

3          Defendants seek summary judgment of no liability with respect to the remaining

4    patents in this lawsuit.  In particular:

5          • Facebook does not infringe the '961 patent, BlackBerry's untimely new

6            infringement theory should be stricken, and the '961 patent is invalid

7            under Section 101;

8          • Defendants do not infringe the '120 patent;

9          • Defendants do not infringe the '634 patent and the '634 patent is invalid

10           under Section 101; and

11         • The '236, '713, and '250 patents are invalid under Section 101.

12   **II.     U.S. Patent No. 7,372,961**

13         **A.      Facebook Does Not Infringe the '961 Patent**

14         BlackBerry asserts the '961 patent against an open source and freely available

15   cryptographic software library known as "OpenSSL." BlackBerry accuses Facebook

16   of infringing claim 2, which depends from (and thus incorporates all limitations of)

17   claim 1.  The first three limitations of claim 1 are reproduced below:

18
19         1. A method of generating a key k for use in a
           cryptographic function performed over a group of order q,
20         said method including the steps of:

21         [a] generating a seed value SV from a random number
22         generator;

23         [b] performing a hash function H( ) on said seed value SV
24         *to provide an output H(SV)*;

25         [c] determining whether *said output H(SV)* is less than
26         said order q prior to reducing mod q ….

27   (Ex. 1, '961, Claim 1, 5:33-41.)  As shown, step 1[b] recites providing "*an output*

28

*H(SV),*" and step 1**[c]** then recites a determining step involving "**said output H(SV),**" referring back to the same "output H(SV)" provided in step 1**[b]**.  In other words, to infringe, the claim requires that "said output H(SV)" involved in the determining step 1**[c]** be the __same__ output H(SV) provided in the performing step 1**[b]**, as BlackBerry's expert admitted.  (Ex. 2, Rubin Depo. 131:13-16; Ex. 3, Katz Decl., Ex. B ¶ 140.)

But BlackBerry cannot demonstrate that Facebook satisfies this critical requirement.  As explained below, BlackBerry's infringement theory relies on a value for the claimed "said output H(SV)" in step 1**[c]** that is __**different**__ from the value BlackBerry identifies as "output H(SV) in step 1**[b]**.  Summary judgment of non-infringement is therefore warranted.

With respect to claim 1**[b]**, all three iterations of BlackBerry's infringement contentions served in this action (from August 2018 through the close of discovery in September 2019) alleged that the OpenSSL infringes step 1**[b]** because "*an output H(SV)*" is the value provided and placed into a variable called "**global storage md**":

Facebook's Accused Instrumentalities perform the step of performing a hash function H( ) on said seed value SV, stored in the location local_md, to provide an output H(SV), which is placed in the global storage md.

(Ex. 4, Ex. 961-1 to Blackberry's Preliminary Infringement Contentions at 10 (highlighting added); Ex. 5, Ex. 961-1 to Blackberry's Final Infringement Contentions, at 21.)  The allegation that "an output H(SV)" for step 1**[b]** was stored in "**global storage md**" was also mirrored in the expert report of BlackBerry's expert, Dr. Aviel Rubin:



(Ex. 6, Rubin Report, ¶¶180-181 (emphasis added); Ex. 3 ¶154.)  Thus, BlackBerry

and Dr. Rubin consistently alleged that the claimed "*an output H(SV)*" in step 1**[b]** is the value that is "**placed in global storage md**."

The implications of this are clear.  Because the subsequent step 1**[c]** recites "determining whether *said output H(SV)* is less than said order q," the "output H(SV)" used in that determining step 1**[c] must** be the <u>**same**</u> output H(SV) provided in step 1**[b]**.  But it is not.  BlackBerry's theory instead relies on an entirely different value.

BlackBerry and Dr. Rubin allege that "*said output H(SV)*" in step 1**[c]** takes the form of a different value known as "**r**."  (Ex. 2 at 202:5-9; Ex. 6 ¶190.)  There is no dispute that "**r**" is a different value from the "**global storage md**" identified as "*an output H(SV)*" in step 1**[b]**.  (Katz Decl., Ex. B ¶¶155-158; Ex. 2 at 208:9 – 209:4 and Exs. 7 and 8, (showing the source code for storing value to global storage md (the identified "an output H(SV)") and the source code for the different value returned as the value "r".) (Exs. 8, 12 to the Rubin Deposition). This was confirmed by a demonstration in Dr. Katz's report showing the accused OpenSSL software outputting actual values of "**global storage md**" (in red below) and "**r**" (in blue):



(Katz Decl., Ex. B ¶¶ 157-158.)  As shown above, although "**global storage md**" and "**r**" are both represented as exceedingly large numbers, their values are not only completely different, but the numbers themselves are not even the same length.

BlackBerry's expert was asked about these results and agreed that the value stored in "global storage md" (the accused "*an output H(SV)*") was not the same as the value "r" (the accused "*said output H(SV)*").  (Ex. 2 at 199:4-10.)  There is no evidence whatsoever that "r" and "global storage md" would ever be the same.  As explained in the next section, BlackBerry's expert realized this while preparing for his deposition (even though Facebook included it as a basis for non-infringement in its

interrogatory responses), and attempted an untimely change to BlackBerry's infringement theory long after expert reports had been served.

As there is no issue of material fact that the accused "*an output H(SV)*" in step 1**[b]** is not the same value used as the accused "*said output H(SV)*" in step 1**[c]**, summary judgment is appropriate.  In fact, this failure not only extends to step 1**[c]**, but to all other subsequent steps in claim 1.  ('961, step 1**[d]** ("accepting *said output H(SV)* for use as said key k...."), step 1**[e]** ("rejecting *said output H(SV)* as said key k...."), step 1**[f]** ("if *said output H(SV)* is rejected...."), step 1**[g]** ("if *said output H(SV)* is accepted....").)  BlackBerry's infringement theory does not rely on "global storage md" with respect to any of these subsequent recitations of "*said output H(SV),*" and thus, does not rely on the same "*output H(SV)*" in step 1**[b]** as the claim requires.  The Court should therefore grant summary judgment.

**B.   BlackBerry's Untimely Attempt to Change its Infringement Theory Raises No Genuine Issue of Material Fact and Should Be Stricken**

Realizing that it has pursued a fatally deficient infringement theory throughout this entire case, BlackBerry recently attempted a wholesale change to its theory of "*an output H(SV)*" in step 1**[b].**  On December 19, 2019, the day before the deposition of its expert, BlackBerry served an unauthorized supplement to its infringement report attempting to change what BlackBerry identifies as "*an output H(SV)*" in step 1**[b].**[1]  This purported supplement came months after the close of discovery, after the service of all expert reports, and after the deposition of Facebook's expert, despite Facebook's disclosure of the non-infringement position in an interrogatory response served well before Dr. Rubin's opening infringement report.  (Ex. 9, Defs. Fourth Suppl. Resp. to 1st Set of Rogs, App. D, at 2 (Aug. 30, 2019) ("… the accused functionality [the determining step] does not operate on the accused H(SV). For example, the accused comparison operates on a value different from the accused H(SV).")   BlackBerry

---

[1] Facebook promptly objected to this clarification.  Facebook also informed BlackBerry that it would be filing this motion to strike.

