1   COOLEY LLP                           COOLEY LLP
2   HEIDI L. KEEFE (178960)              MICHAEL G. RHODES (116127)
    (hkeefe@cooley.com)                  (rhodesmg@cooley.com)
3   MARK R. WEINSTEIN (193043)           101 California Street, 5th Floor
    (mweinstein@cooley.com)              San Francisco, CA  94111-5800
4   MATTHEW J. BRIGHAM (191428)          Telephone: (415) 693-2000
    (mbrigham@cooley.com)                Facsimile:  (415) 693-2222
5
6   3175 Hanover Street
    Palo Alto, CA  94304-1130
7   Telephone:   (650) 843-5000
    Facsimile:    (650) 849-7400
8
9   *Attorneys for Defendants*
10  *FACEBOOK, INC., WHATSAPP INC.,*
    *and INSTAGRAM, LLC*
11

12                      UNITED STATES DISTRICT COURT
13                     CENTRAL DISTRICT OF CALIFORNIA
14

15
16  BLACKBERRY LIMITED,                  Case No.  2:18-cv-01844 GW(KSx)

17                  Plaintiff,           **DEFENDANTS' REPLY IN SUPPORT
                                         OF MOTION FOR SUMMARY
18  v.                                   JUDGMENT AND MOTION TO
                                         STRIKE**
19
20  FACEBOOK, INC.,
    WHATSAPP INC., and                   The Hon. George H. Wu
21  INSTAGRAM LLC,
                                         Hearing Date:  February 20, 2020
22                  Defendants.          Time:  8:30 a.m.
                                         Ctrm:  9D
23

24

25

26          <mark>REDACTED VERSION OF DOCUMENT</mark>

27

28

# TABLE OF CONTENTS

**Page**

I.    U.S. PATENT NO. 7,372,961 ........................................................................ 1

    A.    The '961 Patent is Not Infringed Under the Theory BlackBerry Has Asserted Throughout This Case, and BlackBerry Should Not Be Allowed to Change Its Theory Now .................................................. 1

    B.    The Sole Asserted '961 Patent, Claim 2, is Invalid Under § 101 ......... 3

II.    U.S. PATENT NO. 9,349,120 ...................................................................... 5

III.    U.S. PATENT NO. 8,209,634 ...................................................................... 9

    A.    Summary Judgment of Non-Infringement Should Be Granted ............ 9

    B.    The Asserted Claims Are Invalid Under 35 U.S.C. § 101 .................. 11

IV.    U.S. PATENT NO. 8,429,236 .................................................................... 12

V.    U.S. PATENT NO. 8,301,713 .................................................................... 14

VI.    U.S. PATENT NO. 8,677,250 .................................................................... 15

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Alice Corp. Pty. v. CLS Bank Int'l*,
573 U.S. 208 (2014)......................................................................... 4, 5, 12, 15

*Ancora Techs. v. HTC Am.*,
908 F.3d 1343 (Fed. Cir. 2018) ........................................................ 5, 13

*Aptalis Pharmatech, Inc. v. Apotex Inc.*,
718 F. App'x 965 (Fed. Cir. 2018) ....................................................... 11

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
788 F.3d 1371 (Fed. Cir. 2015) ............................................................ 13

*Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) ........................................................... 14

*BSG Tech v. Buyseasons*,
899 F.3d 1281 (Fed. Cir. 2018) .............................................................. 4

*ChargePoint, Inc. v. SemaConnect, Inc.*,
920 F.3d 759 (Fed. Cir. 2019) ............................................................... 12

*Core Wireless Licensing SARL v. LG Elecs.*,
880 F.3d 1356 (Fed. Cir. 2018) ........................................................... 16

*Data Engine Techs. LLC v. Google LLC*,
906 F.3d 999 (Fed. Cir. 2018) ............................................................. 16

*Datamize, LLC v. Plumtree Software, Inc.*,
417 F.3d 1342 (Fed. Cir. 2005), *abrogated on other grounds*
*Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014) ........................... 8

*Elec. Power Grp. v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016) ....................................................... 4, 11

*Halliburton Energy Servs., Inc. v. M-I LLC*,
514 F.3d 1244 (Fed. Cir. 2008) ........................................................... 13

# TABLE OF AUTHORITIES
(continued)

**Page**

*Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*,
   540 F.3d 1337 ........................................................................................ 7

*Intellectual Ventures I v. Capital One Bank*,
   792 F.3d 1363 (Fed Cir. 2015) ............................................................ 14

*Intellectual Ventures I v. Capital One Fin.*,
   850 F.3d 1332 (Fed. Cir. 2017) ............................................................. 4

*Interval Licensing v. AOL, Inc.*,
   766 F.3d 1364 (Fed. Cir. 2014) ......................................................... 8, 9