1   never sought leave to serve a supplemental report, nor provided any prior notice of its

2   intention to do so.  Because BlackBerry's new infringement opinions were untimely,

3   they should be stricken and disregarded and therefore raise no genuine issue for trial.

4        During his deposition, Dr. Rubin explained that, the day prior, he reviewed Dr.

5   Katz's rebuttal report and, in response, decided to make "corrections" to "mistakes"

6   in his report.  (Ex. 2 at 145:17 – 146:11, 148:3-18, 152:4 – 153:10.)  Specifically, Dr.

7   Rubin attempted to change BlackBerry's longstanding infringement theory regarding

8   what corresponds to the claimed "output H(SV)" in step 1**[b]**.  Although Dr. Rubin

9   and BlackBerry attempted to make the document visually look like a deposition errata,

10  there was no avoiding that Dr. Rubin was attempting to completely change his

11  opinions.  (*Id.* at 320:11 – 321:9.)  The supplementation struck the "**global storage**

12  **md**" relied on for step 1**[b],** replaced it with a different value, "buf," and replaced the

13  source code citations in that paragraph to point to different OpenSSL code.  (*Id.* at

14  83:12 – 84:8; *see also id.* at 199:12-18.)  As Dr. Rubin further explained:

15       Q.   Okay.   Now, my question is, You understand that Dr. Katz
16       interpreted your report as alleging that the output HSV was the value
17       placed in GLOBAL storage MD, you understand that's what, how he
         interpreted your report, correct?
18
     THE WITNESS:  That seems to be what he was addressing.
19
20       Q.   Okay.  Now, putting aside that how you interpret your report, you'd
         have to agree that Dr. Katz's interpretation of your report was at least
21       reasonable on this point, correct?
22
     THE WITNESS:  I, *I had used the wrong variable in my report, and*
23   *he responded to the one that I originally had, which makes sense.*

24  (*Id.* at 325:8 – 326:5 (objections omitted).)  The reason BlackBerry chose to simply

25  serve its untimely and unauthorized supplemental expert report rather than seeking

26  leave to amend seems apparent – BlackBerry could never show the requisite "good

27  cause" required for such a supplementation.  Its infringement theory was based on

28

open source OpenSSL code that it had in its possession even before this case was filed.

And although BlackBerry attempted to style the unauthorized supplement as a "clarification," it was not a mere typographical error or mistake, but rather, a change of theory that came far too late. Throughout this case, BlackBerry consistently identified the value of "*an output H(SV)*" as the value stored in the variable "**global storage md**." Identifying an entirely different value for this element of step 1**[b]** (and citing different code to support it) is a clear change from the theory BlackBerry pursued throughout this case. Facebook and its expert have never had an opportunity to respond to this untimely supplement. As a result, BlackBerry's "clarification" should be ignored and Facebook hereby moves to strike it as untimely should the case proceed on the '961 patent. The Court should grant summary judgment of non-infringement of the '961 patent based on the only theory BlackBerry ever timely disclosed and presented in this case.

### C. The '961 Patent Is Also Invalid Under § 101

Under the first step of *Alice,* the '961 patent is directed to the abstract idea of random number generation, and more specifically, generating a random value within a desired range. Generation of random values is a longstanding practice that predates the use of computers. For example, generation of random values is integral to games of chance such as roulette, slots, various games that involve the use of dice (such as craps), among others.

It is also well-known and an abstract idea that techniques for random number generation, whether running on a computer or not, can generate numbers *within a desired range*. For example, a die can be used to generate values from one to six. Roulette wheels typically have 38 pockets, each uniquely identified by some combination of numbers and colors (*e.g.*, black or red). The same is true with computers — computer programming languages and operating systems have long had built-in libraries for generating random values from zero to a maximum value, determined by the number of random bits generated. (Katz Decl., Ex. A ¶¶ 306-307.)

BlackBerry's expert, Dr. Rubin, conceded that the '961 patent does not purport to describe any new technique for generating random numbers; it instead relies on "a known random number generator" that was "not one that was provided new in this patent."  (Ex. 2 at 143:8-12; *id.*, 143:17-18 ("The random number generator itself could be one that already existed in the prior art.").)

In order to obtain random numbers *within a desired range,* the '961 patent employs the old and abstract adage:  if at first you don't succeed, try, try, again.  For example, if one wanted to generate a random number from 1 to 3 using a six-sided die, one could simply roll the die as many times as needed until it showed a number from 1 to 3.  Like the die analogy, a computer can generate random numbers within a specified range by simply (1) generating a new candidate random number, (2) checking to see if the number falls within the specified range, and (3) either accepting the number if it falls within the specified range or going back to (1) to try again until an in-range number is obtained.  (Katz Decl., Ex. A ¶ 309.)

And this is all the claims themselves recite.  Claim 1 recites a method to generate and provide a random value (referred to as "**output H(SV)**") and then determine if that value is less than the desired range ("**order q**").  If it is, the random value is accepted; otherwise the value is rejected and the method repeated until an acceptable number is finally obtained.  (Ex. 1 at claim 1.)  Accordingly, the claims merely apply the abstract idea of repeatedly generating random numbers until one falling within the desired range is obtained – akin to rolling a die repeatedly until it shows a value within the desired range.

BlackBerry will likely lean on the claim's cryptography jargon to make them appear more technologically advanced than they are. (Ex. 11, Rubin Rebuttal Rpt. ¶¶ 237-238.) But it is undisputed that the cryptographic jargon and terminology in the claim reflect well-known concepts of the prior art, including the well-known government Digital Signature Algorithm (DSA) discussed in the specification.  The patent explains that "[t]he basic structure of a public key cryptosystem is well known

and has become ubiquitous with security in data communication systems." (Ex. 1 at
1:10-12.)  The claim steps reciting generation of a key k for use in a cryptographic
function performed over a group of order q, the generation of a random number SV,
and hashing that random number to provide output H(SV), are simply restatements of
what the patent itself and BlackBerry's expert acknowledge were already part of well-
known prior art techniques. (Ex. 2 at 19:13-21:7; Katz Decl., Ex. A ¶ 310 (citing '961,
1:63-64, 2:36-55).)  The claim concludes with the step of "providing said key k for
use in performing said cryptographic function," in other words, the claim simply
"hands off" H(SV) to an unspecified "cryptographic function," whose details are not
recited in the claim.  This terminology may give the '961 patent a veneer of
cryptographic technology, but the concepts they describe are so basic in the world of
cryptography that they do not distinguish the claims from the abstract idea.