*Invitrogen Corp. v. Clontech Labs., Inc.*,
   429 F.3d 1052 (Fed. Cir. 2005) ........................................................... 14

*MAZ Encryption Techs. v. Blackberry*,
   No. 13-304-LPS, 2016 WL 5661981 (D. Del. Sept. 29, 2016) ............. 5

*Mortg. Grader v. First Choice Loan Servs.*,
   811 F.3d 1314 (Fed. Cir. 2016) ....................................................... 5, 13

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014) ............................................................................... 8

*PersonalWeb Tech. v. Google*,
   No. 13-cv-1317, 2020 WL 470189 (N.D. Cal. Jan. 29, 2020) .............. 4

*Saffran v. Johnson & Johnson*,
   712 F.3d 549 (Fed. Cir. 2013) ....................................................... 10, 11

*Sitrick v. Dreamworks*,
   516 F.3d 993 (Fed. Cir. 2008) ............................................................... 5

*SRI Int'l v. Cisco Sys.*,
   930 F.3d 1295 (Fed. Cir. 2019) ....................................................... 5, 13

*In re TLI Commc'ns LLC Patent Litig.*,
   823 F.3d 607 (Fed. Cir. 2016) ................................................. 12, 14, 15

*Trading Techs. Int'l, Inc. v. IBG LLC*,
   921 F.3d 1378 (Fed. Cir. 2019) ........................................................... 15

# TABLE OF AUTHORITIES
(continued)

**Page**

*Two-Way Media v. Comcast Cable Commc'ns,*
  874 F.3d 1329 (Fed. Cir. 2017) .......................................................................... 4, 5

*Uniloc USA, Inc. v. ADP, LLC,*
  772 F. App'x 890 (Fed. Cir. 2019) ...................................................................... 14

**Statutes**

35 U.S.C. § 101 ................................................................................ 3, 5, 11, 15

DEFENDANTS' REPLY ISO
MOTION FOR SUMMARY JUDGMENT

Defendants submit the following reply in support of their motion for summary judgment and motion to strike:

## I.  U.S. Patent No. 7,372,961

### A.  The '961 Patent is Not Infringed Under the Theory BlackBerry Has Asserted Throughout This Case, and BlackBerry Should Not Be Allowed to Change Its Theory Now

BlackBerry does not dispute that under the only theory it advanced throughout this case—that the accused value for "output H(SV)" in claim 1[b] is the value stored in the global variable md—Facebook does not infringe the '961 patent.  The Court should grant summary judgment of non-infringement with respect to this theory.[1] Whether BlackBerry should be allowed to change its theory should be decided separately from the issue of summary judgment.  For the reasons explained below, it should not be permitted to do so.

BlackBerry's opposition argues that Facebook and its expert were "mistaken" in interpreting BlackBerry's infringement theory as alleging that the value placed in "global storage md" was the accused H(SV) in step 1[b].  (Opp. at 2.)  But this is precisely what BlackBerry said, both in its infringement contentions and in the report of its expert, Dr. Rubin.  For example, BlackBerry's infringement contentions stated:



(Opp., Ex. E at 21 (emphasis added); *see also* ECF 552 at 2 (excerpt from preliminary infringement contentions served in September 2018 including the same allegation).) And BlackBerry's expert report said substantially the same thing:

---

[1] As explained in Defendants' opposition to BlackBerry's motion to exclude Dr. Katz, Defendants properly disclosed this non-infringement position.  (*See* ECF 600.)

1    (Opp., Ex. A, ¶181 (highlighting added).)   BlackBerry's identification of "global

2    storage md" was not a mere typo as BlackBerry claims.  Following and in support of

3    the statement that output H(SV) ████████████████████████ Dr. Rubin's report

4    included a block of source code that included line 533 below, which ████████████

5

6

7

8

9

10

11    (ECF 552-14, Katz Decl., Ex. B at 70-71, ¶155 (citing Rubin Report and identifying

12    ███████████████████████████████████

13    ██████████ ; *see also, e.g.,* Opp., Ex. E at 23 (showing citation to code in the

14    infringement contentions).)  Dr. Rubin's source code citations were entirely consistent

15    with BlackBerry's repeated and unequivocal allegation that the accused H(SV) in

16    claim 1[b] is the value placed in the global variable md.