To illustrate this point, Facebook's cryptography expert provided an illustration
of what claim 1 of the '961 patent would look like if one struck the generic
cryptographic concepts in the claim, or replaced them with generic placeholders:

> 1. A method of ~~generating a key k for use in a cryptographic function performed over a group of order q, said method~~ including the steps of:
>
> generating a seed value ~~SV~~ from a random number generator;
>
> ~~performing a hash function H() on said seed value SV to provide an output H(SV);~~
>
> determining whether [VALUE] is less than [MAX VALUE] ~~prior to reducing mod q~~;
>
> accepting [VALUE] ~~for use as said key k~~ if the value of [VALUE] is less than [MAX VALUE] ~~said order q~~;
>
> rejecting [VALUE] ~~as said key~~ if said value is not less than [MAX VALUE];
>
> if [VALUE] is rejected, repeating said method; and
>
> if [VALUE] is accepted, providing [for use] ~~said key k for use in performing said cryptographic function, wherein said key k is equal to said output H(SV)~~.

(Ex. 10 ¶ 312.)  As shown, once the well-known and generic cryptographic concepts of the prior art are removed from the claim or replaced with generic placeholders (such as "[VALUE]" and "[MAX VALUE]" for output H(SV) and order q, respectively), the claim makes sense but recites only the abstract idea by (a) "determining" whether a generated random value is less than a given desired range, (b) "accepting" that value if it is less than the given range, and "providing" it to some other process to use, and (c) "rejecting" the value and starting over if it is not less than the given range.  Claim 2 adds nothing for the purposes of § 101 as it merely recites generating another "seed value" similar to the "rejecting" step of claim 1.

BlackBerry may also argue that the '961 patent is not directed to an abstract concept under *Alice* Step 1, and provides an inventive concept under *Alice* Step 2, because the alleged invention was intended to solve a particular problem relating to modulo "bias" in cryptographic key generation.  (Ex. 11 ¶¶ 229, 239.)  But the inventors did not identify this problem – the patent itself credits its identification to a third party (Daniel Bleichenbacher), and there is no evidence that the inventors had any involvement in discovering this issue.  (Ex. 1 at 2:56-61; Ex. 2 at 256:2-20.)  The specification frames the alleged invention in the context of addressing this issue, but the claims go about addressing it by merely reciting the abstract idea – repeatedly generating random numbers until one within the desired range is obtained.

More specifically, the actual steps in the claims merely recite generating a random value, determining if the value falls within the desired range, and then accepting or rejecting the value based on the determination.  The purported benefit, in other words, flows **entirely** from the claim's unadorned recitation of the abstract idea itself.  "It has been clear since *Alice* that a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept."  *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018); *see also Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1349 (Fed. Cir. 2019) ("Wireless

communication cannot be an inventive concept here, because it is the abstract idea that the claims are directed to.").  Stated more simply, a patent claim cannot be said to recite anything meaningfully "beyond" the abstract idea when, as here, its limitations merely restate the abstract idea itself.  *See Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1344 (Fed. Cir. 2018) ("Other software-based claimed inventions… failed to pass section 101 muster, because… the elements of the asserted invention were so result-based that they amounted to patenting the patent-ineligible concept itself.").   The claim limitations here, individually or as an ordered combination, merely restate the abstract idea of repeatedly generating random numbers until an acceptable value is obtained.  The '961 patent is invalid under § 101.

## III.   U.S. Patent No. 9,349,120

The '120 patent purports to describe a technique for preventing ("silencing") notifications for new incoming messages in a selected message thread.   The Background of the '120 patent explains that "[e]lectronic messages, such as electronic mail messages and messages posted to group sites, can be grouped into message threads.  Each message thread can relate to a particular matter such as a particular topic of conversation or an activity."  (Ex. 12 at 1:22-25.)  After a user selects a particular message thread to be silenced, the system silences (i.e., prevents) notifications for new incoming messages in that thread.

BlackBerry's infringement claims under the '120 patent focus on a feature that allows messaging users to "mute" or disable the presentation of certain types of new message notifications.   Although BlackBerry accuses a broad array of products offered by Facebook, WhatsApp and Instagram, its infringement allegations — and the reasons they fail – are substantially similar for each accused product.

Claims 1 and 13 (the two independent claims at issue) both recite the ability to activate a "flag" indicating that a particular message thread has been "silenced." When a new incoming electronic message is received, both claims recite the ability to "*display[] the new incoming electronic message in an inbox together with any*

*message thread not flagged as silenced, <u>while silencing any further notifications</u>*
*<u>pertaining to receipt of the new incoming electronic message</u>*" **[1.g]**, **[13.g]**.  The plain
language of claims 1 and 13 requires that <u>all</u> notifications pertaining to the new
incoming electronic message be silenced or prevented, as well as notifications for any
subsequent new incoming messages in the thread.  (Ex. 13, 12/12/2019 Rosenberg
Depo. at 264:15 - 265:3 (agreeing that "[o]nce a message thread has been silenced
under the '120 patent, all notifications for any subsequent messages in that thread have
to be silenced.").)   The Court construed "notification" as "some form of visual,
auditory, or physical cue to draw attention to an incoming message that would not
otherwise have been noticed, at the time of the incoming message." (ECF No. 157, at
31.)

As demonstrated below, BlackBerry has failed to show that any of the accused
products satisfy this requirement because all accused products continue to provide
notifications upon receipt of new messages in muted chats or conversations.

### A.    All Accused Products Continue to Provide Visual Notifications

All of the accused products continue to provide visual notifications for new
incoming messages – even for messages received in threads that have been muted.
For example, the exemplary screen capture shown below shows a list of conversations
(the alleged "inbox") in Instagram.  (ECF No. 279-7 at ¶¶ 5-8.)   The first listed
conversation (mandylawrence531) has been muted (as shown by the icon 🔇  after
"now"), yet shows the name and message text shown in **boldface** type, with a blue dot
🔵 on the right of that entry in the list.



These visual cues – the boldface type and the blue dot – notify the user that a new incoming message has been received in the "mandylawrence531" conversation, even though the conversation has been muted.  (*Id.*)  The visual cues do not appear next to the second conversation (sarahtoompson) because no new message was received in that conversation.

The accused Facebook and WhatsApp features function in a substantially similar way with respect to displaying chats or conversations in which a new incoming message has been received.  Like Instagram, the accused Facebook and WhatsApp products provide a similar visual cue to the user (such as a blue or green dot, bolded or different colored text, moving the thread to the top of the inbox, etc.) to notify the user that a new incoming message has been received for a particular chat.  (ECF No. 279-6 at ¶¶ 4-5, 7-8 (WhatsApp); ECF No. 279-5 ¶¶ 4-6, 9-10 (Facebook).)  For all of the accused products, the purpose of these visual cues is to draw the user's attention to the fact (i.e. notify the user) that a new message has been received in a particular conversation.  (ECF No. 279-7 at ¶¶ 6, 8; ECF No. 279-6 at ¶ 8; ECF No. 279-5 at ¶¶ 6, 10, 13, 16.)  BlackBerry's own expert admitted that these visual cues are "designed to tell the user that there is a new message in [a] particular thread." (Ex. 14, 08/06/2019

Rosenberg Depo. at 166:16-18.)  Dr. Rosenberg also conceded that the blue dot and bolded font allows the user to visually distinguish message threads that have new messages from those that do not.  (Ex. 13 at 178:10-180:10; *id.*, 180:24-181:1 ("Q. So it allows the user to visually identify which of the various message threads in the list have new messages; correct?  A.  Yes.").)  It is also undisputed that the accused Facebook, Instagram, and WhatsApp products continue to present these new message notifications even with respect to chats or conversations that have been "muted" by the user.  (ECF No. 279-7 at ¶¶ 7-8; ECF No. 279-6 at ¶¶ 7-8; ECF No. 279-5 at ¶¶ 8-11, 15-16; Ex. 13 at 176:21-178:1.)