17          The crux of BlackBerry's argument is that Facebook should have discovered

18    BlackBerry's mistake, based on the "context" and "entirety" of its infringement

19    theory, and disregarded BlackBerry's express allegations.  But the statements quoted

20    above identifying "global storage md" as the claimed "output H(SV)" are the <u>only</u>

21    <u>statements in BlackBerry's contentions or expert report that actually tie the accused</u>

22    <u>source code to the "output H(SV)" limitation in claim 1[b]</u>.  BlackBerry and its expert

23    never cited or referred to "buf" as the claimed output H(SV).  (Opp., Ex. E at 24

24    (including source code that includes a formula for the variable "buf" but no allegation

25    that "buf" is the value H(SV)); *id.* at 13, 24-31 (including allegations for other claim

26    limitations and no allegations that these are related to H(SV) in limitation 1[b]); Opp.,

27    Ex. A, ¶¶ 184-85 (copying the infringement contentions at 24 to describe some code

28    that includes buf, but never tying that code to the value H(SV)).)   Nothing in

BlackBerry's contentions or expert report called into question the explicit allegation that global md is the accused H(SV).  As for Facebook's reasonable reliance on that allegation in its response, Dr. Rubin acknowledged:



(ECF 552-2, 325:18-326:5.)

BlackBerry's attempt to shift the blame to Facebook should be rejected.  It was BlackBerry's responsibility as the patentee to understand what it accused and to diligently investigate non-infringement positions clearly provided in discovery.  As explained in Facebook's opening brief and in its opposition to BlackBerry's motion to strike relating to Dr. Katz, Facebook explicitly informed BlackBerry in its interrogatory responses—months before service of its opening expert report—that the code it identified for the "determining" step "operates on a value different from the accused H(SV)."  (ECF 552-5 at 2.)

The prejudice from this late change in theory is clear.  Facebook and its expert relied on and responded to the specific allegations made by BlackBerry—which even Dr. Rubin acknowledged ██████████████ (ECF 552-2, 325:18-326:5.)  Dr. Rubin made his changes after service of Dr. Katz's report and after his deposition, giving Dr. Katz no opportunity to respond.  If the Court were to permit BlackBerry to change its infringement theory *after* the service of all expert reports, Facebook's expert would need an opportunity to provide a supplemental report to respond to them.  BlackBerry's change simply came too late and would be too prejudicial.

## B.    The Sole Asserted '961 Patent, Claim 2, is Invalid Under § 101

BlackBerry argues "the claims of the '961 Patent are directed to a specific solution for generating secure cryptographic keys that overcomes the Bleichenbacher vulnerability."  (Opp. at 9.)  But the sole asserted method claim uses only "result-

based functional language" to require the generic results of "determining" whether a generated random value is less than a given desired range, "accepting" that value if it is less than the given range, and "providing" it to some other process to use, and "rejecting" the value and starting over if it is not less than the given range. (Mot. at 8-9.[2]) Such a basic concept, embodied in a method claim reciting only abstract, functional results, is not patent-eligible subject matter. *E.g.*, *Elec. Power Grp. v. Alstom S.A.*, 830 F.3d 1350, 1351, 1354-55 (Fed. Cir. 2016) ("lengthy" claims reciting "functions" but no actual improvement in computer technology); *Two-Way Media v. Comcast Cable Commc'ns*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) (claim required functional results, but did not "sufficiently describe how to achieve [the] results in a non-abstract way"). Under *Alice* step 1, when the claims are properly "[s]tripped of excess verbiage," the claims are "directed to" nothing more than the abstract idea of generating a random value within a desired range, no different in substance than generating random values in games of chance, such as roulette or craps. *Intellectual Ventures I v. Capital One Fin.*, 850 F.3d 1332, 1339 (Fed. Cir. 2017); *PersonalWeb Tech. v. Google*, No. 13-cv-1317, 2020 WL 470189, at *1-5, *13 (N.D. Cal. Jan. 29, 2020) (invalidating claims applying a cryptographic hash function).

   At *Alice* step 2, BlackBerry mistakenly argues that Defendants "waived" any argument that the ordered combination was unconventional. (Opp. at 10.) But Defendants' opening brief plainly argued the "claim limitations here, whether individually or *as an ordered combination*, merely restate the abstract idea of repeatedly generating random numbers until an acceptable value is obtained." (Mot. at 10 (emphasis added).) "If a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed" into patent-eligible subject matter. *BSG Tech v. Buyseasons*, 899 F.3d 1281, 1290-91 (Fed. Cir. 2018); Mot. at 9-10; ECF 552-14, Katz Decl., Ex. A,

---

[2] Claim 2 generates another value like the abstract "rejecting" step of claim 1.

¶¶ 61-77, 81-86, 305-312.  The concepts in the asserted claim are so basic, they do not distinguish the claim from the abstract idea itself.  (Mot. at 8.)  BlackBerry itself is unable to articulate any "inventive concept" in claim 2.