This is fatal to BlackBerry's theory of infringement.  As explained, both independent claims require, while displaying the new electronic message in an inbox, "silencing *any further notifications* pertaining to receipt of the new incoming electronic message."  ('120, claims **[1.g]**, **[13.g]**.)  It is undisputed that, while displaying the conversation or chat list (the accused "inbox"), the accused products continue to present new message notifications even for chats or conversations that have been muted by the user – precisely what the claim forbids.  As explained below, the fact that the accused products provide these visual cues "while" the accused "inbox" is displayed does not preclude them from qualifying as "notifications."

These visual cues in the accused products are "notifications" under the Court's construction.  The display of colored dots, the bolding or coloring of text, and the like, clearly provide "some form of visual… cue," and as explained, their purpose is to draw the user's attention to the new incoming message that might otherwise have gone unnoticed.  (ECF No. 279-7 at ¶¶6, 8; ECF No. 279-6 at ¶8; ECF No. 279-5 at ¶¶6, 10, 13, 16.)  BlackBerry's expert admitted, in fact, that these visual cues are "designed to tell the user that there is a new message in a particular thread."  (Ex. 14 at 166:16-24.)  Because the accused products continue to present "notifications" for chats or conversations that are muted, BlackBerry cannot show infringement.

### B. Vibration Notification for Instagram for Apple iOS

Instagram for iOS (*e.g.* Apple iPhone) does not infringe for the additional reason that when a new message is received by Instagram for iOS – even for a muted thread – the app creates a noticeable vibration on the user's phone to notify the user of the new message. (ECF No. 279-7 at ¶ 8; Balakrishnan Decl. Ex. B ¶ 369; Ex. 13 at 132:13-134:1.) This vibration clearly qualifies as a "physical cue" to "draw attention to an incoming message that would not otherwise have been noticed, at the time of the incoming message." (Balakrishnan Decl. Ex. B ¶ 369; ECF No. 279-7 at ¶ 8.) The vibration draws the user's attention to an incoming message, which the user might have missed in the absence of the vibration.

BlackBerry's expert conceded that Instagram for iOS provides this vibration upon receipt of a new message – even in a "muted" thread – but argued that the vibration does not qualify as a "notification" under the Court's construction. (Ex. 13 at 132:13-136:22.) Dr. Rosenberg's sole reason for this opinion was that the vibration occurs *when Instagram for iOS displays the user's messaging inbox.* (Ex. 13 at 134:2-136:22.) Dr. Rosenberg opined that such a notification would not meet the "would not otherwise have been noticed" part of the Court's construction because the user is presumably focused on his or her messages if the inbox is displayed. Dr. Rosenberg, in fact, flat out opined that it would be **impossible** for a system to present a "notification" while the inbox is displayed. (*Id.*, 186:12-187:8.) Under his theory, therefore, even if a phone presented a full 4th of July fireworks presentation upon receipt of a new message, that could not be a "notification" if the phone's screen happened to be showing the user's inbox. Dr. Rosenberg relies on this argument not only with respect to the physical vibration provided by Instagram for iOS, but also to argue that the visual cues provided by all accused products (discussed above) are not "notifications." (*Id.*, 176:21-177:8.)

Dr. Rosenberg's opinion raises no issue of material fact because it contradicts the clear claim language and finds no support in the Court's construction. Both claims

1 and 13 expressly contemplate silencing of notifications while the inbox is viewed. Claim 1**[h]**, for example, expressly states: "<u>display the new incoming electronic message in an inbox</u> together with any message thread not flagged as silenced, **<u>while silencing any further notifications pertaining to receipt of the new incoming electronic message</u>**, wherein the new incoming message thread flagged as silenced is displayed in the inbox in a different manner than any message thread not flagged as silenced." (Ex. 12 at claim 1[h].)  The claim thus expressly requires that all notifications be silenced **<u>while</u>** the inbox is being displayed.  This claim language would make no sense if, as Dr. Rosenberg opines, it was categorically impossible to even present a "notification" while the inbox is being displayed.

Second, Dr. Rosenberg's opinion is based on speculation that a user may be staring at the inbox screen at the very moment a new message arrives, and thus, might take notice of the receipt of a new incoming message even without the vibration.  But Dr. Rosenberg's theory ignores the fact that, as he admitted, the Court's construction of "notification" imposes an objective standard that does not depend on what the user happens to be doing at the moment a message is received.  (Ex. 13 at 189:5-16.)  During a previous deposition relating to his declaration in support of BlackBerry's summary judgment motion, in fact, Dr. Rosenberg conceded that "if the user isn't there to sense or feel the vibration, the notification has yet still been provided."  (Ex. 14 at 168:24-169:3.)  Summary judgment is therefore appropriate.

## IV.   U.S. Patent No. 8,209,634

### A.   Defendants Do Not Infringe the '634 Patent

The '634 patent describes a technique for "providing notifications of unread messages on a wireless communication device." (Ex. 16 at Claim 1, preamble.)  The key limitation for purposes of this motion is the final one in claim 1 (the sole independent claim at issue), which recites the step of "*visually modifying at least one displayed icon relating to electronic messaging to include a numeric character representing a count of the plurality of different <u>messaging correspondents</u> for which*

*one or more of the electronic messages have been received and remain unread.*" (Ex. 16 at claim 1[c].)   The Court construed "messaging correspondent" as a "distinct sender of an electronic message." (ECF No. 157, at 25.)

The accused features might be familiar to even casual users.   The accused products can present a numeric value (or "badge") next to an electronic messaging icon.   For example, users of Facebook Messenger might be familiar with a numeric badge that may appear alongside the application's launch icon in the home screen, as shown in the screenshot at right.   (*See* Ex. 17, 12/17/2019 Schonfeld Depo. Ex. 9.)   BlackBerry claims that these messaging-related icons, which can also appear at various places inside the accused Facebook, WhatsApp, and Instagram products, constitute the alleged "*at least one displayed icon relating to electronic messaging,*" for purposes of claim 1.   BlackBerry further contends that the numeric value (e.g. "**1**") qualifies as "*a numeric character representing a count of the plurality of different messaging correspondents for which one or more of the electronic messages have been received and remain unread,*" under claim 1.