Nor does BlackBerry identify any actual "factual dispute" over *Alice* step 2.  (*See* Opp. at 10.)  BlackBerry simply invokes "Ex. B ¶¶ 238-240, 243," but conclusory expert testimony is not sufficient to defeat summary judgment.  *E.g.*, *Sitrick v. Dreamworks*, 516 F.3d 993, 1001 (Fed. Cir. 2008); *Mortg. Grader v. First Choice Loan Servs.*, 811 F.3d 1314, 1325-26 (Fed. Cir. 2016) (affirming grant of summary judgment of § 101 invalidity despite expert declaration).  Nothing recited in claim 2 "transform[s] the abstract idea into something more" that is patent eligible.  *Two-Way Media*, 874 F.3d at 1339.[3]

## II.  U.S. Patent No. 9,349,120

BlackBerry has struggled throughout this litigation to explain why the visual cues provided by all accused products (blue dot, bolded text, etc.), and the additional physical cue provided by Instagram (vibration), do not qualify as "notifications" under the '120 patent.  Every single time BlackBerry has spoken about this issue, it has abandoned earlier theories and offered new explanations, and its opposition here is no exception.  But BlackBerry's shifting arguments cannot change the undisputed operation of the accused products and the lack of any issue of material fact.

BlackBerry argues that the fact that its earlier motion for summary judgment failed means that Defendants' motion should suffer the same fate.  (Opp. at 10-11.)  But BlackBerry bears the burden of establishing infringement and the record has changed considerably since BlackBerry's motion.  For example, in arguing that the visual cues provided by Defendants' products were not "notifications," BlackBerry's

---

[3] BlackBerry's cited cases are unavailing.  *E.g.*, *SRI Int'l v. Cisco Sys.*, 930 F.3d 1295, 1304 (Fed. Cir. 2019) (improved "technical functioning of the computer"); *Ancora Techs. v. HTC Am.*, 908 F.3d 1343, 1349 (Fed. Cir. 2018) (same); *MAZ Encryption Techs. v. Blackberry*, No. 13-304-LPS, 2016 WL 5661981, at *7 (D. Del. Sept. 29, 2016) (specific implementation requiring "two-table limitations").

1    earlier motion spent several pages attempting to analogize those cues to the numeric

2    counter mentioned in the Court's claim construction order and pointing to excerpts of

3    the prosecution history.  (ECF 317 at 17-21.)[4]  The Court rejected both arguments.

4    (ECF 468 at 50 ("BlackBerry's reliance on portions of the intrinsic record in crafting

5    its arguments appears somewhat irrelevant, given that the bolding and blue dot in

6    Facebook Defendants' example from the accused instrumentalities is different than

7    simply adding a numeric counter.").)  BlackBerry's opposition here largely abandons

8    those points and relies on new arguments.  And those arguments either lack any

9    evidentiary support in the record or rely on incorrect legal arguments.

10        ***Visual Notifications***:  With respect to the visual cues, BlackBerry argues that

11   they "were not intended to draw attention *at the time the message is received.*"  (Opp.

12   at 11 (italics in original).)  But BlackBerry does not even argue that there is any delay

13   between the receipt of a new message and the presentation of these visual cues.  The

14   parties are in full agreement that these visual cues appear simultaneously with receipt

15   of the incoming message.  (ECF 552-12, ¶6; ECF 552-11, ¶5; ECF 552-10, ¶6; ECF

16   540-18 Ex. 14, 161:23-162:2 ("Q. So at the time that the message comes in [] the

17   message chat is displayed with both the blue dot and with the blue coloring of the time

18   value. Correct? A. That's correct.").)

19        BlackBerry also makes much of the fact that Defendants' internal documents

20   do not specifically refer to these visual cues as "notifications."  The way the visual

21   cues work is undisputed, and the Court has provided an express construction of

22   "notifications."  Whether those undisputed visual cues are described internally as

23   "notifications" is irrelevant to whether they meet the Court's express definition.

24        BlackBerry next makes a new claim construction argument—that the visual

25   cues provided by the accused products cannot be "notifications" because the claim

26

27   ---

     [4]  BlackBerry inaccurately states that it brought its motion for summary judgment
28   "after the close of fact discovery" (Opp. at 1).  BlackBerry filed its motion on July 18,
     2019 (ECF 247), approximately six weeks before the close of fact discovery.

separately recites the ability to display a silenced message thread "in a different manner" from a non-silenced thread.  (Opp. at 12-13.)  But nothing in the Court's claim construction or the patent specification suggests that a visual notification cannot be manifested as a change in the way a message thread appears in the inbox.  The "displayed… in a different manner" limitation provides a way to visually distinguish silenced from non-silenced threads.   The visual cues provided by the accused products, on the other hand, appear identically for both muted and non-muted threads.[5]

BlackBerry also argues that Dr. Rosenberg provided "credible testimony that a POSITA would not consider minor visual differences such as bolded text and blue dots to be notifications in light of the examples in the patent." (Opp. at 13.)  But these are just legal arguments about the meaning of "notifications," dressed up as expert testimony.   BlackBerry's argument appears to be that the phrase in the Court's construction, "*that would not otherwise have been noticed*," requires a cue that is more shocking, jarring or otherwise more intrusive than what the accused products' visual cues provide.  But the Court's construction does not impose any such requirement.  The visual cues (e.g., blue dot, bolded text, etc.) clearly draw the user's attention to message conversations with new messages, and BlackBerry does not dispute that without them, a user could not visually distinguish a conversation that has new messages from one that does not.  (ECF 552-7, 181:16-182:9.)