1  But BlackBerry's infringement theory fails with respect to all accused products

2  for a simple reason – the accused "numeric

3  character" does **not** represent the number of

4  different messaging *correspondents*.   It instead

5  represents the number of messaging *conversations*

6  (or "chats") that have at least one unread message

7  in them – which has nothing to do with the number

8  of distinct senders of electronic messages.   For

9  example, the screenshot at the right provides "an

10  example of the chat screen that can be presented

11  using Facebook Messenger."  (Ex. 18, Schonfeld

12  Depo. at 132:15-21.)  Like the home screen icon,

13  the bottom of the screen shows an accused icon

14  with a "**1**" that indicates there is one conversation

15  (chat) that has at least one unread message – in this

16  case the one at the top with Carole, Sarah, and Eliza

17  shown with the blue dot.



18  But there can be no dispute that the accused numeric value here (e.g. "**1**") does

19  not tell the user anything about the number of "*different messaging correspondents*

20  (i.e. 'distinct senders of an electronic message') *for which one or more of the*

21  *electronic messages have been received and remain unread*."  In the chat above

22  involving Carole, Sarah, Eliza, for example, one can only tell from the "**1**" that there

23  is **one** *conversation* with at least one or more new messages – and that number tells

24  us nothing about the number of distinct *senders* of the new messages within that

25  conversation.  In fact, Dr. Schonfeld, after looking at the same screenshot shown

26  above, agreed that the number "1" has no relationship to how many new messages in

27  that thread or how many distinct users sent those messages.  (*Id.*, 133:21-25.)

28  Q:   But the number "1" would be the same if there was one new

message in that thread or a thousand, correct?

A:     Yeah.  That's – that's correct.  That's the purpose behind it.

Q.     And so using the same logic as before, this number "1," you can't
tell how many users sent new messages in that thread, correct?

A.     Yeah.  It's the same response I gave before.  We know it's one
thread, one correspondence, but we don't know how many users
within that thread.

Q.     So it could be one, or it could be as many as there are new
messages, correct?

A.     In principle, yeah.  There is nothing limiting it.

(Ex. 18 at 133:21-134:11.)  The accused "numeric character" represents the number
of conversations (or chats) with at least one unread message, not the number of
correspondents (distinct senders) from whom unread messages have been received.
Although the discussion above focuses on Facebook Messenger, the same is true with
respect to all other accused products.  (*Id.* at 139:12-140:4 (WhatsApp), 145:11-146:3
(Instagram); *see also* Balakrishnan Decl. Ex. B ¶¶ 107, 129, 144, 163, 179.)  Summary
judgment is therefore appropriate.

      **1.**    **A Conversation or Chat is Not a "Messaging Correspondent"**

BlackBerry does not explain how a message conversation or chat – as distinct
from the users who participate within it – can itself qualify as a "messaging
correspondent."  A particular chat or conversation is not itself a sender – it is simply
a construct used by the software to collect and organize electronic messages sent by
participating users.  If a particular chat or conversation had 1,000 new messages from
500 distinct senders, to infringe the claim, the claimed "numeric character" would
need to read "**500**."  But in the accused products, it would simply read "**1**," which does
not convey the number of distinct senders.  There is nothing in the '634 patent
specification discussing conversations or chats, let alone suggesting that they could be

1   counted separate and apart from the distinct senders that participate within them.

2   BlackBerry has presented no evidence (or coherent explanation) as to how a chat or

3   conversation itself qualifies as the "sender" of electronic messages.

4      The conflating of chats and conversations

5   with "messaging correspondents" creates other

6   anomalous results as well.  For example, if a

7   single person (Sarah Thompson) sends new

8   messages in three separate conversations or

9   chats, the accused products report the number

10  "**3**" even though there is only one distinct sender

11  of the electronic messages (see right).  (*E.g.*,

12  Balakrishnan Decl. Ex. B ¶¶ 111-112.)  If the

13  accused products practiced the '634 patent

14  (which they do not), they should report the

15  number as "**1**" instead of "**3**."  (*Id.*)



16      **2.    BlackBerry's Infringement**
            **Theory Is Barred by the**
17          **Prosecution            History**
            **Generated During the IPR**
18          **Proceedings**

19

20      Aside from having no support in the claim

21  language or specification, BlackBerry's theory is at odds with its recent statements to

22  the Patent Office in attempting to avoid prior art.  Most recently, Defendants filed an

23  *inter partes* review (IPR) petition (IPR2019-00924) based on a Facebook-reference

24  called Canfield, which was fittingly called "IM Conversation Counter and Indicator."

25  (Ex. 19, Petition, at 16.)  Canfield describes a technique – materially identical to the

26  accused products – in which software can identify the number of instant messaging

27  (IM) sessions or conversations that have new messages.  (*Id.* at 16-17 (quoting

28  Canfield, 1:53-62).)

On July 18, 2019, BlackBerry filed its Preliminary Response in which it successfully distinguished Canfield by drawing a distinction between (1) a number of IM sessions/conversations having new messages, and (2) the claimed number of "messaging correspondents."   BlackBerry argued that the original prosecution "plainly demonstrated that tracking a number of 'messages or conversations' was distinct from the claimed invention."  (Ex. 20, POPR at 7-8.)  BlackBerry further argued that "[t]here is no dispute that instant messaging 'sessions' are not the same as messaging 'correspondents.'"  (*Id.* at 34-35.)  BlackBerry further asserted:

> As an initial matter, it is undisputed that Canfield uses the term "session" to refer to something different than a "messaging correspondent." EX2001, ¶47. Canfield uses the term "sessions" in the context of conversations/windows that are used to send and receive messages, for example. In contrast, "buddies" relied on by Petitioner as disclosing "messaging correspondents" refer to users that may be participants of the "sessions."

(*Id.* at 34-35.)  BlackBerry thus told the PTAB that the IM sessions or conversations were not messaging correspondents, and urged the PTAB not to conflate the IM sessions with the individual senders (buddies) who may participate within those IM sessions.  Like the sessions in Canfield, the chats and conversations in the accused products are in fact "windows that are used to send and receive messages," and they are distinct from the users who participate in them.

The PTAB agreed with BlackBerry's distinction between IM sessions and "messaging correspondents," and based on that distinction, refused to institute IPR:

> Patent Owner responds that the distinction between "sessions" (or conversations) and "senders" is not insignificant. Prelim. Resp. 34−35. The '634 patent describes messaging correspondents as "buddies," which according to Patent Owner, are distinct from the IM sessions they would participate in.  *Id.* Thus, according to Patent Owner, a "session" and "messaging correspondents" are different things and mean different things to a user.  *Id.* at 35−36…

> We agree with Patent Owner that Canfield's "sessions" do not teach the recited "messaging correspondents." Canfield describes typical instant

messaging in which an IM between two users comprises a conversation or an IM session. Ex. 1004, 3:54−58, 3:12−14.  The user sending the IM, or sender, is the "messaging correspondent," according to Petitioner. As stated above, <u>Canfield does not report the number of senders from which messages remain unread. Canfield reports on the user interface the number of sessions with pending unread messages</u>.

(Ex. 21, ID at 14 (emphasis added).)  BlackBerry's statements to the PTAB reinforce the distinction, reflected in the plain language of the claims and the Court's construction, between "messaging correspondents" and the chats or conversations in which they participate.  Under BlackBerry's own reasoning to the PTAB, therefore, the accused products provide different information to the user than the claimed numeric character.