***Instagram Vibration Notifications:***   Even if the Court were to find factual issues with respect to the visual cues, <u>it must grant partial summary judgment with respect to Instagram</u>.  BlackBerry's opposition doubles down on the sole argument it has, that the haptic vibration is not a "notification" because it occurs while the

---

[5]   BlackBerry also argues the inventor testified that the patent was intended to prevent what he called "verbose" notifications.  (Opp. at 13.)  But the Court has provided an express definition of "notifications" that Mr. Kalu admitted that he had never seen. (Keefe Decl. Ex. 35, 164:24-165:24.)  Mr. Kalu's testimony is thus irrelevant to the meaning of "notifications."  *See Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.,* 540 F.3d 1337, 1347 (Fed. Cir. 2008) ("[I]nventor testimony as to the inventor's subjective intent is irrelevant to the issue of claim construction.").

DEFENDANTS' REPLY ISO
MOTION FOR SUMMARY JUDGMENT

1   Instagram inbox is displayed on the screen.

2       BlackBerry's argument should be rejected because, aside from having no

3   support in the claim language as explained in Defendants' opening brief, it turns the

4   definition of "notification" into a *subjective* inquiry into whether or not a user would

5   be *distracted* by the particular visual or physical cue in question.  For example,

6   BlackBerry argues that the purpose of the patent is to "prevent unwanted notifications

7   that would distract a user in situations where the user is not focused on the messaging

8   application," and thus, "[a] haptic bump that is provided only when the application is

9   opened and navigated to the inbox would not provide such a distraction from other

10  tasks." (Opp. at 13-14 (emphasis added).)  In other words, a user who happens to be

11  staring at her Instagram inbox is already focused on her messaging application, and

12  thus, a new message vibration does not provide a "distraction" from that task.

13      Putting aside that the concept of "distraction" is found nowhere in the Court's

14  construction or the patent specification (which does not contain even one instance of

15  the word "distraction" or any variant of it), BlackBerry's argument is entirely

16  subjective—it would cause the definition of "notification" to turn on what a human

17  operator happens to be doing at the moment the vibration occurs.  If the inbox is

18  displayed but the user happens to be doing something else (or for some other reason

19  is not looking directly at her phone), then a new message vibration could certainly

20  provide "a distraction from other tasks." (*Id.*)

21      The Court should also reject BlackBerry's argument because it would render

22  the claims indefinite under § 112.  The Federal Circuit has made clear that claims are

23  indefinite when their scope turns on the subjective experience of a human operator.

24  *See, e.g.*, *Interval Licensing v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014);

25  *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1349-50 (Fed. Cir. 2005),

26  *abrogated on other grounds Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898

27  (2014.  For example, the Federal Circuit in *Interval Licensing* held that the claim

28  phrase, "**unobtrusive manner that does not distract a user**," was indefinite in a

claim directed at presenting information to a user through a computer display. The Federal Circuit found the phrase "highly subjective" and cited with approval the district court's observation that "whether something distracts a user from his primary interaction depends on the preferences of the particular user and the circumstances under which any single user interacts with the display." *Interval Licensing*, 766 F.3d at 1371. The court found the phrase indefinite because it "offers no objective indication of the manner in which content images are to be displayed to the user." *Id.* BlackBerry's arguments about requiring "distraction" of the user urge the Court to create § 112 infirmities in the '120 patent, by rendering the applicability of the term "notification" dependent on how end users perceive the physical and visual cues provided by the accused products.

## III.   U.S. Patent No. 8,209,634

### A.   Summary Judgment of Non-Infringement Should Be Granted

BlackBerry's opposition rests on the false premise that Defendants' motion relies on limiting "messaging correspondents" to "users." (Opp. at 17.) It does not. The motion instead relies on the fact that BlackBerry cannot show that the accused numeric character represents the number of "distinct senders" as required by the claim.

BlackBerry's exposition of the claim construction process conspicuously avoids the key point raised here—how is a conversation or chat itself a "distinct sender of an electronic message"? As Defendants' opening brief explained, messages within a conversation or chat are sent by the individual participating users. (Mot. at 22.) BlackBerry does not argue that the chat or conversation *itself* ever sends messages.

BlackBerry argues that "newly received messages are sorted into separate line items in the recipient's inbox," i.e., based on chats or conversations. (Opp. at 18.) But BlackBerry does not explain how the on-screen display of a chat or conversation has anything to do with how the messages were sent—or by whom.