BlackBerry's statements to the PTAB also preclude its infringement theory under the doctrine of prosecution disclaimer.  *See Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1362 (Fed. Cir. 2017) (holding that "statements made by a patent owner during an IPR proceeding, whether before or after an institution decision, can be considered for claim construction and relied upon to support a finding of prosecution disclaimer.").  As explained above, BlackBerry made a clear and unequivocal distinction to the PTAB between IM sessions/conversations and the claimed "messaging correspondents."  And it made these arguments against a prior art reference that worked, for purposes of the numeric character limitation, identically to the accused products.  BlackBerry cannot now reclaim coverage over the very technique it successfully distinguished in convincing the PTAB not to institute IPR.

## B. The '634 Patent Is Also Invalid Under § 101

Under the first step of *Alice*, the '634 patent is directed to the abstract idea of identifying the number of messaging correspondents (distinct senders) from whom unread messages were received.  The number of messaging correspondents is simply a piece of information, like a number of new messages or the identity of the persons from whom messages were received.  The concept of identifying the number of

distinct senders ("five people called while you were out") is obviously not limited to computers, and is an abstract idea.

BlackBerry will no doubt argue that the '634 patent describes an improved user interface for a small handheld mobile electronic device. But this argument is without basis. The Court rejected BlackBerry's argument that the claim is limited to a small-screen wireless device, explaining that the term "wireless communication device" broadly encompasses any device that could be adapted for wireless communication. (ECF No. 157, at 20-21.) The '634 patent does not purport to have invented electronic messaging using wireless devices, either, as the specification acknowledges commercially-available messaging systems, such as AOL Instant Messenger and Microsoft Network (MSN), and their use on wireless devices. (Ex. 16 at 1:53-58.) The claims also recite the use of an application icon for notifications, but the specification acknowledges this was already known in the art. (*Id.* at 1:41-48.) That the '634 patent did not invent visually modifying an icon on a computing device with a numeric character—including on a wireless communication device—is also confirmed by the prosecution history of the '634 patent. (*E.g.*, Balakrishnan Decl. Ex. A ¶¶ 110,117 .) In allowing the claims, in fact, the Examiner cited the numeric character that "represents a count of the plurality of different messaging correspondents for which one or more of the electronic messages have been received and remain unread" – the abstract idea – as the sole basis for allowing the claims over the prior art. (Ex. 22, 03/30/2012 Notice of Allowance at 2, ¶ 1.)

Nor do the claims of the '634 patent recite any inventive concept under Step 2 of *Alice*. They recite only the routine and conventional use of well-known, generic computing components and techniques. This is confirmed by both the claims themselves and the specification of the '634 patent—neither provides particular detail regarding a concrete technological implementation for how to carry out the idea of visually modifying an icon with the claimed numeric character. The asserted claims simply recite a "wireless communication device" with a "graphical user interface" that

includes an icon that is visually modified. The specification provides no detail to teach the reader, for example, how to visually modify an icon displayed on a graphical user interface, or how to count the number of messaging correspondents from whom at least one unread message has been received. (Balakrishnan Decl. Ex. A ¶ 351.)  The specification discusses including a bubble corresponding to the number of unread messages ('634, 8:1-8), but does not even teach how to count the number of messaging correspondents from whom an unread message has been received – it instead treats it as an afterthought.  (*Id*., 8:8-13 ("Persons of ordinary skill in the art will appreciate that a visual modification 400 different from a bubble may be used and the count may represent other information, such as the number of correspondents or 'buddies' from which one or more messages have been received but remain unread.").)

Dependent claim 6 further includes the step of displaying "at least one preview of content associated with at least one of the received electronic messages," which does not alter the abstract idea.  The claim recites no details about how to create or display the claimed "preview," and the ability to display previews of messages was a well-known feature of popular messaging applications such as the MSN Messenger product mentioned in the '634 specification.  (Balakrishnan Decl. Ex. A ¶¶ 205, 70.)

## V.    U.S. Patent No. 8,429,236

The title of the '236 patent concisely states what the patent purports to cover – "Transmission of Status Updates Responsive to Status of Recipient Application." (Ex. 23, '236 at face page)  The asserted claims, 15 and 17, recite little more than this concept.  Claim 15 recites:

> 15.    A mobile communications device, comprising:
>
> a mode selector configured to determine whether a recipient application is actively processing status updates and to select a message transmission mode based on whether the recipient application is actively processing status updates; and
>
> a message generator configured to generate status messages and to cause transmission of status messages from the mobile

communications device to a recipient application using the
selected message transmission mode.

(*Id*., claim 15)  Claim 17 depends from claim 15 and further recites, "wherein the
mode selector comprises a component to observe a local database for a record in the
database, the record comprising an indication that the recipient application is actively
processing status updates."  (Ex. 23 at claim 17)

### A.   The '236 Patent Is Directed to an Abstract Idea (Step 1)

The '236 patent is clearly directed to an abstract idea under Step 1 of *Alice*.
One of the named inventors, Gary Klassen, concisely summarized the subject matter
of the '236 patent at his deposition – ████████████████████ (Ex. 24,
Klassen Depo. at 207, Q. 850.)  This concept is not limited to computers, as it applies
to any real-world situation in which a person decides not to communicate with another
person because the other person is not listening, in other words, "don't waste your
breath." ████████████████████████████████████████
████████████████████████████████████████████
████████████  (*Id.* at 211, Q. 862.)

The asserted claims here are remarkable in their lack of any meaningful
technological detail.  Claim 15 recites a "recipient application," which the parties have
agreed broadly refers to "software, hardware, component, or collection of components
that processes status updates from a mobile communications device and generates an
output based on the status updates."  (ECF No. 157 at 9.)  Claim 15 further recites a
"mode selector" and a "message generator," both of which are depicted in the patent's
figures as nondescript blank boxes.  (Ex. 23, Fig. 1; *id.* at 6:11-14.)  The specification
merely parrots the claim language and makes clear that the "mode selector" and
"message generator" can be anything that carries out their associated functionality.
(*Id.* at 6:22-26, 11:38-43, 12:10-14.)  Similarly, the specification makes clear that
conventional database technologies are used in a routine and conventional manner –
storing, monitoring, and retrieving data.  (Weissman Decl. Ex. A ¶ 182.)  The claims

are thus clearly directed to the abstract idea of sending status messages to a recipient application only when the recipient application is actively processing them.

BlackBerry will no doubt argue that the '236 patent is directed to a technological improvement that reduces battery consumption.  Although this may have been a goal of the alleged invention, the Federal Circuit has repeatedly emphasized the § 101 analysis must focus on the claims themselves.  *E.g.*, *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766 (Fed. Cir. 2019).  To the extent practicing the '236 patent would provide conservation of battery power, that is a benefit that flows solely from the abstract idea itself, rather than any specific technique recited in the claims.  The Court recognized this principle when it rejected BlackBerry's argument that targeted advertising results in savings in bandwidth and processing.  The Court explained that "these <u>results of practicing the abstract idea</u> <u>cannot be used to support patent eligibility</u>."  (ECF No. 487 at 11 (emphasis added).)