9

DEFENDANTS' REPLY ISO
MOTION FOR SUMMARY JUDGMENT

1
2
3
4

5          Finally, BlackBerry's opposition attempts to obscure this issue by coining a

6   new phrase about sending a message "*on behalf of* a group conversation," to somehow

7   suggest that a group conversation may be regarded as a distinct sender.  (Opp. at 18.)

8   But BlackBerry does not dispute that the individual participants of a group

9   conversation are the entities that actually send the messages.  The fact that messages

10  may be *associated* with a group conversation does not make the group conversation

11  itself into the sender of those messages.

12         BlackBerry's revisionism with respect to its statements to the PTAB should also

13  be rejected.  BlackBerry said more than enough to confirm that its infringement theory

14  falls outside the scope of the claims.  *See Saffran v. Johnson & Johnson*, 712 F.3d

15  549, 559 (Fed. Cir. 2013) ("[A]pplicants rarely submit affirmative disclaimers along

16  the lines of 'I hereby disclaim the following ...' during prosecution and need not do so

17  to meet the applicable standard.").  BlackBerry does not deny (a) that it expressly

18  argued to the PTAB that the "IM sessions" in Canfield are not "messaging

19  correspondents," and (b) that it cannot identify any material difference between the

20  IM sessions in Canfield and the chats and conversations in the accused products.

21         BlackBerry instead tries to recast its arguments to the PTAB as a response to

22  Defendants' obviousness argument that there could be a one-to-one correspondence

23  between the number of IM sessions in Canfield and the number of distinct senders

24  (i.e. for IM sessions that only had two members).  (Opp. at 19-20.)  But BlackBerry

25  made arguments about that issue *in addition* to its argument on pages 34-35 of its

26  Patent Owner Response that the IM sessions in Canfield were simply not "messaging

27  correspondents."  (ECF 540-24, at 36-40.)  Federal Circuit law is clear that "an

28  applicant's argument that a prior art reference is distinguishable on a particular ground

1   can serve as a disclaimer of claim scope even if the applicant distinguishes the
2   reference on other grounds as well." *Saffran*, 712 F.3d at 559 (citation omitted).
3   BlackBerry should be held to its clear statements that the "IM sessions" in Canfield—
4   which are indistinguishable from the accused conversations and chats—are not
5   "messaging correspondents."

6        BlackBerry's statements to the PTAB are relevant irrespective of whether they
7   rise to the level of disclaimer. *See, e.g.*, *Aptalis Pharmatech, Inc. v. Apotex Inc.*, 718
8   F. App'x 965, 971 (Fed. Cir. 2018) (prosecution history relevant even in the absence
9   of disclaimer).  The fact that BlackBerry consistently distinguished "IM sessions"
10  from the participating "messaging correspondents" in that session further supports
11  Defendants' argument.

12        **B.      The Asserted Claims Are Invalid Under 35 U.S.C. § 101**

13        Nothing in the patent specification suggests that counting and reporting the
14  number of messaging correspondents (i.e. distinct senders) is any less abstract than
15  simply counting the number of new or unread messages.  The specification itself
16  mentions this feature only in passing as an alternative to counting the number of
17  unread messages.   (ECF 540-20, Ex. 16 ('634), 8:4-13 ("In this exemplary
18  embodiment, the new IM message is indicated with a visual modification **400**
19  comprising… a numeric indicator '1' representing a count of… unread messages.
20  Persons of ordinary skill in the art will appreciate that… the count may represent other
21  information, such as the number of correspondents or 'buddies' from which one or
22  more messages have been received but remain unread."), 8:13-29.)  Nothing in the
23  specification suggests that counting the number of messaging correspondents
24  improved the computer.  It instead describes a particular type of information that the
25  claimed invention collects and presents to a user.  *See Elec. Power Grp.,* 830 F.3d at
26  1353 ("Information as such is an intangible.  Accordingly, we have treated collecting
27  information, including when limited to particular content (which does not change its
28  character as information), as within the realm of abstract ideas.") (citations omitted).

1    Nor has BlackBerry raised any issue of fact with respect to the "inventive
2 concept" prong of *Alice*.  BlackBerry does not dispute that mobile devices, presenting
3 information by modifying an icon associated with electronic messaging, and the
4 ability to access unread messages, were all routine, conventional, and well-understood
5 concepts.  (Mot. at 25-26.)  BlackBerry does not explain how the whole of the
6 limitations is greater than the sum of its well-known parts.  BlackBerry also makes no
7 separate arguments with respect to dependent claim 6.