Refraining from communicating with another person who is not listening, of course, inherently has a benefit of saving energy (*e.g.*, "don't waste your breath"). But the claims themselves do not go beyond this abstract concept.  They merely recite the abstract idea of "select[ing] a message transmission mode based on whether the recipient application is actively processing status updates," *i.e.* whether the other person is listening, and generating status messages "using the selected message transmission mode."  (Ex. 23, claim 15.)  The claims do not specify any particular technique for carrying out this abstract concept.

### B.    The '236 Patent Recites No Inventive Concept (Step 2)

With respect to the "inventive concept" analysis, the '236 patent's claims do not add "significantly more" to the abstract idea of "don't talk when no one is listening."  As explained above, the limitations of the asserted claims, at most, reflect the routine and conventional use of well-known, commercially-available technologies and practices for performing an abstract idea.  (Weissman Decl. Ex. A  ¶¶ 183, 184.) Nothing in the patent suggests that the inventors came up with any new type of

communications protocols, database technology, or made any technological advancement in the area of mobile devices or communications. (Weissman Decl. Ex. A ¶ 182.) To the contrary, the '236 patent acknowledges that mobile communications devices already supported applications that used data generated or collected at the device for including in status updates. (Ex. 23 at 1:21-28, 2:46-48.) The patent also acknowledges numerous commercially-available wireless networks for mobile device data transmission that a device can connect to using "well-known devices for connecting to networks," as well as commercially-available positioning services, such as GPS. (Ex. 23 at 25:19-35, 25:63-26:14, 26:43-52.) The patent further makes clear that conventional database technologies, such as SQL, may be used. (Ex. 23, 16:54-65; Weissman Decl. Ex. A ¶ 182.)

Generic computing components are not sufficient to transform the claims into patent-eligible subject matter. *E.g.*, *Alice v. CLS Bank Int'l*, 573 U.S. 208, 226 (2014) ("data processing system," "communications controller," and "data storage" were "purely functional and generic" and supplied no inventive concept); *see also, e.g.*, *Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324-25 (Fed. Cir. 2016) ("[T]he claims 'add' only generic computer components such as an 'interface,' 'network,' and 'database.' These generic computer components do not satisfy the inventive concept requirement."); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) ("physical components" such as a "telephone unit" and a "server" merely provided a "generic environment in which to carry out the abstract idea"); *ChargePoint*, 920 F.3d at 774-75, 770 (apparatus claims reciting a "control device," "transceiver," "controller," and "remote server" invalid under § 101).

Considering the claims as an ordered combination does not change this conclusion. At most, the steps recite an order that a person of ordinary skill in the art would find logical and would expect – first, the "mode selector" determines whether the recipient application is actively processing status updates to select a message

transmission mode, and then the "message generator" uses the selected mode to generate and transmit messages.  (Weissman Decl. Ex. A ¶ 187.)  This merely recites the same sequence one would use to carry out the abstract idea in any context – in order to carry out the principle of "don't talk when no one is listening," of course, one should first determine if someone is listening before deciding whether or not to talk.  And as noted, the routine and conventional use of a database is added in claim 17, and does not add anything meaningful.  *E.g.*, *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1287-88 (Fed. Cir. 2018) (claims reciting a particular data classification, or even changes in "the organization of information in the database … are not improvements to database functionality," but rather mere "benefits that flow from performing an abstract idea in conjunction with a well-known database structure.").

## VI.   U.S. Patent No. 8,301,713

The Court's order of August 21, 2018 granted a motion to dismiss and found the independent claims of the '713 patent invalid under § 101.  (ECF No. 68, at 12-18.)   The Court declined to reach the dependent claims because "they include references to 'resumption messages' and other concepts that have not been sufficiently addressed by [Defendants] and which have been raised by BlackBerry, making it inappropriate to extend the patent ineligibility determination to those claims."  (*Id.* at 18.)  As explained below, those additional claims add nothing meaningful to the § 101 analysis, and should be found invalid for the same reason as the independent claims.

As a result of the Court's order, the only remaining claim asserted is dependent claim 4, which depends from claims 3, 2, and 1:

> 2. The method of claim **1**, wherein the input is a resumption message.
>
> 3. The method of claim **2**, further comprising outputting in the electronic conversation a second indication representative of at least a portion of the resumption message.
>
> 4. The method of claim **3**, wherein the time stamp is disposed between the first indication and the second indication.

(Ex. 25, '713, claims 2-4.)  There is nothing in any of these dependent claims that would justify any deviation from the § 101 ruling with respect to claim 1.

Claim 2 merely recites that "the input" from claim 1 "is a resumption message." After the Court's previous § 101 ruling on the '713 patent, the parties stipulated that a "resumption message" is simply a "message after a period of interruption."  (ECF No. 157, at 9.)  This limitation adds nothing meaningful to the subject matter of claim 1.  Invalidated claim 1 already recites the step of detecting an input after "determining that a predetermined duration of time has elapsed," so it should come as no surprise that claim 2 would clarify that "the input" is a resumption message.

Claim 3 merely recites the step of outputting (at least a portion) of the resumption message.   This adds nothing meaningful to the subject matter of invalidated claim 1, which already recites "outputting an electronic conversation comprising a plurality of indications, each indication being representative of at least a portion of a corresponding messaging communication…."  (Ex. 25 at Claim 1[a], 8:50-54.)  Because invalidated claim 1 already recites output of multiple messaging communications (or portions of them), this additional step in claim 3 adds nothing meaningful – it simply extends the output from claim 1 to the "resumption message."

Finally, claim 4 recites that "the time stamp is disposed between the first indication [*i.*e. the first messaging communication in claim 1] and the second indication [*i.e.* the resumption message of claims 2-3]."  This also adds nothing meaningful because invalidated claim 1 already recites "outputting in the electronic conversation, a time stamp representative of the second time."  (Ex. 25 at Claim 1[e], 9:1-3.)  Displaying a time stamp that is "disposed between" the two messages is a routine design decision that does not involve any technological improvement.  *See Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1346 (Fed. Cir. 2018) ("[T]he claims do not recite any arguably inventive method of how the secondary information is displayed, such as what portion of the screen is utilized or how the primary activity on the screen is monitored.")  Because there is no dispute of material fact, Defendants

1    are entitled to judgment as a matter of law that claim 4 of the '713 patent is patent

2    ineligible under § 101.

3    **VII.   U.S. Patent No. 8,677,250**

4        **A.    The '250 Patent Is Directed to an Abstract Idea (Step 1)**

5        BlackBerry asserts claims 9 and 14 of the '250 patent against Defendants.  The

6    '250 patent is directed to the abstract idea of sending and receiving messages about

7    game play between at least two players.  The subject matter of the patent embodies

8    the basic and longstanding concept of correspondence gaming, in which two players

9    participate in a game (by making moves or taking turns, depending on the game)

10   through some type of long-distance messaging communication channel, such as postal

11   mail ("chess by mail"), email, or other forms of communication.  (Weissman Decl.