8 **IV.    U.S. Patent No. 8,429,236**

9    BlackBerry cannot seriously dispute that the asserted claims of the '236 patent
10 are directed to an abstract idea and lack any meaningful technological detail.
11 BlackBerry instead improperly focuses on the patent's specification.    *E.g.*,
12 *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766 (Fed. Cir. 2019).  But far
13 from showing that the claims are "limited to a specific and concrete technical
14 implementation" as BlackBerry contends (Opp. at 24), BlackBerry's specification
15 cites are filled with high-level, functional language that often simply parrots the
16 claims—and confirms that the claims are directed to an abstract idea.  *In re TLI*
17 *Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016) ("The specification
18 fails to provide any technical details for the tangible components, but instead
19 predominately describes the system and methods in purely functional terms.").

20    For example, BlackBerry points to a passage describing the "recipient
21 application" as "any software, hardware, component, or collection of components that
22 processes status updates…."  (Opp. at 24 (citing '236, 2:55-3:6).)  Another passage,
23 nearly verbatim of claim language, describes the "mode selector" as "any component"
24 "operable to determine whether the recipient application 250 is actively processing
25 status updates from the mobile communications device" and "to select a message
26 transmission mode."  (*Id.* (citing '236, 6:22-34).)  Similarly, the "message generator"
27 is something "operable to generate status messages comprising status updates and
28 cause the status messages to be transmitted to the recipient application 250 using the

1    selected message transmission mode." (*Id.* (citing '236, 6:34-38).)

2        BlackBerry also improperly points to the specification to contend that "[t]he
3    '236 Patent presents no threat of preemption that would suggest that BlackBerry has
4    tried to claim an abstract idea." (Opp. at 23.)  Still, the high-level, functional language
5    of the claims (and specification), clearly raises preemption concerns—other than
6    having a "mode selector" to determine if someone is listening or not and a "message
7    generator" to transmit in accordance with that determination, how would a device
8    implement the abstract idea of "don't talk when no one is listening"? *E.g.*, *Halliburton*
9    *Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1256 n.7 (Fed. Cir. 2008) (overbreadth
10   and preemption effects "inherent in open-ended functional claims, ...which
11   effectively purport to cover any and all means so long as they perform the recited
12   functions.").  In any event, "[w]hile preemption may signal patent ineligible subject
13   matter, the absence of complete preemption does not demonstrate patent eligibility."
14   *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015).

15       BlackBerry argues that the '236 patent "claims a particular technique ...
16   directed towards solving a particular problem (*i.e.*, conserving battery life and system
17   resources)" (Opp. at 24), but as explained in Defendants' opening brief, to the extent
18   practicing the '236 patent would conserve battery power, that benefit would flow
19   solely from the abstract idea itself, and cannot be used to support patent eligibility.
20   (Mot. at 25.)  Thus, the *SRI* and *Ancora* cases cited by BlackBerry are inapposite
21   because, unlike here, the claims in those cases recited specific technological
22   implementation details for solving specific technological problems.  *SRI Int'l.*, 930
23   F.3d at 1301, 1303; *Ancora Techs.*, 908 F.3d at 1346, 1348-49.

24       BlackBerry's claim that a dispute between the parties' technical experts
25   precludes summary judgment should also be rejected.  (Opp. at 26.)  "The mere
26   existence in the record of dueling expert testimony does not necessarily raise a genuine
27   issue of material fact."  *Mortg. Grader*, 811 F.3d at 1325-26.  The opinions of
28   Defendants' technical expert are amply supported by the '236 patent itself as well as

other sources.  (ECF 540-3, ¶¶ 53-57, 70-71.)  The Court is under no obligation to find that the competing *ipse dixit* testimony of BlackBerry's technical expert raises a genuine issue of material fact.  *See Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1080-81 (Fed. Cir. 2005) ("A party does not manufacture more than a merely colorable dispute simply by submitting an expert declaration asserting that something is black when the moving party's expert says it is white; there must be some foundation or basis for the opinion.").

Lastly, BlackBerry is wrong that the claims "represent the kind of inventive techniques that the Federal Circuit has repeatedly held pass muster under Alice Step Two."  (Opp. at 26.)  Unlike *Bascom* and *Uniloc* cited by BlackBerry, where the Federal Circuit found an inventive concept in the ordered combination of components[6], here the claim steps recite an order that a person of ordinary skill in the art would find logical and expect.  (Mot. at 26-27.)  Steps that "do nothing more than spell out what it means to 'apply it on a computer' cannot confer patent-eligibility."  *TLI*, 823 F.3d at 615 (quoting *Intellectual Ventures I v. Capital One Bank*, 792 F.3d 1363, 1371-72 (Fed Cir. 2015)).