12   Ex.       A        ¶      188;       *see*       *also*       Exs.       27       and       28

13   [https://en.wikipedia.org/wiki/Correspondence_chess],

14   [https://www.guinnessworldrecords.com/world-records/longest-game-of-

15   correspondence-chess/].)  These communication channels allow players to participate

16   in game play even if they are not physically near each other.  This concept is

17   acknowledged in the '250 patent's background discussion, which describes

18   participating in turn-based games intermittently while engaging in other tasks.  (Ex.

19   26 at 1:45-57.)

20       The asserted claims of the '250 patent are not directed to a technological

21   improvement.  Instead, they attempt to address a general *human* problem.  (Weissman

22   Decl. Ex. A ¶ 190.)  For example, the '250 patent observes that "[a] user may play

23   more than one game at a time or play a game in a non-linear manner, leaving a game

24   interface to perform other tasks such as email, calendar review, etc." (Ex. 26 at 1:53-

25   55.)   This observation applies beyond instant messaging and game play on an

26   electronic device.  For example, it also applies to correspondence chess.  The patent

27   asserts that, as a result, "[i]t is desirable to provide an interface to games in progress."

28   (Ex. 26 at 1:55-56.)  Again, the same idea applies to correspondence chess – a person

1    can interact with multiple ongoing games.

2         The asserted claims do not provide any technological improvement.  Instead,

3    they use only generic instant messaging components, including a "contact list," or

4    recite the use of functionality provided by those components, such as "displaying"

5    instant messages or "communicating" messages using the instant messaging system

6    of the messaging application.  (Weissman Decl. Ex. A ¶ 190.)  In fact, the '250 patent

7    itself acknowledges that, by the filing date of the '250 patent, instant messaging (IM)

8    was a "popular" form of communication with others using devices such as personal

9    computers, mobile telephones and personal data assistants.  (Ex. 26 at 1:23-30.)  The

10   '250 patent also acknowledges that "IM applications and IM games are commercially

11   available (e.g. AIM™ from AOL, Yahoo! Messenger™, MSN Messenger™, etc.) for

12   many platforms…."  (Ex. 26 at 13:2-7.)  The exemplary IM applications and IM games

13   identified in the specification were well-known to persons of ordinary skill in the art –

14   and the general public – before the filing date of the '250 patent.  (Weissman Decl.

15   Ex. A ¶ 189.)  For example, AOL Instant Messenger (AIM) had more than 53 million

16   users  as  of  2005,  and  MSN  Messenger  had  about  29  million.    (Ex.  29

17   [http://old.seattletimes.com/html/businesstechnology/2002497821_webmicrosoftaol

18   15.html].)  One of the inventors of the '250 patent confirmed that ██████████████

19   ████████████████████████████████████████████████████████ (Ex. 24,

20   pp.133-134, Q 531, Q 532, Q 533.)

21        Because the limitations of the asserted claims are specified at a high-level and

22   in  functional  terms,  they  make  clear  that  their  focus  is  not  on  any  particular

23   technological  improvement,  but  on  addressing  the  general  human  problem  of

24   communicating and resuming game play.  *E.g.*, *In re TLI Commc'ns*, 823 F.3d at 611

25   ("physical components" such as a "telephone unit" and a "server" merely provided a

26   "generic environment in which to carry out the abstract idea"); *see also Alice*, 573

27   U.S. at 226; *Mortg. Grader*, 811 F.3d at 1324-25; *ChargePoint*, 920 F.3d at 774-75,

28   770.  For example, claim 9 recites "enabling a game application on the electronic

device to utilize a contact list for an instant messaging application for playing games with contacts in the contact list by identifying game play in the contact list," which states a merely functional end result and does not specify *how* the game application is supposed to carry out this function.  With this claim limitation, and the ones that follow, the claim does not specify the mechanism by which the "instant messaging application" and the "game application" interact with one another.  (Weissman Decl. Ex. A ¶ 191.)   The next limitations recite preparing game messages and communicating them "using an instant messaging system used by the instant messaging application," without specifying any mechanism by which the game messages are prepared and communicated.  The remaining two limitations both recite "displaying," the first requiring display of "at least one instant message in an instant messaging conversation user interface associated with the particular contact indicative of game progress, the instant messaging conversation user interface enabling additional instant messages to be sent to the particular contact in addition to instant messages indicating game play."  This simply recites the basic concept of using a conventional IM system to receive and display messages about gaming – and other topics – which applies the basic concept of using a generic communications channel to send gaming and non-gaming related content.  In other words, it takes the generic concept of correspondence gaming (such as chess by mail) and applies it to the instant messaging context.  (Weissman Decl. Ex. A ¶ 191.)   The second "displaying" limitation in the claim merely requires displaying the "game in progress user interface" after the user has decided to switch to the game.  The patent does not provide any details about this user interface – the details of the game itself are outside the scope of the patent.  (Weissman Decl. Ex. A ¶ 191.)

The other asserted dependent claims similarly fail to describe any specific technology for carrying out the functions.  (Weissman Decl. Ex. A ¶ 192.)  Claim 12, for example, recites instructions for "associating a contact list entry in the contact list with a game in progress associated with the game messages," without specifying how

the association is supposed to take place.  Claim 13 recites "instructions for displaying the game in progress user interface upon detecting selection of the contact list entry associated with the game in progress," but as noted, the actual game play itself falls outside the scope of the patent.  Finally, claim 14 recites "instructions for maintaining the game progress data upon switching away from the game in progress user interface to enable the game in progress to be resumed upon a re-invocation of the game in progress user interface," which comprises basic and conventional storage of information.  Even in correspondence gaming such as chess by mail, the game progress data must be maintained by both parties to know what moves have already been made, before they resume game play.  The claim does not specify any particular technology of maintaining game progress data.

### B.    The '250 Patent Recites No Inventive Concept (Step 2)

The '250 patent's claims add nothing "significantly more" to the abstract idea of sending and receiving messages about game play between at least two players.  As explained above, the limitations of the asserted claims, at most, reflect the routine and conventional use of well-known, commercially-available technologies and practices for performing an abstract idea.  (Weissman Decl. Ex. A ¶ 189.)  Generic computing components are not sufficient to transform the claims into patent-eligible subject matter.  *E.g.*, *Alice*, 573 U.S. at 226; *see also, e.g.*, *Mortg. Grader*, 811 F.3d at 1324-25; *In re TLI Commc'ns*, 823 F.3d at 611; *ChargePoint*, 920 F.3d at 774-75, 770.

Nothing in the "ordered combination" of the claim elements supplies an inventive concept.  The steps at most recite an order that a person of ordinary skill in the art would find logical and would expect.  (Weissman Decl. Ex. A ¶ 193.)  The order of the steps mirrors the steps one would expect in carrying out correspondence gaming techniques in the "real" (non-computer based) world.  (*Id.*)

Date:  January 7, 2020

By:  */s/ Heidi L. Keefe*
Heidi L. Keefe (178960)