## V.    U.S. Patent No. 8,301,713

BlackBerry attempts to expand the agreed-upon claim construction of "resumption message" by arguing that an "interruption" must be a "non-trivial break." (Opp. at 27.)  But it is too late to undo stipulated constructions.  BlackBerry has also not shown how this change would make any difference; even if a resumption message required more than a "non-trivial break," it would still encompass small and large lapses in time, and therefore, would add nothing meaningful to the subject matter of the claim.  (*See* ECF 68 at 15.)  Claims 3 and 4 add nothing meaningful as to formatting and display over claim 1.  These claims in no way limit the size of the time

---

[6] *See Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016); *Uniloc USA, Inc. v. ADP, LLC*, 772 F. App'x 890, 899 (Fed. Cir. 2019).

stamp or conserve screen real estate; they merely direct that a time stamp be "disposed between" the two claimed messages.  This language provides no technological improvement to the user interface.  Claim 4 is invalid under § 101.

## VI.    U.S. Patent No. 8,677,250

BlackBerry claims that there is "ample technological detail to ground the claims in a specific technological improvement to then-existing instant messaging technology." (Opp. at 30)  But as explained in Defendants' opening brief, the alleged technological detail represents basic features of the concept of correspondence gaming applied to an IM environment.[7]  (Mot. at 31-32.)  And because the "then-existing instant messaging technology" simply serves as a particular technological environment in which the concept is implemented, it cannot confer eligibility.  *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 222 (2014) ("[T]he prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment").

BlackBerry's assertion that the claims are directed to specific solutions to technological problems is not supported by the claims or specification.  The '250 patent does not purport that there were technological problems preventing the integration of a game application and IM system.  *E.g.*, *TLI*, 823 F.3d at 612 ("[T]hey are directed to the use of conventional or generic technology in a nascent but well-known environment, without any claim that the invention reflects an inventive solution to any problem presented by combining the two."); *see also Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1378, 1384 (Fed. Cir. 2019) ("The claims are focused on providing information to [users] in a way that helps them process information more quickly ... not on improving computers or technology.").  Rather, as explained in Defendants' opening brief, the '250 patent recognized a general *human* problem

---

[7] BlackBerry focuses on the "identifier" limitation, but that limitation is just like *TLI's* "classification information" that was transmitted with images and used to determine how to handle them.  *TLI*, 823 F.3d at 610, 614.

regarding participating in turn-based games intermittently while engaging in other tasks (Mot. at 29) and addressed it with known and generic IM components and functionality.  (Mot. at 32; ECF 540-3, ¶¶ 189-192, 61-63 (describing prior art, including use of an icon to indicate an IM user's game play).)  *Data Engine* and *Core Wireless*, cited by BlackBerry, are inapposite because the claims in those cases *were* held to be directed to addressing specific technological problems.  *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1008 (Fed. Cir. 2018) ("…specific solution to then-existing technological problems in computers and prior art electronic spreadsheets"); *Core Wireless Licensing SARL v. LG Elecs.*, 880 F.3d 1356, 1363 (Fed. Cir. 2018) ("…specific manner of displaying a limited set of information to the user, rather than using conventional user interface methods…").

BlackBerry is also wrong that Dr. Weissman did not provide an opinion as to "whether the specific limitations relating to the interaction between game and IM applications—whether individually or in an ordered combination—recite routine conventional technologies and practices." (Opp. at 32.)  Dr. Weissman, for example, explained that the asserted claims use "generic instant messaging components, including a 'contact list,' or recite using functionality provided by those components, such as 'displaying' instant messages or 'communicating' messages using the instant messaging system used by the instant messaging application." (ECF 540-3, ¶ 190; *see also id.*, ¶¶ 191-193.)  He further explained that the claims "recite an order that a person of ordinary skill in the art would find logical and would expect." (ECF 540-3, ¶ 193.)  While BlackBerry offers dueling testimony of its technical expert, the Court need not find that his unsupported testimony raises a genuine issue of material fact.

1    Date:  February 6, 2020                    RESPECTFULLY SUBMITTED,

2
                                                */s/ Heidi L. Keefe*
3                                               Heidi L. Keefe (178960)

4
                                                COOLEY LLP
5                                               HEIDI L. KEEFE (178960)
                                                (hkeefe@cooley.com)
6                                               MARK R. WEINSTEIN (193043)
                                                (mweinstein@cooley.com)
7                                               MATTHEW J. BRIGHAM (191428)
                                                (mbrigham@cooley.com)
8                                               3175 Hanover Street
                                                Palo Alto, CA  94304-1130
9                                               Telephone:   (650) 843-5000
                                                Facsimile:    (650) 849-7400
10
11
                                                COOLEY LLP
12                                              MICHAEL G. RHODES (116127)
                                                (rhodesmg@cooley.com)
13                                              101 California Street, 5th Floor
                                                San Francisco, CA  94111-5800
14                                              Telephone:  (415) 693-2000
                                                Facsimile:   (415) 693-2222
15
16
                                                Attorneys for Defendants
17                                              FACEBOOK, INC., WHATSAPP INC.,
                                                and INSTAGRAM, LLC
18
19
20
21
22
23
24
25
26
27
28